JUDGE CAPRONI

Dale M. Cendali
Joshua L. Simmons
Jordan M. Romanoff
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
jordan.romanoff@kirkland.com

## 19 CV 7913

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRONICLE BOOKS, LLC; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS LLC; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SCHOLASTIC INC.; AND SIMON & SCHUSTER, INC. | Case No. _____ <br><br> ECF Case |
| Plaintiffs, | |
| - against - | **COMPLAINT** |
| AUDIBLE, INC. | |
| Defendant. | |

Plaintiffs Chronicle Books, LLC ("Chronicle"), Hachette Book Group, Inc. ("Hachette"),

HarperCollins Publishers LLC ("HarperCollins"), Macmillan Publishing Group, LLC.

("Macmillan"), Penguin Random House LLC ("PRH"), Scholastic Inc. ("Scholastic"), and

Simon & Schuster, Inc. ("S&S") (collectively, "Publishers" or "Plaintiffs"), by and through their

attorneys, Kirkland & Ellis LLP, for their Complaint, hereby allege against Defendant Audible,

Inc. ("Audible") as follows.

## NATURE OF THE ACTION

1.      Audible, Inc. unilaterally—without permission from or any notice to Publishers—has decided to introduce a new, unauthorized, feature for its mobile application called, "Audible Captions."  Audible Captions takes Publishers' proprietary audiobooks, converts the narration into unauthorized text, and distributes the *entire* text of these "new" digital books to Audible's customers.  Audible's actions—taking copyrighted works and repurposing them for its own benefit without permission—are the kind of quintessential infringement that the Copyright Act directly forbids.

2.      All of the Publishers are member companies of the Association of American Publishers, the mission of which is to be the voice of American publishing on matters of law and public policy.  Plaintiffs are seven of the world's preeminent publishers, and the exclusive publishers and licensees of tens of thousands of the world's most sought after authors and books. Plaintiffs have collectively spent hundreds of years cultivating well-established sales, licensing and other distribution channels through which books are provided in different formats, e.g., print books, eBooks, and audiobooks, resulting in a vibrant marketplace, of books and ways to consume them.  They have been able to do so because of the protections of the Copyright Act and its aim "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

3.      Despite these protections, and despite not holding the rights necessary to do so, Audible seeks to seize for itself a competitive advantage against other audiobook providers who are not violating copyright law, and to cut Publishers out from a business model that already exists, by unlawfully creating derivative works of, reproducing, distributing, and publicly

displaying unauthorized copies of the Works.[1]  Audible did not seek a license for the creation

and provision of the transcriptions provided to consumers (the "Distributed Text"), does not plan

to compensate Publishers or their authors for this feature, nor will it allow them to decide what

titles will be made available as Distributed Text.  Moreover, Audible Captions does not maintain

the quality control that readers have come to expect from Publishers and authors.  Indeed,

Audible has admitted to Publishers that up to 6% of the Distributed Text may contain

transcription errors, the equivalent of 18 full pages of a 300-page book (6,000 errors in a 100,000

word book).  And, critically, Audible Captions could directly compete with both books (physical

and eBooks) and authorized cross-format (incorporating both text and audio) products, the latter

which benefit consumers by not relying on faulty transcription technology and for which

Publishers and authors are compensated.

　　　　4.　　　　If Audible is not enjoined, Audible will take for itself a format of digital

distribution it is not authorized to provide, devalue the market for cross-format products, and

harm Publishers, authors, and the consumers who enjoy and rely on books.  To avoid these

results, Publishers asked Audible not to launch the Distributed Text with Publishers' Works and

suggested that Audible limit the Distributed Text to works in the public domain.  Audible

rebuffed those good faith attempts at resolution and, upon information and belief, intends to

launch its new feature on September 10, 2019—a few weeks from now.  Accordingly, due to

Audible's refusal to cease and desist or to prevent these imminent harms, Publishers have no

choice but to file this lawsuit.

---

[1] "Works," as used herein, is defined further in Paragraph 36.

## PARTIES

5.      Publishers are seven of the preeminent trade publishers in the United States, responsible for developing, publishing, distributing, and marketing tens of thousands of titles a year, spanning a wide variety of topics.

6.      Plaintiff Chronicle is a publishing company, having its principal place of business in San Francisco, and is qualified to do business and is doing business in the State of New York and in this District.  With over fifty years of history, Chronicle publishes approximately 300 titles every year, and has a print and digital catalog of thousands of titles.  Writing across dozens of genres, Chronicle authors, including, among others, Dave Effers, David Borgenicht, Katherine Paterson, Snoop Dogg, Annie Barrows and Gary Soto, are winners of the Pulitzer Prize, the Golden Kite Award, the Caldecott and Newbery Medals, Coretta Scott King Award, and the National Book Award.

7.      Plaintiff Hachette is a publishing company, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District.  Hachette has been publishing books since 1837, and its publishing brands currently include Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; Public Affairs; Orbit; FaithWords; and Center Street. Hachette's books and authors have garnered major awards including Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes.  Hachette's bestselling authors have been published all over the world and include David Baldacci, Michael Connelly, Malcolm Gladwell, Elin Hilderbrand, N. K. Jemisin, Stephenie Meyer, James Patterson, J.K. Rowling, Nicholas Sparks, Rick Steves, Donna Tartt, and Malala Yousafzai.

8.      Plaintiff HarperCollins is a publishing company, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of

New York and in this District.  With over two hundred years of history and more than 120

branded imprints around the world, HarperCollins publishes approximately 10,000 new books

every year in 16 languages, and has a print and digital catalog of more than 200,000 titles.

Writing across dozens of genres, HarperCollins' authors are winners of the Nobel Prize, the

Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man

Booker Prize.

       9.     Plaintiff Macmillan is a publishing company, having its principal place of

business in New York City, and is qualified to do business and is doing business in the State of

New York and in this District.  Macmillan is part of a global trade publishing group operating

worldwide, with trade publishing companies in the United States, Germany, the United

Kingdom, Australia, South Africa, and India.  Macmillan operates eight divisions in the US:

Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company;

Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press and Tor/Forge.

Its writers, including, among others, Jeff VanderMeer, Senator Elizabeth Warren, James Comey,

Orson Scott Card, and Paul Beatty, come from a vast array of literary backgrounds and have won

awards including the Caldecott Medal, the Nobel Prize, the Man Booker Prize, the Pulitzer Prize,

the National Book Award, and the Printz Award.

       10.    Plaintiff PRH is a publishing company, organized under the laws of Delaware,

having its principal place of business in New York City, and is qualified to do business and is

doing business in the State of New York and in this District.  With a rich history dating back to

the 1800s, PRH's expansive publishing portfolio includes nearly 275 independent publishing

imprints and brands on five continents and contains books and products for readers of all ages at

every stage of life.  PRH publishes 15,000 new titles annually and sells close to 800 million

print, audio, and eBooks annually.  PRH operates a dedicated audiobooks division that publishes

1400 new titles annually and has garnered 15 Grammy awards for Best Spoken Word Album.

PRH's many authors include more than 80 Nobel Laureates and hundreds of the world's most

widely read authors.

11.     Plaintiff Scholastic is a publishing company, having its principal place of business

in New York City, and is qualified to do business and is doing business in the State of New York

and in this District.  Scholastic is the world's largest publisher and distributor of children's

books, and a leading provider of literacy curriculum, professional services and classroom

magazines, and a producer of educational and entertaining children's media.  With a history

spanning a century, Scholastic creates and distributes quality books and eBooks, learning

programs for pre-K to grade 12, and other products and services that support children's learning

and literacy at school and at home.

12.     Plaintiff S&S is a publishing company, organized under the laws of New York,

having its principal place of business in New York City, and is qualified to do business and is

doing business in the State of New York and in this District.  It publishes 2000 titles annually in

numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books,

Gallery Books, Pocket Books, Adams Media, Simon & Schuster Children's Publishing and

Simon & Schuster Audio and international companies in Australia, Canada, India and the United

Kingdom.  S&S proudly brings the works of its authors, which include, among others, Dale

Carnegie, Sharon Draper, Jennifer Egan, Joseph Heller, Ernest Hemingway and Stephen King, to

more than 200 countries and territories.  Its books, authors and audiobook productions have been

winners of the Pulitzer Prize, National Book Award, National Book Critics Circle Award,

Grammy Award, Newbery Medal, and Caldecott Medal.

13.     Defendant Audible is a Delaware corporation with its principal place of business in Newark, New Jersey.  Audible is a subsidiary of Amazon.com, Inc.  Audible's headquarters, with an address of One Washington Park Newark, NJ 07102, is located within 100 miles of this District.  Audible advertises and sells audiobooks and related products and services on www.audible.com and www.amazon.com, among other places.  It is registered with the New York Secretary of State and is doing business in the State of New York and in this District, including distributing audiobooks to consumers in the District.  Moreover, upon information and belief, the Audible Captions feature is marketed to, will be available to, and is targeted at consumers throughout this District.  Thus, harm to the Publishers will be felt in this District. Further, many of the events set forth in this Complaint concerning Audible's copyright infringement took place within this District.

## JURISDICTION AND VENUE

14.     This action arises under the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq.* This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

**I.      Publishers' Valuable Rights in the Works**

16.     Publishers are preeminent producers of high-quality books, which they offer to consumers in a variety of print and digital formats for reading and/or listening.  Publishers either own the copyrights to the books they publish or are the exclusive licensee of rights relevant to this lawsuit.  They are therefore the appropriate protectors of their authors' interests.  In filing this action, they also benefit smaller publishers who may lack the resources to litigate.

17.     Publishers promote literacy, defend freedom of speech, advance scientific progress, stimulate the intellectual and cultural discourse that is central to a healthy democratic society, and foster the joy of storytelling.

18.     Publishers invest heavily in the identification, editing, promotion, and distribution of original works of fiction and non-fiction by new and existing authors.  They spend time and resources in identifying and supporting talented authors, providing advances on future royalty earnings to those authors, editing their manuscripts, and determining the best ways to design, market, and promote works so that a rich variety of titles are readily available for readers. Publishers' Works are imbued with their authors' creative expression and enrich our society. Publishers expend significant resources determining how a particular work should be presented (including, for example, the cover art, typeface, page layout and other book design elements) and marketed.  Publishers can afford to expend these resources, and thus benefit authors and readers, because of the protections afforded by copyright law.

19.     Copyright law was specifically and originally intended to incentivize the creation and dissemination of books.  The United States Constitution sets forth in Article 1, Section 8, Clause 8 that, Congress shall have the power to "promote the Progress of Science and useful Arts," by securing to authors the exclusive rights to their works.  Within a year, this notion was codified in the first Copyright Act of 1790.  Under today's Copyright Act, authors and their exclusive licensees have the right to reproduce the work, prepare derivative works, distribute copies, perform the work publicly, and display the work publicly.  Put colloquially, each of those separate rights is a "stick" in the "bundle of sticks" that a copyright owner may choose to exploit. A copyright owner may even decide not to exploit one of these rights in a way that is

inconsistent with their business model or literary vision.  Those are the exclusive rights that copyright law ensures are retained by the holders of the exclusive rights in those copyrights.

20.     No longer do publishers merely distribute hardback versions of books.  As technology and consumer preferences have changed and developed, so have the markets for books.  These include the rise of paperbacks, serialized books, translated versions of books, large-print books, Braille, audiobooks (i.e., recordings of the text), and numerous other formats, such as movies and plays.  More recently, as technology has evolved to permit digital distribution of books, Publishers actively develop, promote, and distribute their authors' works as eBooks (electronic formats of print works) and digital audiobooks.  All of these different distribution formats, which benefit consumers by providing multiple avenues for accessing and appreciating books, are made possible pursuant to copyright law, and the revenues secured from each method help to encourage authors to create more books, compensate Publishers for their efforts in bringing such works to the public, and ensure the quality and long-term success of the books.

21.     Publishers do not lightly decide to change a format from one medium to another; for example, they invest substantial additional time, money, professional expertise and resources in creating high-quality eBooks and audiobooks to ensure that the reader and listener reads or hears the content of the work as intended.  Authors rely on Publishers to do this well. Accordingly, each new format for Publishers' books requires careful consideration of the means and presentation of the work in that market.

22.     Publishers depend on sales, licensing, and other revenues from their catalog of books to maintain profitability, ensure royalty compensation to their authors, and continue to respond to consumer trends.  As the industry has become increasingly digital, Publishers have

entered into separate agreements to prepare and sell eBooks and digital audiobooks of their

catalogs.  As with any copyright arrangement, the rights are divisible and may be granted on an

individual basis; thus, the right to perform or distribute an audiobook does not automatically

include the right to perform or distribute the book's text, and vice versa.  Authors and Publishers

carefully control and allocate the exclusive copyright rights for each of these formats and

markets to ensure a vibrant, nimble marketplace benefiting creators, distributors, and readers.

**II.      Audible's Infringement and Commercial Exploitation of
            Publishers' Copyrighted Works**

23.     Upon information and belief, Audible was launched in 1995 and is engaged in the

business of offering and providing to the public digital audiobooks and other audio materials.

Audible distributes audiobooks created by Publishers or by third parties with Publishers'

authorization and engages in the production of its own original audiobooks.  Audible is a

distributor of Publishers' audiobooks and no more has the right to create and offer Distributed

Text than a physical book store selling physical books would have the right to make and sell

eBooks.

24.     Audible distributes content in a number of ways.  In addition to the digital

distribution of standard audiobooks, Audible has for years offered cross-format features that

integrate and synchronize text and audio.

25.     One cross-format offering is called Whispersync for Voice.  As depicted below

using an image from Audible's website, Whispersync allows Audible users to switch between

reading the Amazon Kindle edition of the eBook and listening to its audiobook version with the

tap of a button.  According to Audible, "As long as your Whispersync for Voice-ready device

has access to a Wi-Fi connection, the playback position, bookmarks, and notes will be kept across devices without any action required."[2]



26.     Another offering is called <u>Immersion Reading</u>.  Immersion Reading allows Audible users to "Read and listen simultaneously with real-time highlighting."[3]  Audible markets Immersion Reading as "a valuable tool to boost reading comprehension and overall retention of content."[4]  All users have to do is: "1. Open your eBook.  2. Tap on the screen.  3. Tap the Play button at the bottom of the screen."[5]  Then, the "narration will play and highlight the text as it narrates."

27.     For both Whispersync and Immersion Reading, Audible users are required to purchase both the audiobook *and* the Amazon Kindle edition of the eBook versions of the title. Consequently, Publishers actively participate in these cross-format features, and they and their authors enjoy revenues from the sales of works that employ them.

28.     On July 15, 2019, Audible announced, without any advance notice or discussion with Publishers, that Audible would be adding an "Audible Captions" feature to its Audible app.

---

[2]      What is Whispersync for Voice?, AUDIBLE,
https://audible.custhelp.com/app/answers/detail/a_id/7371/~/what-is-whispersync-for-voice%3F.
[3]      Keep the Story Going, AUDIBLE, https://www.audible.com/ep/wfs.
[4]      What is Immersion reading?, AUDIBLE,
https://audible.custhelp.com/app/answers/detail/a_id/5176/~/what-is-immersion-reading%3F
[5]      How can I use Immersion Reading on a Kindle device?, AUDIBLE,
https://audible.custhelp.com/app/answers/detail/a_id/4538/c/3087.

As a result, in addition to supplying the audio version of Publishers' Works, Audible generates the Distributed Text without Publisher or author (a) approval or involvement, (b) compensation, (c) curation, or (d) control over the quality and presentation of the text.

29.     Specifically, as demonstrated in the promotional video released with the announcement, Audible has selected the titles in its audiobook library that will have Audible Captions capability.  When its users choose to listen to one these pre-selected "Caption-ready" books and enable Audible Captions, Audible, on demand, generates and distributes the Distributed Text to the user's screen in a matter of milliseconds, synchronized to the audiobook, which continues to play in the background.  Users can rewind, fast-forward, and pause the audiobook, viewing the newly generated Distributed Text as they wish.  Audible's reproduction, distribution, and display of the Distributed Text, when it has only been authorized to deliver the work in audiobook format, is a misappropriation of the copyright owner's exclusive rights.

30.     For this reason, Audible touts the Audible Captions feature as one that "will allow listeners to follow along with a few lines of text as they hear the audiobook performed."[6]  The Distributed Text is a clear reproduction of Publishers' copyrighted text and is a quintessential derivative of Publishers' audiobooks, both of which require a license from the owner of the rights.  A true and correct copy of the promotional video is attached hereto as **Exhibit 1**.

---

[6]     Audible Captions: A Demonstration, AUDIBLE, https://www.audible.com/about/newsroom/audible-captions-a-demonstration/

 

31.     The Distributed Text is only as good as Audible's transcription technology, which does not transcribe accurate text, making it especially error-ridden when, for example, works are used that include foreign or fanciful author-created words (as often appear in science fiction or fantasy books), or when narrators speak in an accent.

32.     As a result, Audible conceded to Publishers that it would choose not to offer Audible Captions for a percentage of the available audiobooks on its service due to these errors. Audible, however, admitted that even for those audiobooks that would be included, up to 6% of the Distributed Text would contain transcription errors, such as transcribing the common Yiddish phrase "mazel tov" as "mazel tough."  As noted above, in a 300-page book, a 6% error rate is the equivalent of 18 full pages of pure errors.  Of course, this is a tacit admission that Audible already has engaged in the creation of Distributed Text, and copied Publishers' audiobooks, as it would be unable to make determinations as to the error rates without having done so.  Moreover, the Distributed Text is not presented in the same thoughtfully selected typeface as the eBook versions of the Works and because it is not done in partnership with Publishers, it denies

Publishers or authors as rights holders any say in the Works chosen for the feature or in any creative choices on how to present their books.

33.     Upon learning of Audible's announcement, many of the Publishers immediately informed Audible in writing through cease-and-desist letters that Audible Captions, among other things, constituted copyright infringement.  In response to receiving those objections, and under the pretense of trying to allay Publishers' fears, Audible belatedly offered to provide Publishers with a demonstration of Audible Captions and the resulting Distributed Text.  Far from allaying concerns, the demonstrations provided to several Publishers only served to confirm them. Publishers again communicated their objections to the new feature.  Audible has nevertheless insisted on moving forward with the Audible Captions launch.  Following Publishers' initial objections, Audible released a July 31, 2019 advertisement depicting a slightly revised version of Audible Captions that reduced the number of words presented on the screen at a given time.  But, as shown below, while fewer words are presented on the screen at any given time, the Distributed Text is still the *entirety* of the text of the book, top-to-bottom, left-to-right.  A true and correct copy of the advertisement is attached hereto as **Exhibit 2**.

 

34.     Upon information and belief, Audible expects Distributed Text to drive additional users to Audible's offerings, from which Audible will benefit financially through both subscription and audiobook purchase revenue.  Audible has refused to grant Publishers' request to limit Distributed Text to public domain works or, alternatively, to allow them to "opt-out" of the Audible Captions feature, even though Audible could do so.

35.     As discussed above, Audible already has created Distributed Text for use in various private and public demonstrations, as well as its own internal testing.  Further, Audible has selected and made audiobooks "Captions-ready" for the initial launch of Audible Captions, which will be available to "students, parents and listeners everywhere."[7]  Audible has also indicated that Audible Captions will be made available for <u>all</u> works (other than those that contain too many foreign or fanciful words).

36.     Identified below are a representative sample of Publishers' Works that, upon information and belief, are, or will be, available with Audible Captions (the "Works").  The Works—which feature unique stories and characters by Publishers' authors, various graphics and images, the selection of distinctive and stylized typeface and layout, and many other choices— are creative expressions that were the product of the ingenuity and efforts of authors, editorial discretion, and substantial skills, resources, and creative energies.  They have a large following of fans throughout the world.  The Works include:

- *The Adoration of Jenna Fox* by Mary E. Pearson (Macmillan)

- *Atomic Habits: An Easy & Proven Way to Build Good Habits & Break Bad Ones* by James Clear (PRH)

- *Balto of the Blue Dawn* by Mary Pope Osborne (PRH)

- *Catch-22* by Joseph Heller (S&S)

---

[7] Audible Captions: A Demonstration, AUDIBLE, https://www.audible.com/about/newsroom/audible-captions-a-demonstration/.

- *David and Goliath: Underdogs, Misfits, and the Art of Battling Giants* by Malcolm Gladwell (Hachette)

- *A Dog's Purpose* by W. Bruce Cameron (Macmillan)

- *Echo* by Pam Munoz Ryan (Scholastic)

- *Educated: A Memoir* by Tara Westover (PRH)

- *Feck Perfection: Dangerous Ideas on the Business of Life* by James Victore (Chronicle)

- *The Finisher* by David Baldacci (Scholastic)

- *The Friend* by Sigrid Nunez (PRH)

- *Girl, Stop Apologizing: A Shame-Free Plan for Embracing and Achieving Your Goals* by Rachel Hollis (HarperCollins)

- *God Save Texas: A Journey Into the Soul of the Lone Star State* by Lawrence Wright (PRH)

- *The Hate U Give* by Angie Thomas (HarperCollins)

- *How to Win Friends & Influence People* by Dale Carnegie (S&S)

- *The Hunger Games* by Suzanne Collins (Scholastic)

- *In the Unlikely Event* by Judy Blume (PRH)

- *Kingdom of the Blind: A Chief Inspector Gamache Novel* by Louise Penny (Macmillan)

- *Let the Great World Spin* by Colum McCann (PRH)

- *Little Fires Everywhere* by Celeste Ng (PRH)

- *The Lost City of the Monkey God: A True Story* by Douglas Preston (Hachette)

- *Manhattan Beach* by Jennifer Egan (S&S)

- *Masterpiece* by Elise Broach (Macmillan)

- *The Monster of Florence* by Douglas Preston and Mario Spezi (Hachette)

- *The Old Man and the Sea* by Ernest Hemingway (S&S)

- *On Writing: A Memoir of the Craft* by Stephen King (S&S)

- *Out of My Mind* by Sharon Draper (S&S)

- *Past Tense: A Jack Reacher Novel* by Lee Child (PRH)

- *A Path Appears: Transforming Lives, Creating Opportunity* by Nicholas D. Kristof and Sheryl WuDunn (PRH)

- *Perfidia* by James Ellroy (PRH)

- *The Pharaoh Key* by Douglas Preston and Lincoln Child (Hachette)

- *Refugee* by Alan Gratz (Scholastic)

- *The Secret Art of Being a Parent: Tips, Tricks, and Lifesavers You Don't Have to Learn the Hard Way* by Bridget Watson Payne (Chronicle)

- *Simon vs The Homo Sapiens Agenda* by Becky Albertalli (HarperCollins)

- *The Sports Gene: Inside the Science of Extraordinary Athletic Performance* by David Epstein (PRH)

- *The Tipping Point* by Malcolm Gladwell (Hachette)

- *To Kill a Mockingbird* by Harper Lee (HarperCollins)

- *Turtles All the Way Down* by John Green (PRH)

- *Under the Dome* by Stephen King (S&S)

- *Wintergirls* by Laurie Halse Anderson (PRH)

- *The Woman in the Window* by A.J. Finn (HarperCollins)

- *The Worst-Case Scenario Survival Handbook* by Joshua Piven and David Borgenicht (Chronicle)

Each of the Works has been registered with the U.S. Copyright Office.  Attached hereto as

**Exhibit 3**, and incorporated herein by reference, are true and correct copies of Certificates of

Registration and other documents reflecting the Works' registration.  Publishers are, and at all

times material herein were, the owners or exclusive licensees of the eBook and audiobook rights

for the Works.

**III.     The Harm to Publishers**

37.     Publishers produce and distribute high-quality Works on behalf of themselves and their authors, from which they receive revenues.  Without Publishers' permission, Audible is unilaterally (and over the objections of the Publishers) exploiting an existing market, and new potential markets, while exercising rights not licensed to it, causing the authors and Publishers of the Works to face substantial irreparable harm.  The harm is at least three fold.

38.     *First*, the Distributed Text could directly compete with Publishers' existing markets for the Works, allowing Audible to profit commercially without paying Publishers for use of the text.  The Distributed Text could act as a direct substitute for the Works' text in a physical book or eBook.  Indeed, Audible's admitted goal is to give users a *reading* experience, despite Audible only having the right to distribute *audio*books.  Moreover, this convenience is not an innovation, as synchronized text and audio markets already exist.  In fact, as discussed above, Audible already offers the Immersion Reading feature to allow users to listen to an audiobook while simultaneously reading the book's original text.  The reading experience of Immersion Reading and Audible Captions is remarkably similar aside from the errors that appear in the Distributed Text.  If you compare an image from Audible's own website regarding the Immersion Feature to its depiction of Audible Captions from its promotional video, this is obvious:

**Immersion Reading**          **Audible Captions**

    

The critical difference between Immersion Reading and Audible Captions is that Immersion Reading requires the purchase of both the audiobook and the Kindle edition of the eBook of the title. This means that the books' authors and relevant Publishers are compensated for the use of both versions of the books. Audible Captions, by contrast, does not require the purchase of an eBook, misappropriating the right to distribute text and depriving authors and Publishers compensation for distribution of their written works thereby lessening their incentive and ability to create and publish works for consumers. It is hard to compete with free. In addition, Publishers have other authorized cross-format technology products with which Audible Captions will directly compete. For example, there has long been an existing market for educational products in the children's book industry that provide a combined offering allowing children to listen while they read. Finally, upon information and belief, Audible has indicated that, in time, it would like to provide Distributed Text in other languages, which would undercut Publishers' translation market.

39.     *Second*, by unilaterally offering the unauthorized Distributed Text for free, Audible is devaluing the price point for cross-format technology, causing consumers to believe that there is little value in receiving the text of the Works when they already have an audiobook. This is entirely inconsistent with Publishers' existing markets where consumers using cross-

format technologies pay for both the eBook and the audiobook.  The Copyright Act entitles Publishers and their authors to receive compensation for the text of Works, and Audible's infringement will cause them to lose unquantifiable revenues and good will and provide consumers with less incentive to participate in the properly authorized Audible Immersion market.

40.    *Third*, Publishers are irreparably harmed by the Distributed Text because they do not have the control that copyright ensures they can exert over the quality, presentation, and distribution choices for the Works.  As detailed above, Whispersync and Immersion Reading offer a quality combined reading and audio experience, including the Publishers' carefully selected presentation of text.  In sharp contrast, the Distributed Text contains extensive errors that, of course, are not approved by the Works' authors or Publishers, and does not reflect Publishers' desired presentation.  Authors and Publishers invest time and financial resources to create quality works that are then distributed to the public as written.  By using the Distributed Text in lieu of the actual text of the Works, Audible is irreparably harming the reputation of the Publishers as trusted and valued stewards of their authors' works and that of the authors as careful and thoughtful writers.  The Audible Captions feature further harms Publishers and the authors they represent by misappropriating their right to decide which works will be distributed in which format and at which time.  Instead, as noted above, Audible will not provide Publishers with the right to opt-in, or out, of the Audible Captions feature, thereby appropriating for itself the right to determine which works are best suited for distribution in the Audible Captions format.

41.    Audible has attempted to justify Audible Captions to Publishers as being targeted for educational purposes because it claims the availability of text, together with the audiobook,

would benefit "listeners who face challenges understanding words."[8]  This half-hearted attempt to justify infringement is inconsistent with the facts.  *First*, to the extent there is a benefit to seeing words while listening to the audio, this functionality is already offered by Audible in a manner approved by Publishers and through which authors and Publishers share in the revenue (*i.e.*, Immersion Reading).  *Second*, Audible admits that the Distributed Text may have as high as a 6% error rate.  As a result, the Distributed Text provides a jarring, misleading, and inaccurate reading experience, which undermines and is contrary to its alleged educational goal. *Third*, although Audible claims that Audible Captions is intended for students, upon information and belief, the Distributed Text will not be limited to the educational market, but rather will be available for all audiobooks offered by Audible, in its sole discretion, and without limiting the demographics of the users to whom it is made available by age, location, or any other factor. Audible's own statement asserted that the Distributed Text would be helpful to "students, parents and listeners everywhere."  The likely inclusion of works inappropriate for students further belies the claimed justification.  And, in any case, the educational market has long been a key market for Publishers, where they have provided quality books and technology-based products and services to meaningfully enhance student learning.  The Audible Captions feature is not filling a void and, if anything, is adding an error-filled alternative that would undermine the learning experience Audible claims it wants to enhance.  *Fourth*, Audible's mantle of "education" is a loophole that would justify any form of copying and violation of a copyright owner's exclusive rights.  This same "education" argument could be used to justify the creation of unauthorized audiobooks themselves, as audiobooks too would help those who are reluctant to read.  It cannot seriously be argued, however, that audiobooks are not within a copyright owner's exclusive

---

[8] Audible Captions: A Demonstration, AUDIBLE, https://www.audible.com/about/newsroom/audible-captions-a-demonstration/.

ability to license and distribute.  ***Finally***, Audible could provide an education-targeted product for students using just public domain works.  For instance, it is extremely telling that the two works that Audible has used to demonstrate the Distributed Text in its own public advertisements have been *David Copperfield* and *Pride and Prejudice*, both of which are in the public domain. Yet, Audible has told Publishers that it will not so limit its feature.

42. Audible has made clear that it intends to release Audible Captions without receiving authorization from Publishers.  In fact, upon information and belief, Audible Captions' release is intended to be September 10, 2019.

43. In sum, Audible is attempting to seize for itself a competitive advantage against other audiobook providers who are not violating copyright law, undercut an existing market, and undermine Publishers' well-established business model by creating derivative works of, reproducing, distributing, and publicly displaying copies of the Works in the form of Distributed Text accompanying an audiobook.  Audible is aware that its gained profits would come at the expense of content producers like Publishers.  Publishers told Audible that the Distributed Text infringes their exclusive rights.  Nevertheless, without receiving Publishers' authorization, Audible plans to release Audible Captions, monetize the Distributed Text, and keep the profits for itself, thereby undermining Publishers' investment and ability to control their own Works.  In so doing, Audible also undermines the incentive for authors to create high-quality publications and for Publishers to support, edit, design, and distribute them.  As Publishers will suffer irreparable harm unless Audible's actions alleged above are enjoined by this Court, and they have no adequate remedy at law to redress all of the injuries that Audible causes and intends to cause by its conduct, Publishers seek injunctive relief from this Court.

## CLAIMS FOR RELIEF

### COUNT I
### Direct Copyright Infringement (17 U.S.C. § 101 *et seq.*)

44.     Publishers repeat and reallege each and every allegation above as if fully set forth herein.

45.     The Works are original, creative and copyrightable subject matter under the laws of the United States.

46.     The copyrights in the Works are registered, and the Copyright Office has issued the valid Certificates of Registration for the Works indicated in **Exhibit 3**.

47.     Publishers have complied in all respects with 17 U.S.C. §§ 101, *et seq.*, and have secured the exclusive rights and privileges in and to the copyrights in their written Works and content.

48.     By its actions, alleged above, Audible has infringed and will infringe Publishers' copyrights in and to the Works by, *inter alia*, making derivative works of, reproducing, distributing, and publicly displaying the Works without any authorization or other permission from Publishers.

49.     Audible, moreover, selects the works for which Distributed Text will be offered, and designed and interfaced the functionality of Audible Captions with its Audible App. Audible has further arranged for software programs and servers to generate Distributed Text and transmit it to its paying consumers.

50.     Audible's infringement of Publishers' copyrights is deliberate, willful, and in utter disregard of Publishers' rights.

51.     Upon information and belief, as a direct and proximate result of its wrongful conduct, Audible will obtain benefits, including, but not limited to, profits to which Audible is not entitled.

52.     As a direct and proximate result of Audible's wrongful conduct, Publishers will be substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Audible will cause further irreparable injury to Publishers.

53.     Publishers are entitled to injunctive relief enjoining Audible, its agents and employees, and all persons acting in concert or participation with it, from infringing Publishers' Works in the manner alleged above.

54.     Publishers are further entitled to recover from Audible the damages, including attorney's fees and costs, they have sustained and will sustain, and any gains, profits and advantages obtained by Audible as a result of its acts of infringement alleged above.  At present, the amount of such damages, gains, profits and advantages cannot be fully ascertained by Publishers.  Publishers also are entitled to recover statutory damages for Audible's willful infringement of their copyrights.

## COUNT II
### Secondary Copyright Infringement (17 U.S.C. § 101 *et seq.*)

55.     Publishers repeat and reallege each and every allegation above as if fully set forth herein.

56.     Although it is clear that Audible is directly liable, Publishers also bring claims for secondary liability in the alternative because to the extent Audible attempts to disguise its own direct liability by blaming the conduct of its users, it is equally clear that Audible is secondarily liable under theories of contributory liability, inducement liability, and vicarious liability for the

underlying creation of infringing derivatives of Publishers' Works, reproduction of Publishers'

Works, distribution of Publishers' Works, and display of Publishers' Works.

57.     Audible is contributorily liable as it knows or has reason to know that the

Distributed Text necessarily infringes Publishers' Works each time it is created, and Audible has

caused and/or materially contributed to the creation of the infringing Distributed Text, which is

available exclusively on Audible's platform.

58.     Audible has been informed by Publishers that the Distributed Text infringes the

Publishers' copyrights.  Furthermore, Audible is responsible for curating and selecting the works

for which the Audible Captions feature is enabled.  Moreover, it provides the platform on which

the infringing activity occurs, which, upon information and belief, tracks what works exist on

each of Audible's users' devices and what Audible features are being engaged by those users.

Audible thus has specific knowledge that specific infringing material is available on its platform.

59.     Audible could take simple measures to prevent further infringement, such as by

limiting Audible Captions to works in the public domain or to those it has properly licensed.

Nonetheless, it has indicated that it will continue to create and provide access to the infringing

Distributed Text.

60.     As demonstrated by its high-profile rollout of the Audible Captions feature,

facilitating the infringement of Publishers' copyrighted material is a central component of

Audible's business strategy.  Thus, Audible is secondarily liable for contributory infringement.

61.     Audible also is secondarily liable under a theory of inducement because the

Audible Captions are capable of working only on books that Audible has selected, and Audible is

and will be actively encouraging users to receive Distributed Text for those books.  As noted

above, Audible has already actively marketed Audible Captions to users touting the benefits of the Distributed Text.

62.     Finally, Audible is vicariously liable because it has the right and ability to supervise the infringement and possesses a financial interest in continuing the infringement.

63.     As detailed above, Audible has the right and ability to supervise the infringement of Publishers' copyrighted Works because it can start or stop offering the Distributed Text at any time for any work.

64.     Moreover, Audible possesses an obvious and direct financial interest in the continuing exploitation of Publishers' Works as, upon information and belief, Audible believes the Distributed Text will enhance users' Audible experience, leading to more users paying subscription fees and purchasing audiobooks.  Thus, Audible is secondarily liable for vicarious infringement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Chronicle, Hachette, HarperCollins, Macmillan, PRH, Scholastic, and S&S respectfully request judgment against Defendant Audible as follows:

A.     Find that Audible Captions and its Distributed Text infringe the rights of Publishers' copyrights in the Works;

B.     Find a substantial likelihood that Audible will infringe Publishers' copyrights unless enjoined from doing so;

C.     Issue a preliminary and permanent injunction enjoining Audible, and its agents, servants, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in concert with it, from directly or indirectly infringing Publishers' copyrights, including, but not limited to, making derivative works of, reproducing, distributing, or publicly displaying any of Publishers' works

(including without limitation the Works) as Distributed Text, and from participating or assisting in any such activity;

D. Order Audible to render a full and complete accounting to Publishers for Audible's profits, gains, advantages or the value of the business opportunities received from the foregoing acts of infringement;

E. Enter judgment for Publishers against Audible for all damages suffered by Publishers and for any profits or gain by Audible attributable to the infringements alleged above of Publishers' copyrights in amounts to be determined at trial;

F. Enter judgment for Publishers against Audible for statutory damages based upon Audible's willful acts of infringement as alleged above pursuant to the Copyright Act, 17 U.S.C. §§ 101, *et seq.*;

G. Award Publishers costs and disbursement of this action, including reasonable attorney's fees, pursuant to 17 U.S.C. § 505;

H. Award Publishers pre-judgment and post-judgment interest, to the fullest extent available, on the foregoing; and

I. Grant such other, further and different relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable in this action.

Dated:  New York, New York
          August 23, 2019

Dale M. Cendali
Joshua L. Simmons
Jordan Romanoff
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
jordan.romanoff@kirkland.com

*Attorneys for Plaintiffs*