Dale M. Cendali
Joshua L. Simmons
Jordan M. Romanoff
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
jordan.romanoff@kirkland.com

# 19 CV 7913

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRONICLE BOOKS, LLC; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS LLC; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SCHOLASTIC INC.; AND SIMON & SCHUSTER, INC.<br><br>Plaintiffs,<br><br>- against -<br><br>AUDIBLE, INC.<br><br>Defendant. | Case No. _____<br><br>ECF Case |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 3

    I.      PUBLISHERS AND THEIR AUTHORS ............................................. 3

    II.     AUDIBLE AND ITS EXISTING CROSS-FORMAT OFFERINGS ................... 5

    III.    AUDIBLE'S INFRINGING DISTRIBUTED TEXT............................................. 7

    IV.    PUBLISHERS' COMPLAINT AND REQUEST FOR INJUNCTIVE
          RELIEF ............................................................................................ 10

ARGUMENT ....................................................................................................... 11

    I.      PUBLISHERS ARE LIKELY TO SUCCEED ON THE MERITS .................... 11

    II.     PUBLISHERS WILL BE IRREPARABLY HARMED BY THE
          INFRINGEMENT............................................................................... 16

    III.    THE BALANCE OF HARMS FAVORS PUBLISHERS .................................... 21

    IV.    AN INJUNCTION WILL SERVE THE PUBLIC INTEREST .......................... 23

CONCLUSION .................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Stellar Records, Inc.*,
    96 F.3d 60 (2d Cir. 1996) ....................................................................................13

*Advanced Access Content Sys. Licensing Adm'r, LLC v. Tao*,
    689 F. App'x 661 (2d Cir. 2017) .........................................................................18

*Arista Records LLC v. Lime Grp. LLC*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011)............................................................14, 15

*Arista Records LLC v. Usenet.com, Inc.*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009)..................................................................15

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
    931 F. Supp. 2d 537 (S.D.N.Y. 2013)..................................................................11

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014).............................................................................13, 25

*Broad. Music, Inc. v. Prana Hosp., Inc.*,
    158 F. Supp. 3d 184 (S.D.N.Y. 2016)..................................................................19

*Capitol Records, LLC v. ReDigi Inc.*,
    910 F.3d 649 (2d Cir. 2018)..................................................................................13

*Complex Sys., Inc. v. ABN AMRO Bank N.V.*,
    No. 08 Civ. 7497, 2014 WL 1883474 (S.D.N.Y. May 9, 2014)...........................16

*Elektra Entm't Grp., Inc. v. Barker*,
    551 F. Supp. 2d 234 (S.D.N.Y. 2008)..................................................................13

*Elsevier Inc. v. www.Sci-Hub.org*,
    No. 15 Civ. 4282, 2015 WL 6657363 (S.D.N.Y. Oct. 30, 2015) .........................20

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016)....................................................................................14

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir. 1971)................................................................................14

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)...............................................................................................23

*HarperCollins Publishers. L.L.C. v. Gawker Media LLC*,
    721 F. Supp. 2d 303 (S.D.N.Y. 2010) .............................................................12, 16

*Iris Arc v. S.S. Sarna, Inc.*,
    621 F. Supp. 916 (E.D.N.Y. 1985) ........................................................................16

*Island Software & Comput. Serv. v. Microsoft Corp.*,
    413 F.3d 257 (2d Cir. 2005) ..................................................................................11

*Kurt S. Adler, Inc. v. World Bazaars, Inc.*,
    No. 95 Civ 5610, 1995 WL 527991 (S.D.N.Y. Sept. 6, 1995) .............................24

*Leadsinger, Inc. v. BMG Music Pub.*,
    512 F.3d 522 (9th Cir. 2008) .................................................................................13

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
    312 F.3d 94 (2d Cir. 2002) ....................................................................................12

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ...............................................................................................15

*Midway Mfg. Co., v. Arctic Int'l, Inc.*,
    547 F. Supp. 999 1015 (N.D. Ill. 1982) ................................................................24

*MPD Accessories B.V. v. Urban Outfitters*,
    No. 12 Civ. 6501, 2014 WL 2440683 (S.D.N.Y. May 30, 2014) ..........................18

*My-T Fine Corp. v. Samuels*,
    69 F.2d 76 (2d Cir. 1934) ......................................................................................23

*Pearson Educ., Inc. v. Vergara*,
    No. 09 Civ 6832, 2010 WL 3744033 (S.D.N.Y. Sept. 27, 2010) ..........................20

*Rovio Entm't Ltd. v. Allstar Vending, Inc.*,
    97 F. Supp. 3d 536 (S.D.N.Y. 2015) .....................................................................21

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ....................................................................................20

*Scholz Design, Inc. v. Sard Custom Homes, LLC*,
    691 F.3d 182 (2d Cir. 2012) .......................................................................... *passim*

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
    642 F. Supp. 2d 167 (S.D.N.Y. 2009) ...................................................................23

*Take-Two Interactive Software, Inc. v. Zipperer*,
    No. 18 Civ. 2608, 2018 WL 4347796 (S.D.N.Y. Aug. 16, 2018) ....................18, 19

*Tradescape.com v. Shivaram*,
  77 F. Supp. 2d 408 (S.D.N.Y. 1999)........................................................22

*UMG Recording, Inc. v. Escape Media Grp., Inc.*,
  No. 11 Civ. 8407, 2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014)...........................14

*Warner Bros. Entm't Inc. v. RDR Books*,
  575 F. Supp. 2d 513 (S.D.N.Y. 2008)....................................................12, 21, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)........................................................................21

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2d Cir. 2012)...........................................................11, 16, 23

*Zomba Enters., Inc. v. Panorama Records, Inc.*,
  491 F.3d 574 (6th Cir. 2007) ............................................................13

**Statutes**

17 U.S.C. § 101..............................................................................13

17 U.S.C. § 106.......................................................................11, 12, 13

17 U.S.C. § 410(c)...........................................................................11

Plaintiffs Chronicle Books, LLC ("Chronicle"); Hachette Book Group, Inc. ("Hachette"); HarperCollins Publishers LLC ("HarperCollins"); Macmillan Publishing Group, LLC ("Macmillan"); Penguin Random House LLC ("PRH"); Scholastic Inc. ("Scholastic"); and Simon & Schuster, Inc. ("S&S") (collectively, "Publishers") are member companies of the Association of American Publishers, the mission of which is representing the leading United States publishers on matters of law and policy. Publishers submit this memorandum of law in support of their motion for a preliminary injunction against Defendant Audible, Inc. ("Audible").

## PRELIMINARY STATEMENT

Without a prior word to Publishers, Audible recently announced that it will offer as a free add-on the *entire written text* of Publishers' books to purchasers of *audiobooks* without authorization from or compensation to the rights holders—Publishers and the authors they publish. It is long-established in the publishing industry that rights in eBooks and their audiobook analogues are separate and divisible and that, therefore, they must be sold separately absent securing the rights to both. Audible's newly created "Audible Captions" feature will offer two for the price of one: when Audible sells an audiobook, it also will provide the full text of that book without permission to do so or paying a single cent to the rights holders. In short, it is classic, willful copyright infringement.

In a transparent attempt to circumvent these well-known copyright law principles, Audible has introduced a convoluted technology that uses speech-to-text recognition to convert Publishers' audiobooks on demand to text, and transmits that text to listeners, displaying it on their devices (the "Distributed Text"). This still is quintessential infringement. Not only does the Distributed Text infringe Publishers' rights in their books, not only is the Distributed Text an unauthorized derivative work, and not only does it violate the copyright law principles that give copyright owners and their exclusive licensees the right to decide whether and how they will

permit their works to be reproduced, distributed, and displayed, but it also undermines and devalues the Constitutional incentives to produce those books by providing a free stand-in for them. Audible is just a retailer distributing audiobooks. It has no more right to distribute text with the audio than a bookseller would have to offer audio with its physical books.

Unless Audible is enjoined, Publishers and authors will suffer incalculable harm. Instead of Publishers and authors choosing whether their works will be distributed in this manner, Audible would be making the choice, denying them the control that copyright ensures over their works. In addition to this loss of control, the Distributed Text will harm their reputation as it is corrupted with rampant errors and denies Publishers the formatting choices that they make in authorized versions of their works. There is no doubt on this point: Audible has *admitted* that the Distributed Text, at best, may have an error rate as high as 6%[1]—for a 300 page book, that is *18 pages* of pure errors (6,000 errors in a 100,000 word book)—benefiting no one.

To be clear, Publishers do not suggest that services cannot be developed to lawfully play audiobooks while displaying their underlying written expression. One example of such cross-format services that already exists—which, unlike the Distributed Text, complies with the principles discussed above—is Audible's own Immersion Reading. It differs materially from the Distributed Text in at least two ways. **First**, it requires the purchase of the audiobook *and* the eBook versions of the works. By contrast, the Distributed Text requires only the purchase of the audiobook to receive both the audiobook and the unauthorized accompanying text, which is thrown in for free, thereby devaluing the actual text. **Second**, Immersion Reading uses the authorized eBook versions of the works. By contrast, the Distributed Text uses *unauthorized*, error-ridden transcriptions that denigrate books and distract readers from the author's message.

---

[1] As discussed below, Audible told some Publishers that its error rate was as high as 30%. *See infra* 10.

If Audible's Distributed Text is released, it will destabilize the publishing industry and dilute the exclusive rights granted to creators by the Copyright Act. For generations, authors and publishers have exploited their copyrights through carefully planned decisions involving their respective books, including what format or formats (*e.g.*, hardbacks, paperbacks, serializations, and translations) to release, to whom, where, and when. Copyright law protects these business choices by ensuring that each such "stick" in the "bundle of sticks" that comprise a copyright belongs to the copyright holder, and that the copyright owner gets to decide the forms of distribution that are consistent with its business model, or *importantly* whether to decline to enter one or more markets. Audible is willfully breaking the law for its own financial benefit by interfering with Publishers and their authors' markets for distributing the text of their books, as well as cross-format services and potential future services, in a way that it is incalculable.

Publishers repeatedly have tried to persuade Audible that its actions are unlawful under copyright law and will be harmful to Publishers, their authors, and the reading public. This week, however, Audible has made it clear that, despite industry objections, it will not relent, insisting that it will launch Audible Captions and provide the Distributed Text on or around September 10, 2019—just in time to market to its own commercial advantage the availability of free, unauthorized copies of the text of Publishers' books at the start of the new school year and the beginning of holiday book shopping. Thus, Publishers had no choice but to file this action and bring this motion, seeking to preserve the *status quo* during this proceeding.

## FACTUAL BACKGROUND

### I.  PUBLISHERS AND THEIR AUTHORS

Publishers work with some of the world's most distinguished authors of premium literary content, but they are not alone in the publishing industry. As mentioned above, each of the Plaintiffs in this case is a member company of the Association of American Publishers, which

represents U.S. book, journal, and education publishers large and small. American trade book publishers are in the business of cultivating authors, developing and producing original writing and content, bringing those works to market, and distributing their copyrighted works and content. Publishers inspire readers, document history, promote literacy, defend freedom of speech, advance scientific progress, stimulate the intellectual and cultural discourse that is central to a healthy democratic society, and foster the joy of storytelling.

The publishing industry deeply invests in the identification, editing, promotion, and distribution of works by new and existing authors.[2] Publishers spend time and resources in identifying and supporting talent, including through advances to authors, editing manuscripts, and determining the best ways to style, market and promote works. Chronicle Decl. ¶ 10; Hachette Decl. ¶ 16; HarperCollins Decl. ¶ 5; Macmillan Decl. ¶ 21; PRH Decl. ¶ 5; Scholastic Decl. ¶ 17; S&S Decl. ¶ 9. This includes determining how a particular work should be presented (including, for example, the cover art, typeface, page layout and other book design elements) for each distribution market. HarperCollins Decl. ¶ 5; Scholastic Decl. ¶ 5; Hachette Decl. ¶ 22.

As an industry, publishing dates back at least as far as the paradigm shift of the Gutenberg printing press and has embraced the innovation of new technology, business models, distribution platforms, and audiences ever since, which today extend to digital markets through modern copyright laws and global treaties. The industry has embraced an array of formats, such as hardbacks, paperbacks, serialized books, translations of books, large-print books, Braille, audiobook tape or compact discs (*i.e.*, books that provide a listening experience in which a professional voice-over actor or narrator performs the text of the work), and numerous other

---

[2] Declaration of Tyrrell Mahoney ("Chronicle Decl.") ¶ 8; Declaration of Michael Pietsch ("Hachette Decl.") ¶ 6; Declaration of Chantal Restivo-Alessi ("HarperCollins Decl.") ¶ 13; Declaration of Jonathan Yaged ("Macmillan Decl.") ¶ 21; Declaration of Jeffrey Weber ("PRH Decl.") ¶ 5; Declaration of Lori Benton ("Scholastic Decl.") ¶ 18; Declaration of Douglas E. Stambaugh ("S&S Decl.") ¶ 14.

formats and dramatizations.  Hachette Decl. ¶ 15; PRH Decl. ¶ 5; S&S Decl. ¶ 11.  More recently, as technology has evolved, Publishers embraced the rise of eBooks (electronic formats of print works) and digital audiobooks.  Hachette Decl. ¶ 15.

The revenues secured from each method help to compensate authors, encourage the efforts of Publishers, benefit consumers, and ensure the quality and long-term success of the works.  PRH Decl. ¶ 5.  Publishers do not casually change the format of a particular work from one digital medium to another; rather, they invest substantial additional time, money, professional expertise and resources in creating high-quality eBooks and audiobooks.  Hachette Decl. ¶ 16; S&S Decl. ¶ 12.  This investment ensures that consumers have positive experiences.  Hachette Decl. ¶ 16.  To maintain profitability across their offerings and to encourage and invest in their authors, Publishers plan and depend upon receiving revenues from their works, just as the Copyright Act requires.  HarperCollins Decl. ¶ 13; Hachette Decl. ¶ 15.

One area of particular interest to Publishers is supporting pre-kindergarten through twelfth grade learning.  Scholastic Decl. ¶ 16.  Their books and other innovative learning tools frequently are used in the classroom.  *Id.* ¶ 17.  And, indeed, there is a market, particularly in the educational setting, for cross-platform reading and listening experiences.  HarperCollins Decl. ¶ 7; Hachette Decl. ¶ 7; Scholastic Decl. ¶ 11.  As discussed below, Audible claims to be targeting the Distributed Text at this market, at least in part.  Even though Publishers do not give much credence to this claim, even if true, it amplifies rather than relieves Publishers' concerns.

## II.    AUDIBLE AND ITS EXISTING CROSS-FORMAT OFFERINGS

Audible is the world's largest distributor of audiobooks to consumers and, as a result, is authorized by Publishers to distribute audiobook versions of Publishers' titles.  S&S Decl. ¶ 15.  Audible has for years offered cross-format features that integrate both the text and audio versions of Publishers' books.  PRH Decl. ¶ 10.  As shown below, one such feature is <u>Whispersync for</u>

Voice, which allows Audible users with the tap of a button to switch between reading a Kindle eBook and listening to its audiobook version.  *Id.* ¶ 11.



Audible also offers <u>Immersion Reading</u>, allowing its users to "Read and listen simultaneously with real-time highlighting."  *Id.* Ex. 3.  It markets Immersion as "a valuable tool to boost reading comprehension and overall retention of content."  *Id.*  "[A] user can access Immersion Reading by clicking the headphones symbol at the bottom of his or her eBook in Amazon's Kindle app," (shown below left with a red circle), "which will cause the Audible audiobook to be displayed at the bottom of the page" (shown below left with a blue box).  *Id.* ¶ 12.  The user can then play the audiobook while reading the eBook.  As shown below (at right), "Immersion Reading creates a synchronized reading and listening experience, using a highlighting tool to signal the . . . words being read by the narrator of the audiobook."  *Id.*.

 

Both Whispersync and Immersion Reading involve use of Amazon's Kindle Reader,

which uses authorized versions of Publishers' eBooks.[3]  *Id.* ¶¶ 11, 12.  Importantly, to use either, users are required to purchase the audiobook from Audible *and* the eBook from Amazon.  *Id.* Publishers participate in these and other cross-format features, and together with their authors enjoy revenues from the sales.  Macmillan Decl. ¶ 7; PRH Decl. ¶ 14; S&S Decl. ¶ 16.

## III.    AUDIBLE'S INFRINGING DISTRIBUTED TEXT

On July 15, 2019, Audible announced, without any notice to Publishers, that it would be adding an "Audible Captions" feature to its Audible app.  PRH Decl. ¶¶ 15, 16.  As a result, in addition to supplying the audio version of Publishers' works, Audible copies, distributes, and displays an entire version of the text of a book to the user without Publisher approval, compensation, input, or control of the quality and presentation of the text.  Hachette Decl. ¶ 10; PRH Decl. ¶ 43; Scholastic Decl. ¶ 10; S&S Decl. ¶ 20.  Specifically, after Audible curates the catalog of works that will have Distributed Text, its feature, on demand, generates and displays in a matter of milliseconds the Distributed Text, synchronized to the audiobook, on the user's screen.  PRH Decl. ¶ 25.  Audible touts the Distributed Text as facilitating listeners' ability "to follow along with a few lines of text as they hear the audiobook performed."  *Id.* ¶ 27.  On July 15, Audible released a promotional video, in which the Distributed Text looks as follows:




---

[3]    Kindle Reader can translate words, look up terms in a dictionary, and read online articles about them.  *Id.* ¶ 46.

- 7 -

The video also showed examples of audiobooks that would be available with Distributed Text. *Id.* ¶ 24. As shown at right, those works included Charles Dickens' *David Copperfield*, Stan Lee's *A Trick of Light*, Rachel Hollis' *Girl Stop Apologizing*, Suzanne Collins' *The Hunger Games*, Terry Pratchett and Neil Gaiman's *Good Omens*, Oscar Wilde's *The Picture of Dorian Gray*, and Jeff Hirsch's *Sovereign*. *Id.* Audible has indicated that Distributed Text will "be available for all titles that pass [its] quality threshold" (*i.e.*, 6% error rate). Macmillan Decl. ¶ 11.



Upon hearing Audible's announcement, many of the Publishers immediately informed Audible in writing through cease-and-desist letters that the Distributed Text constituted, among other things, copyright infringement. HarperCollins Decl. ¶ 9; Hachette Decl. ¶ 9; PRH Decl. ¶ 17; Scholastic Decl. ¶ 7; S&S Decl. ¶ 18. Apparently in response to those concerns and a tacit admission of the impropriety of the functionality, on July 31, 2019, Audible issued a press release and published a second video depicting a slightly revised version of Distributed Text that displays fewer words on the screen at a given time. The Distributed Text in the new video can be paused, rewound, or fast forwarded by controlling the audio playback. PRH Decl. ¶ 30. Even if the user turns off the volume, the Distributed Text continues to display as it displays the book "cover to cover." *Id.* In this way, the Distributed Text "serves the same exact purpose as the original books." *Id.*

Although as shown below Audible now presents fewer words on its users' screens at any given time (presumably due to the user's typeface size and other settings), the Distributed Text is still the *entirety* of the text of the book and the upshot still is to give listeners of audiobooks the written expression of the book. *Id.* ¶ 29.

 

Moreover, the press release makes clear that Distributed Text will be provided to *all* of Audible's users so "listeners everywhere can have access to this technology." *Id.* ¶ 45.

As Audible generates the Distributed Text by copying audiobook narration and converting it to text, the Distributed Text is riddled with errors. For example, works read by narrators with accents or that have foreign words or fanciful, author-created phrases (as often appear in science fiction or fantasy books) are particularly prone to mistranscription. PRH Decl. ¶ 31; S&S Decl. ¶ 22. Audible informed Publishers that, as a result of these errors, a certain percentage of audiobooks available on its service would not be included. Audible told different Publishers different percentages, but the range of audiobooks that Audible selected to have Distributed Text likely is somewhere between 40 and 50% of the audiobooks sold by Audible. HarperCollins Decl. ¶ 9; PRH Decl. ¶ 31. Audible also stated that it chose not to include "erotica" audiobooks. S&S Decl. ¶ 22.

Moreover, Audible said that the Distributed Text for the selected works would still contain errors. It again gave Publishers different numbers over the course of their meetings (including as high as 30%), but Audible admitted that, at best, the Distributed Text would contain as many as 6% transcription errors. HarperCollins Decl. ¶ 9; Macmillan Decl. ¶ 12; S&S Decl. ¶ 22. For example, in a demonstration, the Yiddish phrase "mazel tov" was mistranscribed as "mazel tough." PRH Decl. ¶ 32. Further, because the Distributed Text is not created in

partnership with Publishers, it denies Publishers and authors any say in the works chosen for the program or in any creative choices on how to present their books (such as their typefaces). HarperCollins Decl. ¶ 18.

## IV.   PUBLISHERS' COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

Publishers repeatedly have urged Audible to relent and not launch the Distributed Text, with conversations continuing as late as yesterday.  Scholastic Decl. ¶ 7.  Audible has refused to agree to stop and secure the permission that it needs under the law.  PRH Decl. ¶ 19.  Audible also has refused to grant Publishers' requests to allow them to "opt-out," and has refused requests to limit Distributed Text to text in the public domain, even though Audible easily could do so.  *Id.* ¶ 33; S&S Decl. ¶ 21; HarperCollins ¶ 20.  Accordingly, Publishers were forced to file this lawsuit and file this motion seeking to enjoin Audible's willful copyright infringement.

The works identified in Publishers' Complaint are a representative sample of the thousands of works that Publishers believe have been or will be infringed by Audible by including Distributed Text (the "Works").  The Works feature unique stories and characters by Publishers' authors, and the eBook and print editions of the Works feature various graphics and images, the selection of distinctive and stylized typeface and layout, and many other choices.  In other words, the Works embody creative expression and are the product of the ingenuity, experience, and dedication of their authors, assisted by talented editors, and the design and marketing skill of the Publishers.  Chronicle Decl. ¶¶ 7, 10; HarperCollins Decl. ¶ 5.  Each of the Works has been registered with the Copyright Office.  Chronicle Decl. ¶ 12; HarperCollins Decl. ¶ 10; Hachette Decl. ¶ 12; Macmillan Decl. ¶ 14; PRH Decl. ¶ 20; Scholastic Decl. ¶ 9; S&S Decl. ¶ 28.  Publishers are the owners or exclusive publishing licensees of copyrights in the Works.  Chronicle Decl. ¶ 7; HarperCollins Decl. ¶ 5; Hachette Decl. ¶ 5; Macmillan Decl. ¶ 5; PRH Decl. ¶ 7; Scholastic Decl. ¶ 5; S&S Decl. ¶ 8.

<u>**ARGUMENT**</u>

"In a copyright case, a district court may grant a preliminary injunction when plaintiffs demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) a balance of the hardships tipping in their favor; and (4) non-disservice of the public interest by issuance of a preliminary injunction." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012).

## I.     PUBLISHERS ARE LIKELY TO SUCCEED ON THE MERITS

Audible is liable for both direct and secondary copyright infringement, each of which are independently sufficient to establish a likelihood of success on the merits.  With regard to **direct liability**, "[a] claim of copyright infringement under federal law requires proof that (1) the plaintiff had a valid copyright in the work allegedly infringed and (2) the defendant infringed the plaintiff's copyright by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the copyright holder." *Island Software & Comput. Serv. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005) (internal quotation marks and citation omitted).

As to the first prong, Publishers control the exclusive publishing rights in the Works,[4] and the Works were registered with the U.S. Copyright Office within five years of their publication. Chronicle Decl. ¶ 12; HarperCollins Decl. ¶ 10; Hachette Decl. ¶ 12; Macmillan Decl. ¶ 14; PRH Decl. ¶ 20; Scholastic Decl. ¶ 9; S&S Decl. ¶ 28.  As a result, the registrations are "*prima facie* evidence of the validity of the copyright[s] and of the facts stated in the certificate[s]," 17 U.S.C. § 410(c), including "both valid ownership of copyright and originality." *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 549 (S.D.N.Y. 2013); *see Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012) ("A certificate of copyright

---

[4]    As Audible copies the audiobooks to create an unauthorized text-based work, it infringes the underlying literary works.  In any case, Publishers generally hold copyrights in the audiobooks as well.  Macmillan Decl. ¶ 5.

registration is prima facie evidence of ownership of a valid copyright[.]").  In any case, there is ample evidence of the Works' originality and creativity.  *See supra* 3, 10.

As to the second prong, Audible itself made Publishers' Works Caption-ready by choosing which would have Distributed Text activated, providing the technology for the transcriptions, marketing the availability of the Distributed Text, selecting and arranging that content on its app, and distributing it to the screens of consumers.  PRH Decl. ¶¶ 24–25, 29. Audible violated several of Publishers' exclusive rights under Section 106 of the Copyright Act, any one of which is sufficient to establish copyright infringement:

- **First**, Audible has reproduced the Works themselves by designing, implementing, and curating a catalog of audiobooks that it converts to the unauthorized Distributed Text.  PRH Decl. ¶ 31; *see supra* 7.  That is obvious infringement.  17 U.S.C. § 106(1); *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 99 (2d Cir. 2002) (affirming grant of preliminary injunction where defendant "copied the entire [work] and used it for a purpose identical to" plaintiff); *HarperCollins Publishers. L.L.C. v. Gawker Media LLC*, 721 F. Supp. 2d 303, 306 (S.D.N.Y. 2010) (finding at the preliminary injunction stage the reproduction right likely infringed where defendant "merely copied the material in order to attract viewers"); *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) (copying of 11% of *Harry Potter* novels held to violate reproduction right).

- **Second**, Audible has created unauthorized derivative versions of the Works, permitting listeners to follow along with the text of a book while the audiobook plays. PRH Decl. ¶ 30; *see supra* 7.  This recasting of the written Works to follow along with their audio analogues are precisely the kinds of derivative uses protected by this

exclusive right.  17 U.S.C. § 106(2); *cf. Authors Guild, Inc. v. HathiTrust*, 755 F.3d

87, 95 (2d Cir. 2014) ("recasting of a novel as an e-book or an audiobook" are

"[p]aradigmatic examples of derivative works").

- ***Third***, Audible distributes the Works to its customers as Distributed Text.  17 U.S.C.
  § 106(3); PRH Decl. ¶ 30; *see supra* 7.  This too is infringement.[5]

- ***Fourth***, Audible publicly displays the Works as Distributed Text.  17 U.S.C. §
  106(5).  To display a work is to "show a copy of it."  17 U.S.C. § 101.  To do so
  publicly means to "transmit or otherwise communicate a . . . display of the work to . .
  . the public[] by any device or process, whether the member of the public capable of
  receiving the . . . display receive it in the same place or in separate places and at the
  same time or at different times."  *Id.*  Audible Captions communicates a version of
  the text-based work to its consumers and displays it—even allowing users to pause
  the display of the text and to jump ahead or look back in the text by rewinding or fast
  forwarding the audio.  PRH Decl. ¶¶ 29–30; *see supra* 7.

As a result, unless Audible can raise a successful defense (which would be its burden to

establish), it is more than likely that Audible infringes Publishers' exclusive rights.[6]

Nor can Audible avoid its direct liability by attempting to push the blame for its actions

onto its own customers by arguing that they are unwittingly directly liable by using the

technology that Audible created for and provided to them, and encouraged them to use in the

---

[5]   The terms "distribution" and "publication" are synonymous, *see Elektra Entm't Grp., Inc. v. Barker*, 551 F. Supp. 2d 234, 242, 244 (S.D.N.Y. 2008) (collecting cases), and the latter is defined at 17 U.S.C. § 101.

[6]   Although it is Audible's burden to establish any purported defense that it may have, it should not be overlooked that it is not fair use to distribute text to assist users in understanding the audio that they are hearing.  *See Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008); *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 582 (6th Cir. 2007); *cf. ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 64 (2d Cir. 1996).  Moreover, it is not transformative to distribute content without commentary or criticism in this way.  *See Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018).

- 13 -

way they are using this technology.  This is because Audible clearly would be **secondarily liable** for their actions in three ways:

- *First*, Audible would be a contributory infringer as it has "knowledge of the infringing activity" and "induces, causes or materially contributes to the infringing conduct of another."  *See Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).  Moreover, the Second Circuit has held that "[o]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."  *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 100 (2d Cir. 2016).  Here, Audible has knowledge and contributed to the infringement of its users because it chose what audiobooks would have the Distributed Text knowing which were copyrighted from its agreements with Publishers, designed the technology that creates it, advertised Audible Captions worldwide, and will be distributing it to its users. PRH Decl. ¶¶ 25, 28, 31, 34; *see supra* 7.  Thus, Audible would be contributorily liable.

- *Second*, Audible would be liable for the "inducement of copyright infringement," which "constitutes a distinct cause of action."  *See Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 424 (S.D.N.Y. 2011).  Inducement exists where a defendant "(1) engaged in purposeful conduct that encouraged copyright infringement with the (2) intent to encourage such infringement."  *UMG Recording, Inc. v. Escape Media Grp., Inc.*, No. 11 Civ. 8407, 2014 WL 5089743, at *24 (S.D.N.Y. Sept. 29, 2014).  A defendant's intent can be shown by its "clear expression" of such intent,

such as "advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations," or "affirmative steps . . . taken to foster infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936–37 (2005) (evidence of inducement includes "advertising an infringing use or instructing how to engage" in one). Here, Audible has engaged in a worldwide marketing campaign to encourage use of Distributed Text, which Publishers repeatedly said infringes their rights. HarperCollins Decl. ¶ 9; Hachette Decl. ¶ 9; Macmillan Decl. ¶ 14; PRH Decl. ¶ 17; Scholastic Decl. 7; S&S Decl. ¶ 18. Moreover, Audible designed the Distributed Text with the intent that it would copy Publishers' Works. PRH Decl. ¶ 33; *see supra* 7. There can be no clearer example of inducement of infringement than when a service provider creates the technology to infringe, selects which works will be infringed, and advertises the feature for the express purpose of causing its customers to engage in acts that it knows will be infringing.

- **Third**, Audible would be liable for vicarious infringement because it is "[1] profiting from direct infringement while [2] declining to exercise a right to stop or limit it." *Grokster*, 545 US at 930 (2005). A direct financial interest exists where "users are drawn to [a service] because [it] permits infringement" or the infringement "increased advertising revenue and increased sales." *See Arista*, 784 F. Supp. 2d at 435; *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009) (same). Here, Audible clearly intends the Distributed Text to drive additional users to Audible's service, from which Audible will benefit financially through both subscription and audiobook purchase revenue. Hachette Decl. ¶ 25; S&S Decl. ¶ 35. Moreover, Audible has the right and ability to supervise its users by activating or

deactivating Distributed Text for its customers.  PRH Decl. ¶ 33.  As both prongs are

satisfied, Audible would be vicariously liable for its monetization of its users'

infringement.

Publishers are likely to succeed on the merits whether Audible is a direct or indirect infringer.

## II.    PUBLISHERS WILL BE IRREPARABLY HARMED BY THE INFRINGEMENT

A preliminary injunction is available where there is a likelihood of irreparable harm to

the plaintiff in the absence of such an order.  *WPIX*, 691 F.3d at 278.  Irreparable harm is "harm

to the plaintiff's legal interests that could not be remedied after a final adjudication."  *Id.* at 285.

"Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs

should not be expected to suffer the loss."  *Id.*  Moreover, "[c]ourts must pay particular attention

to whether the remedies available at law, such as monetary damages, are inadequate to

compensate for the injury."  *Id.* (alterations and internal quotation marks omitted).

In this case, Publishers are irreparably harmed in at least four separate ways by Audible's

unilateral assertion of dominance over existing and potential markets.  ***First***, Publishers are

immeasurably harmed by Audible's decision to directly compete with them in the market for the

text of their Works as well as cross-format services.  Courts in this District are clear that "[d]irect

competition may . . . constitute irreparable harm."  *See Complex Sys., Inc. v. ABN AMRO Bank

N.V.*, No. 08 Civ. 7497, 2014 WL 1883474, at *12 (S.D.N.Y. May 9, 2014) (collecting cases);

*Iris Arc v. S.S. Sarna, Inc.*, 621 F. Supp. 916, 924 (E.D.N.Y. 1985) ("It is clear that Iris and

Sarna are in direct competition in the same market.").  This is because such use "would dilute

plaintiffs' . . . control over their product."  *See WPIX*, 691 F.3d at 285 (finding irreparable harm

and granting preliminary injunction where defendant's streaming of copyrighted programming

would interfere with the regularly scheduled transmission of this programming, thus

destabilizing the television industry); *HarperCollins*, 721 F. Supp. 2d at 307 (loss of "control[]"

over "carefully orchestrated" plan for copyrighted work constitutes irreparable injury).

Publishers are deliberate in deciding how and when to make the Works available in different formats and as part of different technologies. *See supra* 3. Despite Audible working hand-in-hand with Publishers on other projects, it did not discuss the Distributed Text with them and rebuffed their requests that it cancel or even delay its imminent launch. Macmillan Decl. ¶ 14; Hachette Decl. ¶ 11; PRH Decl. ¶ 18. As a result, Distributed Text is a completely unauthorized distribution of the *entirety* of the Works to the public in a format for which Audible holds no rights. *See supra* 11. Audible alone has decided what audiobooks will be offered with Distributed Text, preventing Publishers and their authors from deciding whether their books should be selected or not. And it is a no-cost, functional substitute for the reading experience of Immersion Reading:

**Immersion Reading**



**Distributed Text**



PRH Decl. ¶ 38. The critical difference between the two is that Immersion Reading requires the purchase of both the audiobook and an eBook version of the title and thus compensates authors and Publishers. HarperCollins Decl. ¶ 15; Macmillan Decl. ¶ 19. In addition, the Distributed Text competes with Publishers' other cross-format technology products. PRH Decl. ¶ 39; Scholastic Decl. ¶ 13. This is a classic form of irreparable harm.

**Second**, Audible is devaluing the Works' text by offering it as a free add-on to Publishers' works in the marketplace. As the Second Circuit recognized in *WPIX*, plaintiffs are

irreparably harmed where their revenues are threatened by "substantially diminishing the value of their copyrighted" works. 691 F.3d at 285. Such harm exists where the defendant's actions "undermine[] [the copyright holders'] pricing model," *Take-Two Interactive Software, Inc. v. Zipperer*, No. 18 Civ. 2608, 2018 WL 4347796, at *9 (S.D.N.Y. Aug. 16, 2018), as well as where there would be a "significant undercutting of [the plaintiffs'] price points." *MPD Accessories B.V. v. Urban Outfitters*, No. 12 Civ. 6501, 2014 WL 2440683, at *10 (S.D.N.Y. May 30, 2014); *see Advanced Access Content Sys. Licensing Adm'r, LLC v. Tao*, 689 F. App'x 661, 662 (2d Cir. 2017) (affirming preliminary injunction and finding of irreparable harm where defendant's action would allow users to circumvent encryptions on plaintiff's software thereby "undermin[ing plaintiff's] business model").

Audible's actions will undermine Publishers' existing offerings in two ways. First, it will diminish the overall value of the Works' text by making it available to the public for free, creating the illusion that the text is of little value, thereby making it more difficult to convince consumers that they should pay for the Works' text in the future. PRH Decl. ¶ 40. Second, it will compete with existing business models for similar services, such as Immersion Reading and other works that combine the experience of reading text with listening to audio that properly employ authorized versions of the text and audiobook. HarperCollins Decl. ¶ 15; Macmillan Decl. ¶ 19. The Copyright Act entitles Publishers and their authors to receive compensation for the text of Works, and Audible's infringement will cause them to lose unquantifiable revenues and provide consumers with less incentive to participate in Audible Immersion market.

*Third*, Publishers are irreparably harmed by the Distributed Text because they were unable to ensure that its quality, presentation, and distribution was consistent with their choices as the copyright holders for the Works, which will harm their reputations among consumers and

authors.  Courts "routinely find the harm suffered by plaintiffs in copyright cases to be 'irreparable' on the theory that . . . diminished reputation can be difficult if not impossible to measure." *Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016); *see Take-Two*, 2018 WL 4347796, at *9 (finding it "is impossible to quantify the reputational harm that Take-Two will suffer from losing its credibility with video game players" as a result of infringement).

Audible readily admits that the Distributed Text is not consistent with the high quality consumers have come to expect of the Publishers' Works.  Initially, the Distributed Text is transmitted without regard to punctuation, grammar, or formatting of the Works, thereby providing an inferior reading experience to users.  *See supra* 7.  Additionally, the Distributed Text will have an error rate of as much as 6%, meaning that the text that consumers receive will not match the official, authorized text of the Works.  *Id.*  As mentioned above, this could mean that 18 whole pages of a 300-page book are errors, or 6000 errors out of 90,000–110,000 words. Macmillan Decl. ¶ 12.  And Audible alone has selected what typefaces and other formatting will be used for the Distributed Text, which Publishers understand will not be consistent with Publishers' creative choices for their physical or eBook offerings.  PRH Decl. ¶ 43.  Publishers' business depends on maintaining a positive reputation among authors and consumers as trusted and valued stewards of their authors' works and ensuring that consumers enjoy each version of the Works that are made available.  Macmillan Decl. ¶ 21; S&S Decl. ¶ 35.  Audible's intention to take it upon itself to release a feature of inferior quality using Publishers' copyrighted Works is precisely the type of irreparable injury requiring injunctive relief.

*Finally*, monetary damages cannot sufficiently compensate Publishers for the harm that they will suffer if the Distributed Text is allowed to launch.  As numerous courts have explained,

damages from copyright infringement are notoriously difficult to calculate. *See, e.g.*, *WPIX*, 691 F.3d at 286 (granting preliminary injunction where "plaintiffs' losses would be difficult to measure"); *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("[C]ourts have tended to issue injunctions in this context because 'to prove the loss of sales due to infringement is ... notoriously difficult.'"); *Elsevier Inc. v. www.Sci-Hub.org*, No. 15 Civ. 4282, 2015 WL 6657363, at *3 (S.D.N.Y. Oct. 30, 2015) (irreparable harm where "some percentage of [the copyrighted works] would no doubt have been paid for legitimately if they were not downloadable for free, but there appears to be no way of determining how many that would be"); *Pearson Educ., Inc. v. Vergara*, No. 09 Civ. 6832, 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010) (noting in permanent injunction analysis that the decline in textbook sales is an "injury difficult to quantify").

Audible's feature will not simply cause a few lost sales. It is an extreme departure from the standard way of doing business that will undermine the entire book industry the moment it becomes available by, among other things, usurping Publishers' decisions regarding the formats in which the Works are made available, undermining sales of new releases, and creating an expectation among consumers that the text of new books will be made available in this way. Moreover, offering the Distributed Text enhances the value of Audible's app and platform at the expense of Publishers' content. HarperCollins Decl. ¶ 21; S&S Decl. ¶ 36. Monetary damages cannot compensate for this harm. *WPIX*, 691 F.3d at 286. It would be impossible to create a calculation of the lost sales for new works that have no track record from which to make projections. As the Second Circuit has recognized, it would be grossly unfair to deny copyright holders injunctive relief only to later deny them damages because they are too speculative to calculate. *See WPIX,* 691 F.3d at 286. You cannot unring the bell once the feature is released,

devaluing Publishers' Works forever.

*     *     *

In sum, Audible's Distributed Text will cause immediate, untold harm to Publishers' business, their authors, and the value of the copyrighted Works, and deprive Publishers and their authors of the control over their copyrighted Works that the law guarantees.  Accordingly, injunctive relief is proper.

## III.    THE BALANCE OF HARMS FAVORS PUBLISHERS

In assessing whether the balance of hardships weighs in favor of granting a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotation marks and citation omitted).  For example, where "the absence of an injunction would result in the continued infringement of [a copyright holder's] property interests in the copyrighted material," it supports granting an injunction.  *See WPIX*, 691 F.3d at 287.  By contrast, losing the opportunity to infringe the copyright holder's content does not weigh against granting an injunction.  *See Rovio Entm't Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536, 547 (S.D.N.Y. 2015) (finding the balance of hardships tipped in plaintiff's favor where defendant's only harm was losing the chance to copy plaintiff's copyrighted video games); *Warner Bros.*, 575 F. Supp. 2d at 553 (finding that defendant suffered no hardship where the only harm was the "loss of the chance to sell an infringing book").

Here, the balance of hardships tips dramatically in Publishers' favor given the substantial threat to the value of Publishers' content and their carefully constructed business models posed by Audible's willful infringement.  Publishers work to develop high quality, creative books. Chronicle Decl. ¶ 10; Hachette Decl. ¶ 21; HarperCollins Decl. ¶ 17; Macmillan Decl. ¶ 21; PRH

- 21 -

Decl. ¶ 42; Scholastic Decl. ¶ 10; S&S Decl. ¶ 35  To do so, they expend extensive time, effort, and ingenuity in working on each work.  Macmillan Decl. ¶ 21.  As discussed above, Audible's Distributed Text undercuts those investments, leading to irreparable harm to Publishers.  *See supra* 16.  The risk of wrongfully denying an injunction here is serious, for each day Audible distributes the text of the Works as Distributed Text, Publishers not only will lose revenue, but they also will risk losing customers, some of whom may not return to buying Publishers' eBooks, or existing offerings for reading and listening to books at the same time, once they switch to Audible's free, infringing alternative.  *See Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411–12 (S.D.N.Y. 1999) (finding plaintiff, a software company, suffered hardship where it might lose customers to defendant pending an interim decision).  Further, if Audible is not enjoined, its free dissemination of Publishers' Works will threaten Publishers' other partners, who compete with Audible but abide by copyright law principles, and upon whom Publishers rely to distribute the Works.  HarperCollins Decl. ¶ 14; Macmillan Decl. ¶ 20.  Thus, the Distributed Text threatens Publishers' business relationships and risks encouraging infringement by other partners, who will otherwise be unable to compete with Audible.

By contrast, Audible will not be harmed by Publishers' requested injunctive relief. Publishers only are requesting that this Court stop Audible from providing their works as Distributed Text, which has not even started yet.  Audible can continue to sell audiobook versions of the Works, and other titles, as part of its robust existing offerings.  It could even provide Distributed Text for public domain works if it so chose, which clearly is an option as there are many works in the public domain, and the two works that Audible has used in its advertising to date are Charles Dickins' *David Copperfield* and Jane Austin's *Pride & Prejudice*. Hachette Decl. ¶ 24.  Both are in the public domain.

Moreover, the Second Circuit has made clear that a defendant "cannot be legally harmed by the fact that it cannot continue" infringing a plaintiff's copyrighted works, "even if this ultimately puts [the defendant] out of business." *WPIX*, 691 F.3d 287 (internal quotations marks omitted); *see also SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 197 (S.D.N.Y. 2009) (where defendant infringed plaintiff's copyrighted software, the "loss of ability to engage in unauthorized conduct and the concomitant business opportunities that such activities may provide," did not constitute hardship). As Judge Learned Hand has noted, "advantages built upon a deliberately plagiarized [products] do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed." *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir. 1934). It cannot be argued that Publishers' narrowly tailored injunction would risk putting Audible out of business. All that Audible risks losing is the ability to infringe Publishers' copyrights, which is not legally cognizable harm. Accordingly, the balance of the hardships favors entry of Publishers' proposed injunction.

## IV.    AN INJUNCTION WILL SERVE THE PUBLIC INTEREST

In this case, the public will be served by the issuance of injunctive relief for multiple reasons. ***First***, there is a strong public interest in "prevent[ing] the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Warner Bros.*, 575 F. Supp. 2d at 553; *see also Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985) (purpose of copyright is to ensure that copyright owners receive "a fair return for their labors"). Audible's unauthorized Distributed Text deprives Publishers of both the benefits of their creative Works and the ability to control how their Works are presented. This is contrary to the stated policies underlying the Copyright Act, thereby undermining the public interest in promoting these policies.

***Second***, the public has an interest in ensuring that creators maintain the integrity of their

works by "secur[ing] the rights of [their] creative activity." *Kurt S. Adler, Inc. v. World Bazaars, Inc.*, No. 95 Civ. 5610, 1995 WL 527991 at *1 (S.D.N.Y. Sept. 6, 1995) (denying motion to stay preliminary injunction). The Copyright Act is designed to incentivize creation and ensure that creators are able to reap the benefits of their creation without fear of free-riding or misappropriation. *See Midway Mfg. Co., v. Arctic Int'l, Inc.*, 547 F. Supp. 999 1015 (N.D. Ill. 1982) (noting that "[t]he Copyright Act evidences a public interest in creativity by demonstrating an intent to provide an economic reward for creative expression").

 ***Third***, the public will not lose out on the opportunity to access the Works, including by listening to audiobooks while reading their text. *See WPIX*, 691 F.3d at 288 (finding that "the public will still be able to access plaintiffs' programs through means other than [defendant's] service," as a reason why the public interest was not harmed by granting a preliminary injunction). Physical, eBook, and audiobook versions of the Works are available and will continue to be available. PRH Decl. ¶ 5. Moreover, consumers can continue to use Immersion Reading to read the text of the Works while they are listening to the audiobook versions. Macmillan Decl. ¶ 23. The only difference will be that (a) Publishers and their authors will be remunerated for such use, and (b) the text provided to the public will accurately reflect the text of the Works, instead of a 6% error rate, and include Publishers' desired textual presentation. *See supra* 18.

 ***Finally***, Audible's attempt to clothe itself in a ramshackle argument that the Distributed Text is important to education cannot justify refusing Publishers' requested injunction. As an initial matter, Audible admits that the Distributed Text is not limited to this market as its own press release states that "*listeners everywhere can have access to this technology*." PRH Decl. ¶ 45 (emphasis added). The Distributed Text also is not necessary as existing offerings provide a

better pedagogical experience than the error-riddled Distributed Text. *See supra* 5.  Furthermore, Audible could limit the Distributed Text to just public domain works, or could offer a special program <u>only</u> for students as a charitable endeavor whereby it provides works enabled with Audible Immersion at no cost, but continues to compensate Publishers for both the eBook and the audiobook.  It has chosen not to do so.

Audible's educational pretext if accepted would dilute the Works' copyright protection by being used to justify all kinds of infringement.  Indeed, one can imagine how useful it would be for students to have their books read to them.  Yet no one has suggested that creating audiobooks does not require permission from the copyright holder as the Second Circuit has made clear that "[p]aradigmatic examples of derivative works include . . . the recasting of a novel as . . . an audiobook." *HathiTrust*, 755 F.3d at 95.  Likewise, Audible already has said that in time it would like to provide Distributed Text in other languages, which would undercut the important market for translations.  S&S Decl. ¶ 23.  Readers and listeners would be all the poorer if these critical markets are crippled by a company like Audible.  Finally, Audible is working from the false premise that distribution to the education market is not important to Publishers and their authors.  That simply is wrong.  The education market is critical to Publishers and the impact of Audible's actions will be deeply felt by them. *See supra* zzz.  The public interest clearly favors issuance of an injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, Publishers respectfully request that this Court enter an order preliminarily enjoining Audible from providing the Distributed Text to consumers.

Dated: New York, New York
August 23, 2019

Dale M. Cendali
Joshua L. Simmons
Jordan Romanoff
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
jordan.romanoff@kirkland.com

*Attorneys for Plaintiffs*