JUDGE CAPRONI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRONICLE BOOKS, HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, MACMILLAN PUBLISHING GROUP, LLC, PENGUIN RANDOM HOUSE LLC, SCHOLASTIC CORPORATION, AND SIMON & SCHUSTER, INC.

  Plaintiffs,

- against -

AUDIBLE, INC.,

  Defendant.

Case No. _____

ECF Case

19 CV 7913

---

**DECLARATION OF JEFFREY WEBER OF PENGUIN RANDOM HOUSE LLC IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Jeffrey Weber, declare as follows:

1. I am the Senior Vice President, Director of Online Sales & Business Development for Penguin Random House LLC ("PRH"). I have held the position for the last six years.

2. In this role, I lead the online and digital sales team for PRH, coordinating the many book products aimed at online distribution (such as audiobooks and eBooks). Further, I negotiate new relationships with digital distributors and identify new innovative methods of distributing PRH's works to the public.

3. I understand that PRH, as well as Chronicle Books LLC; Hachette Book Group, Inc.; HarperCollins Publishers LLC; MacMillan Publishing Group, LLC; Scholastic Corp.; and Simon & Schuster, Inc. (collectively "Publishers" or "Plaintiffs") have filed a complaint against Audible, Inc. ("Audible") concerning Audible's newly-announced Audible Captions feature. I also understand that they are trying to enjoin Audible from offering the Audible Captions feature.

4. As I am familiar with the topics identified above, I submit this declaration in support of Plaintiffs' motion for a preliminary injunction. It is based on my personal knowledge and my knowledge based on the review of the documents discussed below.

**Penguin Random House and PRH Audio**

5. PRH is one of the world's largest and most storied publishing houses, with some of its imprints dating back to the 1800s. Today, it publishes tens of thousands of digital and print titles annually. More than 60,000 of PRH's eBooks are available worldwide. As a modern book publisher, PRH's publishing efforts span a variety of media, servicing customers who enjoy books through traditional hardcover and paperback editions, pocket-mini editions, translations, serializations, electronic editions (eBooks), audiobooks, and cross-format experiences. PRH invests in the identification, promotion, and distribution of works by new and existing authors,

including how particular books by those authors should be presented in each available format. PRH uses its resources to support its talented authors, provide advances on royalties, and continue to invest in new ways to bring books to audiences.

6. Notably, PRH has invested heavily in its audiobook offerings. Under several imprints, including Listening Library, Random House Audio, Penguin Audio, and Books on Tape, PRH Audio is the world's largest publisher of audiobooks for general readers/listeners. PRH sells its audiobook content through authorized relationships with third-party wholesalers and retailers, including Audible. Audiobooks are a major source of revenue growth for PRH and the book industry overall.

7. PRH is the owner or exclusive licensee of thousands of copyrighted works. These books were created by their authors and reflect their authors' creativity and PRH's decisions as to presentation style, such as typeface, design, and layout.

**Audible and Cross-Format Offerings**

8. Audible, owned by Amazon, Inc., is the largest retailer of digital audiobooks purchased for download in the country. It offers hundreds of thousands of digital audiobooks to listeners through monthly subscriptions and individual a la carte purchases. According to public industry data, Audible accounts for around 41% percent of all audiobook sales.

9. As with the other Publishers, PRH makes the approximately 13,000 audiobooks it publishes available for sale through Audible, subject to the specific terms of an agreement between PRH and Audible. Sales to Audible users make up a large portion of PRH's total audiobook sales. Although Audible is authorized to sell the audiobook editions of PRH's books, it is not authorized to create or transmit their print versions.

10. PRH and Audible have a long history of developing new ways to distribute PRH's titles to Audible's customers. Since 2012, Audible has offered two cross-format features, called

"Whispersync" and "Immersion Reading," that combine audiobooks with eBooks so that consumers have a cross-format reading/listening experience.

11. Whispersync allows a user to transition between listening to an audiobook on the Audible app and reading the corresponding eBook that he or she has purchased on the Kindle app. Two images from Audible's marketing for Whispersync include the following:







12. Immersion Reading allows users of Amazon's Kindle eBook app to purchase an add-on from Audible that causes the corresponding audiobook to play alongside the eBook that they have purchased. As shown below (at left), a user can access Immersion Reading by clicking the headphones symbol at the bottom of his or her eBook in Amazon's Kindle app, which will

4

cause the Audible audiobook to be displayed at the bottom of the page.  The audiobook then can be played from within the Kindle app, with a bar showing the progress of the audio recording.  As shown below (at right), Immersion Reading creates a synchronized reading and listening experience, using a highlighted tool to signal the accompanying words being read by the narrator of the audiobook.  Audible has synchronized the text with the performed audio, and claims it has two patents on the software that enables the synchronicity.




13.     PRH receives revenues from Amazon and Audible, respectively, based on sales of both the eBook and audiobook that are offered as part of these cross-format features.

14.     PRH also encourages the development of other cross-format offerings by other distributors that combine audio and text experiences.  For example, a digital book distributor called Findaway has partnered with publishers, including PRH, to introduce a children's read-along product called Wonderbook (a physical book with a pre-loaded audiobook embedded in the front cover).  PRH's children's division continues to offer book and CD packages for select young reading materials.

**PRH Learns of Audible Captions**

15.     On or about July 16, 2019, *USA Today* published an article that detailed Audible's planned rollout of a new feature designed to allow Audible customers to listen to and read books at the same time. Called "Audible Captions," the article reported, "reader-listeners will be able to adjust font types and sizes and choose to follow the words on screen through progressive type (it appears as if someone is typing), or via word-by-word or line-by-line visuals." A true and correct copy of the article is attached hereto as **Exhibit 1**. The next day, several other media outlets picked up the story, including the *Los Angeles Times*, *Publisher's Weekly*, and *The Verge*. True and correct copies of these articles are attached hereto as **Exhibit 2**.

16.     PRH was shocked by the announcement as Audible never contacted PRH to discuss its rollout of this new feature. The announcement was doubly surprising given PRH's past work with Audible on other projects, including the Immersion Reading feature.

17.     On July 17, 2019, PRH sent a letter to Audible objecting to the Audible Captions feature and explaining that it was an unauthorized and infringing use of PRH's copyrighted content. The letter stated, in part, that "Audible's reproduction, distribution and/or display of the text for visual reading would constitute an infringement of our exclusive rights under copyright and those of our authors, and would also infringe our exclusive right to create derivative works." PRH demanded that Audible not include PRH titles in the launch of Audible Captions.

18.     Audible sent a reply on July 19, 2019. Audible rebuffed PRH's concerns, and suggested without elaboration that Audible Captions was not infringing. The letter concluded by offering to provide a demonstration of Audible Captions' functionality. PRH agreed to the demonstration, which occurred last week on August 14, 2019, and which I attended. During the demonstration, PRH reiterated to Audible that it was not authorized to go forward with its launch and asked Audible to confirm that it would not do so with PRH titles.

19. In a last-ditch effort to try to avoid this lawsuit, Lee Jarit, responsible for Strategic Content Partnerships at Audible spoke with me on August 19, 2019. During that call, I again made clear that PRH did not approve of the Audible Captions feature, that it was an infringement of publishers' and authors' rights, and that PRH titles could not be included in the program without a license. Audible declined to acknowledge that a license was required and indicated that they intended to launch the program on September 10.

20. Thus, Audible intends to include thousands of PRH's works, a representative sample of which are below:

- *A Path Appears: Transforming Lives, Creating Opportunity,* by Nicholas D. Kristof and Sheryl WuDunn
- *Atomic Habits: An Easy and Proven Way to Build Good Habits and Break Bad Ones* by James Clear
- *Balto of the Blue Dawn* by Mary Pope Osborne
- *Educated: A Memoir* by Tara Westover
- *God Save Texas: A Journey into the Soul of the Lone Star State* by Lawrence Wright
- *In the Unlikely Event* by Judy Blume
- *Little Fires Everywhere* by Celeste Ng
- *Let the Great World Spin* by Colum McCann
- *Past Tense: A Jack Reacher Novel* by Lee Child
- *Perfidia* by James Ellroy
- *The Friend* by Sigrid Nunez
- *The Sports Gene: Inside the Science of Extraordinary Athletic Performance,* by David Epstein
- *Turtles All the Way Down* by John Green
- *Wintergirls* by Laurie Halse Anderson

The underlying text of these books was registered with the Copyright Office within five years of their publication. The Certificates of Registration for each book were attached to the Publishers' Complaint in this case as Exhibit 3, and I can confirm that the certificates are true and accurate.

21.     In light of Audible's recent confirmation that it would not be stopping its launch despite PRH's objections, PRH has filed this lawsuit and is seeking a preliminary injunction to maintain the current situation while the case is litigated.

**Audible Captions Generates the Text of PRH's Works**

22.     In this section, I describe my understanding of Audible Captions based on Audible's public statements and my understanding of the feature from the demonstration that I attended.

23.     On July 15, 2019, when Audible made its announcement, it also released a promotional video titled "Introducing Audible Captions."[1] It was attached to the Complaint in this case as Exhibit 1.

24.     As shown below, the video begins by showing the Audible app with a number of audiobooks in its library, including Charles Dickens' *David Copperfield*, Stan Lee's *A Trick of Light*, Rachel Hollis' *Girl Stop Apologizing*, Suzanne Collins' *The Hunger Games*, Terry Pratchett and Neil Gaiman's *Good Omens*, Oscar Wilde's *The Picture of Dorian Gray*, and Jeff Hirsch's *Sovereign*. Each of these books has a speech bubble indicating that Audible Captions is enabled for that book. As this should make clear, Audible has itself determined which books will be available with Audible Captions.

---

[1]     Audible, *Introducing Audible Captions*, YOUTUBE, https://www.youtube.com/watch?v=TbQgyzKRzJY.



25. My understanding is that, when one of Audible's pre-selected books is tapped, Audible copies the audiobook, transcribes it using Amazon Web Services' speech-to-text technology, and then distributes that text (the "Distributed Text") a few lines at a time to its users.  The text is generated in near real-time from a "network" audio file maintained in Audible's cloud server, and not from the customer's local downloaded audio file.  As a result, a user's device must be connected to the Internet to generate the text.  The Distributed Text is then synchronized to the audiobook, so that as the audiobook plays, the text advances one step at a time as shown below.  In other words, as shown below, Audible is creating complete text versions of audiobooks.




26. On July 31, 2019, Audible issued a press release with additional details about Audible Captions. A true and correct copy of the press release is attached hereto as **Exhibit 3**.

27. In the press release, Audible touts that Audible Captions "will allow listeners to follow along with a few lines of text as they hear the audiobook performed." It goes on to explain that Audible Captions provides "machine-generated transcriptions to accompany Audible content."

28. Along with the press release, Audible created a new video advertisement. Of particular note, the advertisement includes demonstrations of both Immersion Reading and Audible Captions by Audible's Chief Product Officer, Richard Stern.[2] It was attached to the Complaint in this case as Exhibit 2.

29. In the advertisement, Mr. Stern gives an overview of Audible Captions. As in the original promotional video, an Audible user taps an icon in the Audible app to access one of Audible's audiobooks. Once a user turns on Audible Captions, it is applied to all of the

---

[2] Audible, *Audible Captions Demo*, YOUTUBE, https://www.youtube.com/watch?v=gigFk-8VkKs.

audiobooks in the user's library as well as future purchases, to the extent that those titles are Caption enabled by Audible. As shown below, Audible transmits the Distributed Text to the user's device, which will remain synchronized with the audio playback. Depending on the font size chosen by the user and presumably her phone size, in this revised version of Distributed Text, ten to fifteen words appear on the reader's screen at any time.

 

30.     The rate at which the Distributed Text appears on the screen can be paused or modified by controlling the audio playback. Likewise, the user can jump ahead or look back in the text by rewinding or fast forwarding the audio track. The Distributed Text always appears wherever the audio picks up. Even if the user turns off the volume of the audio, the Distributed Text continues to display. In this way, an Audible user can read a book in its entirety, "cover to cover." The Distributed Text thus serves the same exact purpose as the original books.

31.     Audible's press release indicated that Distributed Text will be available "for all titles that pass our quality threshold." Although Audible has complete control over the selection of which works will have Distributed Text, it told PRH that, at this time, it is including works with a 6% error rate or less. Audible estimated, given the current state of its transcription

technology, that this would be approximately 40% to 50% of its audiobook titles.  As an example, Audible indicated to PRH that audiobooks of Shakespeare plays would not currently transcribe accurately enough to qualify for Distributed Text.  To be able to calculate the percentage of books that would qualify for Distributed Text, it would appear that Audible already has created Distributed Text for all of the Publishers' audiobooks.

32. Even the audiobooks that qualify will have some embarrassing errors.  For instance, Audible has said that its system mistranslated the Hebrew phrase "mazel tov."  PRH is concerned that this will give readers a negative and frustrating reading experience and undermine the readers' perception of the quality of the books.

33. When asked, Audible admitted to PRH that it could exclude other classes of works (such as all titles from PRH) from having Distributed Text, but stated it would involve considerable software programing that they did not wish to undertake and that they had no interest doing so.

34. The press release indicated that Audible is aiming to launch at the beginning of the new school year in the first half of September 2019.  In subsequent recent discussions as noted above, Audible confirmed that it is targeting September 10, 2019.

**The Distributed Text Will Harm PRH**

35. My understanding is that Audible intended to provide Distributed Text for PRH's works without PRH's permission and without compensation.  Based on my experience, I can see at least three ways that this will harm PRH and the publishing industry.

*Direct Competition with PRH's Existing Offerings*

36. PRH earns sales revenue from producing and distributing high-quality literary works.  As discussed above, just as there are myriad ways that consumers can discover and consume PRH's works, there are myriad types of arrangements for enjoying PRH's books.

When PRH works with third parties to distribute different versions of its books, it is selling and authorizing the resale of a specific product or format and does not authorize the adaptation of that format or an extension of additional rights. For example, an eBook distributor does not have permission to create an audiobook. Similarly, an audiobook distributor does not have permission to print a book. Likewise, foreign translations are a separate and longstanding market important to PRH's business. Each format is distinct, requires additional investments of time and energy to create, and is subject to a separate negotiation and agreement. Divisibility is important to ensuring a flexible and responsive distribution approach that provides revenues needed to maintain profitability.

37.     Audible is upending this arrangement by distributing the text of the underlying book. Because the Distributed Text is a free substitute for the eBook versions of the works, it will compete with PRH's other offerings, including physical books and eBooks, siphoning off PRH's profits from those uses to an unmeasurable degree.

38.     The Distributed Text also will compete with PRH's existing cross-format offerings. As discussed above, everything that users already can do with the Distributed Text, they already can do better with Immersion Reading. A key difference is that Audible's Immersion Reading customers will purchase both the audiobook and the eBook, thereby maintaining the traditional division between those markets as well as appropriately compensating PRH and its authors. By contrast, the Distributed Text only requires the purchase of the audiobook, denying PRH and its authors the opportunity to monetize the eBook version. Moreover, the accuracy of the text obtained through Immersion Reading better reflects the authors' words, providing a beneficial reading and educational experience.

39.     Likewise, PRH has other "read along" products with which Audible Captions also

will compete, such as the books packaged with CD's and their digital equivalents discussed above.  For example, PRH has worked with a company called Kaidike to adapt its works for a "talking pen" that produces sound corresponding to the words on a page, intended as an English-language training tool for Chinese readers.  PRH sells specially formatted editions of its Step Into Reading books to Kaidike that are compatible with its Talking Pen.  Audible Captions subjects these markets to harm, the magnitude of which is uncertain and unquantifiable.

*Devaluation of Text Used in Cross-Format Technologies*

40. In addition to the direct competition with PRH's existing offerings, by giving away the Distributed Text for free, Audible will devalue the market for text-based works.  My view is that readers will begin to question whether the text is worth paying a separate fee, thereby disrupting that market.  Audible is unilaterally creating a "two for the price of one" business model that devalues eBooks in a lasting and immeasurable way.

41. Furthermore, Audible's unilateral use of Distributed Text undermines the ability for PRH to market and promote other cross-format licensing activities, as well as foreign translations.  If a user can receive cross-format technology from Audible without purchasing an eBook (or a physical book), there is no reason to purchase an eBook or physical book.  It is impossible to estimate the monetary loss from the effect of teaching readers and distributors that the text of a work is not valuable simply because it is transcribed in real time from the audio version of the work.

*Loss of Control Over the Quality of PRH's Works*

42. When authors sign on to work with PRH, they expect high quality editing, design, production, promotion and distribution of their works.  Likewise, when PRH publishes a book, readers and listeners expect a high quality reading or listening experience.  PRH invests considerable time, effort, and creativity in ensuring that those expectations are met.  The finished

product is always careful and deliberate.  PRH is strategic and deliberate in deciding whether and how to distribute its works into different formats.  Where distributors create innovative methods of providing PRH's works—such as Whispersync and Immersion Reading—PRH takes care to ensure that readers are given the high-quality experiences that they expect from our company and also makes sure to reserve the right to opt out of any particular distribution channel for any specific book.

43. The Distributed Text subverts those expectations by denying PRH any say in the books published in its name.  As discussed above, Audible admits that the Distributed Text may contain a 6% error rate, which is totally at odds with how PRH and its authors seek to present their books.  PRH is concerned that certain defects or errors in Audible's product will outrage authors and disappoint readers, the latter of whom likely will assume that it is PRH that caused their faulty reading experience.  In addition, the Distributed Text does not appear to be presented in the same format as PRH's physical and eBook offerings, including using a different page layout and typeface.  In other words, Audible's Distributed Text casts aside the painstaking investment of time, money and careful planning that underlie the creation, selection, design, and presentation of PRH's works.

44. PRH carefully nurtures its relationships with its audience.  It is unconscionable that Audible is distributing such an unauthorized and inferior reading experience in blatant disregard of PRH's creative and commercial interests.

**Audible's Claim that the Distributed Text is for Education Makes No Sense**

45. Audible's excuse for providing the Distributed Text continues to shift over time. Sometimes Audible claims that the Distributed Text is intended for students, but Audible's press release admitted that it will be making the Distributed Text available to its entire customer base, "so students, parents and listeners everywhere can have access to this technology."  Audible

confirmed this in our meeting, stating that, although it could have restricted the Distributed Text to students, it will provide the Distributed Text to anyone who purchases an audiobook from Audible. Thus, Captions is decidedly a mass market feature intended to bring new users to the Audible app and generate additional revenues.

46. Similarly, in its press release, Audible claimed that Distributed Text will allow listeners to check words that they might mishear and to look up the meanings (or, in the case of non-native English speakers, translations) of unfamiliar words. In its advertisement video, Mr. Stern claimed that the Distributed Text is intended to enable students to follow along with the text as they listen to an audiobook book as a way to focus while they listen, thereby enhancing their understanding of the content. Even if these explanations were true, they are misleading: these are both objectives already met through existing Immersion Reading and Whispersync products, both of which appropriately compensate PRH. In fact, any eBooks on Kindle have this function, so Audible Captions is not adding anything new. It is also unclear how a product that displays a handful of words at a time with a 6% error rate will suffice as a learning tool, especially as Audible's existing cross-platform offerings deliver the original, error-free text of a purchased eBook. Nor did Audible adequately explain why using PRH's copyrighted works without authorization (rather than public domain works) is necessary to its supposed educational strategy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21 day of August, 2019.          _____
                                                              Jeffrey Weber