JUDGE CAPRONI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRONICLE BOOKS, LLC; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS LLC; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SCHOLASTIC INC.; AND SIMON & SCHUSTER, INC.<br><br>Plaintiffs,<br><br>- against -<br><br>AUDIBLE, INC.<br><br>Defendant. | Case No. _____<br><br>ECF Case<br><br>**PLAINTIFFS' RULE 7.1 DISCLOSURE STATEMENT**<br><br>19 CV 7913 |

**DECLARATION OF MICHAEL PIETSCH OF HACHETTE PUBLISHING GROUP, LLC IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Michael Pietsch, declare as follows:

1. I am the Chief Executive Officer for Hachette Book Group, Inc. ("Hachette"). I have held the position for over six years. In this role, I lead the strategic decision-making of Hachette, helping the executive team maintain Hachette's role as a leading voice for authors in the era of modern publishing. I oversee acquisitions and partnerships, and take a personal role in securing relationships with our authors.

2. I understand that Hachette, as well as HarperCollins Book Group, LLC; Macmillan Publishing Group, LLC; Penguin Random House LLC; Scholastic LLC; Simon & Schuster, Inc. (collectively "Publishers" or "Plaintiffs") will be filing a complaint against Audible, Inc. ("Audible") concerning Audible's newly-announced Audible Captions feature. I also understand that they will be seeking to enjoin Audible from offering the Audible Captions feature.

3. I submit this declaration in support of Plaintiffs' motion for a preliminary injunction. It is based on my personal knowledge and my knowledge based on the review of the documents discussed below.

**Hachette and Audiobooks**

4. Hachette is a publishing company, having its principal place of business in New York City and is qualified to do business and is doing business in the State of New York and in this District. A division of Hachette Livre, the third-largest trade and educational publisher in the world, Hachette publishers include Little, Brown and Company; Little, Brown Young Readers; Grand Central Publishing; Basic Books; Public Affairs; Orbit; Worthy and Center Street. Hachette's bestselling authors include David Baldacci, Michael Connelly, Malcolm Gladwell, Elin Hilderbrand, N. K. Jemisin, Stephenie Meyer, James Patterson, J.K. Rowling, J.D. Salinger, Rick Steves, Donna Tartt, and Malala Yousafzai.

5.  Hachette is the owner or exclusive licensee of thousands of copyrighted literary works. These books were created by their authors and reflect their authors' creativity and Hachette's deliberate decisions as to presentation style, such as typeface and layout.

6.  To bring its authors' works to new consumers, Hachette has invested heavily in its audiobook offerings, with its imprint Hachette Audio consistently recognized as a leader in the field. Hachette Audio has won 56 Audie Awards, and publishes audiobooks serving a wide variety of readers. In addition to servicing its own imprints, Hachette has partnered with other publishers, including a partnership with Chronicle. As a whole, the audiobook market is skyrocketing, with six consecutive years of double-digit growth. More than ever, consumers are turning to audiobooks to engage with Hachette's catalog.

7.  Audible has engaged in developing new ways for consumers to listen to audiobooks. For example, it has created two cross-format features, called "Whispersync" and "Immersion Reading." Whispersync allows a user to transition between listening to an audiobook on the Audible app and reading the corresponding eBook that he or she has purchased on the Kindle app. Immersion Reading allows a user to listen to the audiobook through the Kindle app, and read along with the highlighted text in sync with the audio. Importantly, Hachette receives revenues based on sales of both the eBook and audiobook that are offered as part of these cross-format features. Hachette engages in consideration of other cross-format offerings by other distributors that combine audio and text experiences. For example, Hachette has worked with its distributor Findaway on a new product called Wonderbook, a special print edition with a built-in audiobook intended to allow young readers to listen along with their favorite books.

**Audible Kept Hachette in the Dark**

8.  Despite a long and productive working relationship with Audible, Hachette

learned of Audible Captions from Audible's public announcements in late July. Distressingly, Audible did not give Hachette any advance notice of Captions, nor did it seek permission from Hachette before the announcement.

9. On July 18, 2019, Hachette sent a letter to Audible advising that the Captions feature constituted an infringing use of its works. Audible responded on July 22, 2019 rebuffing Hachette's position. On July 23, 2019, Hachette sent a reply, reaffirming its view that the works that Audible was generated violated Hachette's rights.

10. Based on my understanding, Audible Captions uses our audiobooks to generate the book's text and send it to a user's device (the "Distributed Text"), which the reader can consume unabridged. In this way, Audible's Distributed Text is a substitute for Hachette's text-based works (*i.e.*, its physical and digital books), but at a lower quality and with no input from or compensation to the publishers.

11. Audible's silence leading up to the announcement was especially concerning given the short timeframe it set out. The press release indicated that Audible plans to launch at the beginning of the new school year in early September 2019. In its correspondence with Audible, Hachette asked that Audible not include any Hachette titles in the planned feature. Nonetheless, Audible declined to halt the release of the Distributed Text and has refused Hachette's request to exclude its titles from distribution.

12. I understand that Hachette has identified the following examples of its books that have been or are likely to be infringed by Audible using the Audible Captions feature:

- *Blink* by Malcolm Gladwell
- *David and Goliath* by Malcolm Gladwell
- *The Tipping Point* by Malcolm Gladwell
- *The Lost City of the Monkey God* by Douglas Preston

- *The Monster of Florence* by Douglas Preston and Mario Spezi

Their underlying text was registered with the Copyright Office within five years of their publication. The Certificates of Registration for each book were attached to the Publishers' Complaint in this case as **Exhibit 3**, and I can confirm that the certificates are true and accurate.

13. When it became clear that Audible was not going to change its mind despite the objections of Hachette and other publishers, Hachette decided to join this lawsuit to honor its obligations to its authors and maintain its quality reputation to audiences.

**Audible's Product Cuts Into Hachette's Lawfully Controlled Markets**

14. Audible's impending launch of the Distributed Text is without Hachette's authorization and will lead to substantial, incalculable, and immediate harm. Based on my expertise in the publishing industry, I believe there are three types of harm that will follow from the Distributed Text. First, if a distributor of audiobooks is permitted to provide a full version of the text for free, there will be a deleterious effect on the market for those texts. Second, continued distribution of a free-text supplemental feature will undermine the market for cross-format works. Finally, Hachette is highly alarmed at the poor quality of the Distributed Text, which, if disseminated, would compromise the integrity of Hachette's works, and would erode its relationships with its authors and audiences.

*Hachette's eBooks and Physical Books Are Harmed by the Distributed Text*

15. Hachette publishes its books through a wide and diverse set of formats, such as paperbacks, CDs, Braille, large print, eBooks and digital audiobooks. These formats have evolved over decades and centuries in response to technological changes. In order to stay current, Hachette ensures that each new format and distribution channel results in royalties for authors, who depend on a steady stream of income from their works to keep creating new works.

16. Over the decades, separate markets have arisen for the formats listed above. All

deliver the content of Hachette's work to consumers. Distributors thus engage in selling particular formats of Hachette's works. Ensuring that each market is treated separately allows Hachette to recoup the time, money, professional expertise and resource necessary to adapt its works into new markets like eBooks and audiobooks, while maintaining a positive experience for audiences.

17. The Distributed Text, as a substitute for lawfully distributed texts, undermines Hachette's market for physical and digital books. Audible, though it is not authorized to sell Hachette's texts, is generating a free version for its own customers. Given the chance to read text for free, an Audible subscriber would have no reason to pick up an authorized eBook or a print edition. Despite the fact that the Distributed Text is riddled with errors, the Distributed Text will supplant the lawful markets for our eBooks and physical books. Audible, as the largest player in the audiobook space, occupies a position of extraordinary market power, and if other distributors see Audible trampling on the rights of Hachette and its authors with impunity, they may feel empowered to make similar incursions on such rights.

*Hachette's Cross-Platform Features Are Fatally Undermined by the Distributed Text*

18. Audible is treating the text of Hachette's books as something that can be reproduced without authorization. As a result, Audible has also compromised Hachette's ability to benefit from legitimate cross-format products and services such as Audible's own Immersion Reading feature. Importantly, Audible's Immersion Reading feature properly compensates Hachette for both the eBook and the audiobook. The result is a product that, compared to Captions, is even better for the reader. As with Captions, it allows consumers to read along in sync with an audiobook, highlighting text in the eBook as the performance unfolds. Like Captions, it allows users to look up definitions and translations through their devices. Thus, it is possible to create a positive reading-plus-listening experience while still properly paying

creators.

19. But in sharp contrast to Captions, Audible has taken for itself what belongs to authors and publishers: it has unilaterally decided that there is no reason to pay creators for the value of their text. This fatally devalues the cross-format market, and deprives authors and publishers of the royalties they deserve.

20. Harming authors harms readers. By withholding revenue from Hachette, Audible has eroded our ability to pay royalties to authors for the use of their works. In turn, this reduces Hachette's own incentives to work with distributors to create novel products. As with the harm to Hachette's texts, the harm to cross-format markets will be immediate and incalculable.

*Hachette Cannot Control Audible's Poor-Quality Product*

21. Hachette works with authors every step of the way to ensure that its finished book products are high quality. For example, Hachette works with authors to edit authors' creative works and shape them, working with them on word choices and other decisions such as page length, illustrations, readers' guides, indexes, titles, and subtitles. These decisions are as critical to digital books as they are to traditional formats such as hardcover and softcover print editions. The decision whether and how to sell an audiobook and an eBook is consequential for a publisher, and should only be made after holistically considering the benefit to its authors and readers. As a result, Hachette is proud of the books it publishes, and knows that readers can rely on Hachette to produce high-quality works.

22. The Distributed Text severs Hachette's control of its own works, and thus its own reputation. Audible has decided that Hachette deserves no input into how its audiobooks are processed into Distributed Text. Hachette and its authors cannot opt out of the Distributed Text, and Hachette cannot make decisions as to the presentation of their works through the Distributed Text. This is a disastrous and unprecedented loss of control fully inconsistent with Audible's

limited right to sell audiobooks.

23. Even worse, I understand that the Distributed Text is error-prone. Audible has stated that it will make Captions available "for all titles that pass our quality threshold," but it has indicated that it will tolerate a margin of error that Hachette would find unacceptable of any other distributor. As a result, Audible's recklessness will negatively rebound on Hachette as customers are faced with an unfavorable reading experience. A text filled with lots of errors should not have Hachette's name on it.

24. As someone who has worked with Audible for many years, I know that it would not be a major hardship for Audible to pause its rollout of Captions, or at least allow Hachette to opt out. Audible has given the impression that it could so limit: for example, it could use the Distributed Text only for portions of works in the public domain. In fact, Audible's marketing materials for Captions used two public domain works (*David Copperfield* by Charles Dickens and *Pride & Prejudice* by Jane Austen). That Audible has entirely refused to entertain the concerns of publishers is a major disappointment, and for this reason immediate relief is necessary to preserve Hachette's control over its works and reputation.

**A Mass-Market App Feature Is a Commercial Product, Not an Educational Tool**

25. Audible's messaging in releasing Captions rested heavily on the supposed benefit to well-read, but inattentive, high-school students. Hachette agrees that encouraging students to read is a valuable goal—that is why we sell books. Yet the Distributed Text's education-focused purpose is more suspect. Audible's high-profile rollout to all of its users, and with titles appealing to all audiences rather than limiting to high schoolers, appears to contradict any specific plan to cater to students. Instead, the better way to think of Captions is a product meant to encourage Audible customers to listen to Audible books by offering all customers free content (at the publishers and authors' expense in order to increase Audible's already formidable market

share).  That Audible is seeking to roll out such a product is not a problem.  The problem is that Audible has decided to do this without paying for that added content, and offering this in all markets, while disseminating copyrighted works under a flimsy excuse of promoting education.

26.  Moreover, even on its own terms, the Distributed Text does not seem to serve much of an unfulfilled educational purpose.  Certainly, a physical book or an eBook can promote education by allowing students to listen to an audiobook while reading at the same time.  In fact, if there is desire to release a product that synchronizes both text and audio, there are better ways to offer such a product, such as Audible's own Whispersync and Immersion Reading products.  Those products offer an error-free experience, as the underlying text is the authorized eBook that Hachette and the book's author worked hard to create.  Immersion Reading and Whispersync help readers comprehend books without cutting authors and publishers out of the deal.  There is no need for the Distributed Text.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of August, 2019.          _____
                                                              Michael Pietsch