**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRONICLE BOOKS, LLC; HACHETTE BOOK GROUP, INC.; HARPERCOLLINGS PUBLISHERS LLC; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SCHOLASTIC INC.; AND SIMON & SCHUSTER, INC.<br><br>         Plaintiffs,<br><br>   v.<br><br> AUDIBLE, INC.,<br><br>         Defendant. | No. 19 Civ. 7913 (VEC) |

**MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**
**AND IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Dated: September 12, 2019
     New York, New York

CLARICK GUERON REISBAUM LLP
Emily Reisbaum
Nicole Gueron
Aaron H. Crowell
Emily A. Weissler
Ashleigh Hunt
220 Fifth Avenue, 14th Floor
New York, NY  10001
Phone:  (212) 633-4310
Fax:  (646) 478-9484

*Attorneys for Defendant Audible, Inc.*

## Table of Contents

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND .................................................................... 3

   1.  Audible Is Guided by a Desire To Promote Learning and Listener Engagement .............. 3

   2.  The Ideas Behind Audible Captions ........................................................ 4

   3.  Audible Captions Is Designed To Enhance the Listening Experience ................................ 6

   4.  Audible Captions Does Not Allow a Listener To "Read" an E-Book ................................ 7

   5.  Audible Captions Offers Significant Potential Benefits ....................................... 8

   6.  Audible Captions Will Not Impair Sales of Cross-Format Products .................................. 9

   7.  Audible Has Licenses and Is Paying for Plaintiffs' Products ........................................... 11

ARGUMENT ...................................................................................... 11

   I.  THE RELEVANT LEGAL STANDARDS....................................................... 11

     A.  Standard for Preliminary Injunction..................................................... 11

     B.  Standard for a Motion to Dismiss ...................................................... 14

   II.  THE PARTIES' LICENSING AGREEMENTS BAR THE INFRINGEMENT CLAIMS ................................................................. 14

     A.  As Copyright Licensors, Plaintiffs Cannot Sue for Infringement for Licensed Conduct ...................................................................... 15

     B.  Plaintiffs Failed To Plead Any Exception to their Waiver............................................. 16

        1.  Plaintiffs fail to allege that Captions exceeds the scope of the licenses ................ 16

        2.  Plaintiffs fail to plead a breach of a condition precedent in the licenses ................ 17

   III.  AUDIBLE CAPTIONS IS A FAIR USE....................................................... 19

     A.  The Purpose and Character of Audible Captions Is To Expand The Utility of Audiobooks ............................................................... 19

        i.  The "commercial" nature of Audible or Audible Captions does not change the result under the first factor ................................................... 25

     B.  The "Nature Of The Work" Factor Is of "Limited Usefulness" ................................... 27

     C.  Captions Does Not Use More of The Copyrighted Material Than Is Reasonably Necessary to Its Fair-Use Purposes.................................................... 28

     D.  Audible Captions Does Not Replace E-Books or Immersive Reading Products .......... 29

   IV.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON ANY THEORY OF SECONDARY LIABILITY ................................................................. 33

V.   PLAINTIFFS FAIL TO SHOW THEY WILL SUFFER IRREPARABLE INJURY
     ABSENT A PRELIMINARY INJUNCTION ................................................................. 34

VI.  THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST BOTH FAVOR
     AUDIBLE ....................................................................................................................... 36

CONCLUSION ........................................................................................................................... 39

## Table of Authorities

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ............................................................ 20, 27

*Am. Airlines, Inc. v. Imhof*,
  620 F. Supp. 2d 574 (S.D.N.Y. 2009)............................................................ 36

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
  573 U.S. 431 (2014)............................................................ 28

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994)............................................................ 29, 32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................ 12, 13

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)............................................................ *passim*

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014)............................................................ *passim*

*Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*,
  821 F.3d 297 (2d Cir. 2016)............................................................ 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................ 12

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ............................................................ 25, 28, 30

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006)............................................................ 22, 25, 26

*Blassingame v. Yale Univ.*,
  2004 WL 1534196 (D. Conn. July 6, 2004) ............................................................ 34, 35

*Campbell v. Acuff–Rose Music, Inc.*,
  510 U.S. 569 (1994)............................................................ *passim*

*Capitol Records, LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018)............................................................ *passim*

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)............................................................ 25

i

*Castle Rock Entm't , Inc. v. Carol Pub. Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998) ................................................................ 22, 24

*Faulkner v. Nat'l Geographic Enters., Inc.*,
  409 F.3d 26 (2d Cir. 2005).................................................................... 32

*Fox Ins. Co. v. Envision Pharm. Holdings, Inc.,*
  2009 WL 790312 (E.D.N.Y. Mar. 23, 2009) ...................................... 35

*Fox News Network, LLC v. Tveyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018).................................................................. 31

*General Texting Printing & Processing Corp. v. Expromtorg Int'l Corp.*,
  862 F. Supp. 1070 (S.D.N.Y. 1994)...................................................... 34

*Graham v. James*,
  144 F.3d 229 (2d Cir. 1998)......................................................... *passim*

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.,*
  2016 WL 4742317 (S.D.N.Y. Sept. 12, 2016) ............................ 33, 34, 35

*Harper & Row, Publishers, Inc. v. Nation Enterprises, Inc.*,
  471 U.S. (Sup. Ct. 1985)....................................................................... 25

*Jasper v. Sony Music Entm't, Inc.*,
  378 F. Supp. 2d 334 (S.D.N.Y. 2005).................................................... 14

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
  58 F.3d 27 (2d Cir. 1995)...................................................................... 36

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
  917 F.2d 75 (2d Cir. 1990).................................................................... 11

*Kamerling v. Massanari*,
  295 F.3d 206 (2d Cir. 2002).................................................................. 33

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ...................................................... 20, 22, 27

*Leadsinger, Inc. v. BMG Music Pub.*,
  512 F.3d 522 (9th Cir. 2008) ................................................................ 24

*Maxtone-Graham v. Burtchaell*,
  803 F.2d 1253 (2d Cir. 1986)................................................................ 27

*Mech. Plastics Corp. v. W.W. Grainger, Inc.,*
  2013 WL 12333770 (S.D.N.Y. Oct. 3, 2013) ........................................ 14

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ........................................................................... 32

*Moore v. Con. Edison Co. of N.Y.*,
    409 F.3d 506 (2d Cir. 2005) ............................................................... 34

*Muench Photo., Inc. v. McGraw-Hill Glob. Educ. Holdings, LLC*,
    367 F. Supp. 3d 82 (S.D.N.Y. 2019) ................................................. 14

*Nadav v. Beardwood & Co. LLC*,
    No. 17-CV-6465 (S.D.N.Y. Jan. 19, 2018) ....................................... 14

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004) ............................................................... 28

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y.2d 685 (1995) ......................................................................... 16

*PaySys Int'l, Inc. v. Atos Se, Worldline SA*,
    226 F. Supp. 3d 206 (S.D.N.Y. 2016) ............................................... 16

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ............................................... 20, 22, 29

*Random House, Inc. v. Rosetta Books LLC*,
    283 F.3d 490 (2d Cir. 2002) ............................................................... 36

*Reis, Inc. v. Spring11 LLC*,
    2016 WL 5390896 (S.D.N.Y. Sept. 26, 2016) ................................. 14

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
    754 F. Supp. 2d 616 (S.D.N.Y. 2010) ............................................... 33

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ........................................... 12, 33, 35, 36

*Sohm v. Scholastic Inc.*,
    2018 WL 1605214 (S.D.N.Y. Mar. 29, 2018) ......................... 14, 15, 17

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ..................................................................... *passim*

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg LP*,
    756 F.3d 73 (2d Cir. 2014) ........................................................ 20, 25, 31

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019) ............................................................... 35

*TechnoMarine SA v. Giftports, Inc.*,
  758 F.3d 493 (2d Cir. 2014)...................................................................... 13

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*,
  936 F.2d 692 (2d Cir. 1991).............................................................. 13, 16

*Waddington N. Am. Bus. Tr. v. EMI Plastics, Inc.*,
  2002 WL 2031372 (E.D.N.Y. Sept. 5, 2002) ........................................ 36

*Warth v. Greif*,
  121 A.D. 434 (2d Dep't 1907) ................................................................ 17

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..................................................................................... 12

*Wolk v. Kodak Imaging Network, Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012)..................................................... 32

*Yamashita v. Scholastic, Inc.*,
  —F.3d—, 2019 WL 4047513(2d Cir. Aug. 28, 2019) ..................... *passim*

*Zomba Enters., Inc. v. Panorama Records, Inc.*,
  491 F.3d 574 (6th Cir. 2007) .................................................................. 24

**Constitution and Statutes**

U.S. Const., Art. I, § 8, cl. 8.................................................................... 18

17 U.S.C. § 101............................................................................................ 28

17 U.S.C. § 107........................................................................................ *passim*

Defendant Audible, Inc. respectfully submits this memorandum of law and accompanying declarations in opposition to Plaintiffs' motion for a preliminary injunction and in support of Audible's motion to dismiss this action.

## PRELIMINARY STATEMENT

Plaintiffs, seven of the world's largest publishers, ask this Court to enjoin Audible, the leading creator and supplier of audiobooks and spoken-word entertainment, from introducing a new feature—Audible Captions—to its audiobook titles. Plaintiffs claim that Audible Captions violates their copyrights and will "undermine the entire book industry the moment it becomes available." (Pl. Br. at 20.) These claims and predictions are factually unfounded, provide no basis for injunctive relief, and, indeed, fail as a matter of law.

Audible Captions is an innovative audiobook feature that works just as its name implies: while a customer listens to an audiobook, snippets of text, similar to closed captioning or subtitles, briefly appear on the screen, word-by-word, in sync with the narration. If the listener taps a word, she can (a) see its dictionary definition, (b) read its related Wikipedia entry, or (c) translate it into another language. Otherwise, the words disappear as the audio progresses: on average, no more than 15 words appear on the screen before it is wiped clean and a new caption begins to appear. Listeners have no access to this text other than for the moment it flashes on the screen. They can choose to enable Audible Captions on their audiobooks—for which they already have paid—and can disable the feature at any time. The text is generated by off-the-shelf, freely available speech-to-text technology.

By contrast, the product Plaintiffs describe, and which they claim will cause "incalculable harm," bears little resemblance to Audible Captions. (*Id.* at 2.) Plaintiffs allege that Audible "will offer as a free add-on" to its audiobooks "the *entire written text*" of the underlying books,

purportedly using "convoluted technology" to steal this "Distributed Text" as a "stand-in" for a paper or e-book.  (*Id.* at 1-2 (emphasis in original).)  Plaintiffs thus paint Audible and its customers as copyright pirates guilty of "classic, willful copyright infringement."  (*Id.* at 1.) These allegations misrepresent the relationships among the parties, how Audible Captions works, and several core principles of copyright law.

*First*, Plaintiffs largely omit the fact that Audible has license agreements with each of the Plaintiffs, and has paid, and will pay, royalties and license fees for the audiobooks at issue.  This omission is critical: when the parties have a license agreement, a copyright claim survives only if the plaintiff pleads that the defendant exceeded the scope of the agreement or breached a condition precedent rather than a contract covenant.  Plaintiffs fail to acknowledge, much less surmount, these hurdles.  Instead, they disguise this contract dispute as a copyright case, as a pretext for seeking an injunction and statutory damages.  But Plaintiffs cannot rush past the contracts governing their relationship with Audible.  Because Plaintiffs fail to plead that the license agreements contain limitations that would support their copyright claims, not only should their motion for an injunction be denied, but their Complaint—which fails to plead anything other than copyright claims—must be dismissed.

*Second*, even if Plaintiffs could allege copyright claims, Audible Captions is a quintessential fair use, and Plaintiffs are not likely to succeed on the merits.  Audible Captions is not a book of any kind, much less a replacement for paper books, e-books, or cross-format products.  Audible developed Audible Captions based on combined insights from Audible's Newark, N.J. non-profit program, its own research, and guidance from leading educators throughout the United States.  The goal is simple: to help listeners understand and engage with the audiobook they purchased.   Audible Captions will be helpful to all listeners but, like closed

captions and subtitles, will be particularly critical for those who have learning disabilities, are hearing impaired, are learning English, or—like the Newark students who inspired this feature— just want to make content they already have more accessible and useful.  Copyright law permits Audible to create a tailored product—one that does not remotely provide the functionality or experience of an e-book, book, or cross-format product—to enhance the utility of audiobooks for its listeners.

*Third*, Plaintiffs are not entitled to an injunction because they cannot demonstrate irreparable harm, or that the balance of hardships or the public interest favors the relief they seek. Because Plaintiffs' claims sound, if at all, in contract, their remedy, if any, is money damages, not injunctive relief.  But even assuming Plaintiffs could assert copyright claims, their own pleadings identify their adequate remedy at law: compensation for the alleged diminution of their e-book sales, which could be calculated using existing royalty contracts.  Finally, given the important public benefits Audible Captions can provide to students, listeners with hearing or learning difficulties, and, to some extent, to all listeners, the public interest in allowing customers to use Audible Captions outweighs any countervailing private interest.

For these reasons, and as discussed further below, the Court should deny the preliminary injunction and dismiss the case.

## FACTUAL BACKGROUND

### 1. Audible Is Guided by a Desire To Promote Learning and Listener Engagement

Audible was founded in 1995 and is the premier distributor of audiobooks.  (Stern Decl. ¶¶ 3-4.)  In addition to contracting with publishers such as Plaintiffs to distribute audiobooks, Audible produces its own audiobooks, including 2,000 last year alone. (*Id*. ¶ 4; Anderson Decl. ¶ 6.)

3

Audible's guiding purpose, since its founding nearly twenty-five years ago, is to further spoken-word content, bring that media into the mainstream, and promote listening to learn. (Stern Decl. ¶ 3.) This mission is rooted in the life experience of Audible's founder, Don Katz. (*Id.*) In the 1990s, Mr. Katz's young daughter had language processing challenges that made it hard for her to read; she overcame these challenges by synchronizing listening and reading. (*Id.*)

Audible is keenly aware of broader societal trends in the United States that reflect a decline in reading among both children and adults. For example, one-third of teens reported not reading *any* books for pleasure in 2016; yet they reported spending on average four to six hours per day online, texting, and on social media. (Stern Decl. ¶ 5.) Just 36% of 8th graders are reading at a "proficient" or "advanced" level while 24% percent are below "basic" level, per the National Assessment of Educational Progress. (*Id.*) And adults are not reading much either: in 2018, just 19% percent of Americans over the age of fifteen reported reading for pleasure in a given day, down from 28% in 2004, and 24% of Americans reported not reading a single book. (*Id.*)

By contrast, audiobooks have gained in popularity over the past twenty years. Digital audio is the only book format realizing double-digit growth—growth that has been consistent for the past seven years. (Anderson Decl. ¶ 7.) Audible is at the heart of this evolution and has always looked for creative solutions to encourage engagement with learning and literature. (Stern Decl. ¶ 7.)

### 2. The Ideas Behind Audible Captions

In 2017, Audible launched and funded Project Listen Up, which was aimed at promoting student literacy and learning in Newark, where Audible is based. (*Id.* ¶ 8.) Project Listen Up provided all Newark public high school students and their teachers—ultimately, nearly 11,000

4

people—a free year of Audible membership, an Amazon Fire tablet, a pair of headphones, and more than 150 educator-selected audiobooks.  (*Id*.)

Audible stayed in close contact with the Project Listen Up educators and students and received their feedback over the course of its inaugural year.  (*Id*. ¶ 9.)  Audible learned from participants that they value the opportunity, while listening to an audiobook, to follow along with the text because doing so improves comprehension, spelling and pronunciation.  (*Id*.)  Separately, Audible also learned that many students use subtitles while watching television, and that this trend—looking and listening—heightens focus, especially when using a device.  (*Id*.)

As a result of this feedback, and to encourage deeper and better understanding of audiobooks for users who have chosen to have an audio-first experience, Audible developed Audible Captions.  (Stern Decl. ¶¶ 9-10.)  As detailed below, Audible Captions is designed to provide listeners increased access to the material and to enhance their engagement and understanding of audiobooks they purchase.  *See infra* pp. 6-8.

In Fall 2019, Audible plans to roll out the Audible for Schools initiative, which features Audible Captions.  (Stern Decl. ¶ 12.)  Audible will provide 150,000 students and their teachers in participating school districts (across twelve states) free Audible accounts for a curated library of 81 audiobooks.  (*Id*. ¶ 13.)  Each student will be able to download twelve additional audiobooks of his choosing, with Audible paying the royalties.  (*Id*. ¶¶ 12-13; Anderson Decl. ¶ 6.)  To support these efforts, Audible assembled an Advisory Council comprising top education and literacy experts in the country.  (Stern Decl. ¶ 14.)  In four meetings so far, these educators have provided guidance to Audible and to participating schools about how to maximize Audible Captions' impact.  (*Id*.; Shanahan Decl. ¶ 7.)

**3.**   **Audible Captions Is Designed To Enhance the Listening Experience**

A customer must opt in to Audible Captions.  (Stern Decl. ¶ 16.)  Audible Captions is not a stand-alone product: the feature may be enabled only for titles that the customer has already licensed and to which she already has lawful access.  (*Id.*)

When a listener chooses to generate Audible Captions for an audiobook, the audiobook file undergoes machine transcription using Amazon Web Services' Transcribe software.  (*Id.* ¶ 17.)[1]  This transcription generally takes less than half an hour.  If the transcription meets Audible's quality control standards (*see infra* p. 7), an encrypted file containing the transcription will be sent back to the listener's device to be stored locally.  (*Id.*)  The encrypted file is also cached: if another Audible listener subsequently elects to generate Audible Captions for the same title in the next 90 days, the cached version will be sent to the next listener's device; otherwise, it is deleted.  (*Id.*)  The customer cannot read, copy, share or otherwise access the encrypted Audible Captions file or its contents—there is simply no access to, or potential use for, the transcription file independent of listening to the specific audiobook title with which the file is associated.  (*Id.* ¶ 18.)

Once a listener generates Audible Captions, she can listen while Audible Captions follows the audio.  (*Id.* ¶ 19.)  Audible Captions displays words one by one, synchronously with the performer's speech, similar to closed captions on television.  (*Id.*)  As the audio unfolds, the screen displays an average of 15 words (and a maximum of 20 words), before either the listener pauses the audio, stopping Audible Captions, or the screen clears and then fills again, following

---

[1] This service is similar to Google Live Captions, Google Live Transcribe, and Otter, which allow a user to transcribe spoken words (including audiobooks, videos, conversations, or lectures) in real time. (*See* Reisbaum Decl. ¶¶ 3-5, Exs. B-D (describing same)).  Unlike Audible Captions, however, transcripts from Google Live Transcribe and Otter can be shared with others, edited, copied, and easily scrolled through or searched.  (*Id.;* Stern Decl. ¶ 18.)

the audio.  (*Id*.)  If the listener pauses the audio, she can tap a word to look up its definition, read

its corresponding Wikipedia entry, or use a translation function.  (*Id*.)

Audible Captions will not be available for every audiobook in the Audible catalog.  (*Id*. ¶

20.)  Because Audible Captions is machine-generated from an audiobook, the transcriptions may

have errors.  (*Id*.)  For example, errors may be more common with words that are difficult to

pronounce, in a language other than English, or made-up.  (*Id*.)  To ensure the quality of the

listener's experience, the transcription service generates a "confidence" score estimating the

accuracy of the transcription, and Audible will not display Audible Captions for texts that fall

below a certain accuracy estimate (currently 94%).  (*Id*.)  Additionally, every listener who

decides to generate Audible Captions for her library will receive a message informing her that

the captions are machine-generated and will contain errors.  (*Id*. ¶ 21.)

**4.**      **Audible Captions Does Not Allow a Listener To "Read" an E-Book**

An audiobook listener has, by definition, chosen to have an audio-first experience with

the audiobook she has purchased, and Audible Captions is designed to support that experience.

(Stern Decl. ¶ 9.)  Audible Captions is not the equivalent of, or a replacement for, reading a book

or e-book.  (*Id*. ¶ 22.)[2]  A reader seeking that experience—either as a stand-alone or in parallel

with an audiobook—will not find it in Audible Captions, which includes the following

distinguishing features:

> a. By appearing one by one, synchronistically with the audio, and by showing on
>    average 15 words on the screen (most often less than a full sentence), a listener
>    can focus on specific words.  However, she cannot scan ahead (as one does when
>    reading a book), but must listen to the audio first.
>
> b. Audible Captions reflects the audiobook performance, and thus has minimal
>    punctuation.

---

[2] To further demonstrate the experience of listening to an audiobook with Audible Captions
enabled, *see* Exhibit A to R. Stern's Declaration (video demonstration of Audible Captions).

     c.   A listener may move through the content only by using the audio scrub bar (a digital reflection of the audio file that allows a user to use her finger to move through the audio file) at the bottom of the screen.  In other words, she may not use the Audible Captions text to flip ahead or backwards, as in an e-book.

     d.   A listener cannot scroll the Audible Captions text at a pace faster or slower than the pace at which the audiobook is being performed.

     e.   Audible Captions does not display any page numbers or page layout of any kind.

(*Id.*)[3]

Finally, contrary to Plaintiffs' alleged concerns (Pl. Br. at 8), if a listener were to turn down the volume on the audiobook and try to "read" along using Captions, she would find it intolerable.  (Stern Decl. ¶ 22.)  Words progress at the speed of the spoken text, which is generally slower than the speed at which most users read; speeding up the narration would result in Audible Captions scrolling more quickly, presenting the text in an out-of-context and disjointed manner that would make "reading" difficult and uncomfortable.[4]  Because the text is joined with the narration, it does not allow a listener to skim through easy material or slow down when there is a complex point or sentence, which is how one reads a book.  (*Id.*)

### 5. <u>Audible Captions Offers Significant Potential Benefits</u>

Audible Captions was created to encourage deeper and better understanding of audiobooks for users who have chosen to have an audio-first experience. (*Id.* ¶ 9.)  It does this in several ways.

---

[3] Plaintiffs complain their rights are further infringed because they cannot choose the Captions font, as they can for an e-book.  (*See* Pl. Br. at 10.)  But Plaintiffs do not have such rights: e-book readers can vary the font of the text as they read to accommodate their preferences.  (Stern Decl. ¶ 21 n.10.)

[4] To further demonstrate the experience of listening to an audiobook at a higher speed with Audible Captions enabled, *see* Exhibit B to R. Stern Decl. (video demonstrating Audible Captions at various speeds and volumes).

*First* and foremost, Audible Captions has the potential to increase the accessibility of literature in audio format. (Shanahan Decl. ¶ 13; Yudin Decl. ¶¶ 14-15.) If a student (or anyone) cannot access information, she will not learn it. (Shanahan Decl. ¶ 13; Yudin Decl. ¶ 15.) In the case of a student with learning disabilities, for instance, she may have high-level capacity for understanding, but if she cannot or does not read—whether because she is dyslexic or because she is not inclined to pick up a book—she will not get the information. (Yudin Decl. ¶ 15.)

*Second*, adding Captions to an audiobook is particularly helpful for learners with unique challenges. For those who have challenges processing letters, the ability to listen to audio and focus on a few words at a time, without having to track a whole page, helps the listener to decode meaning. (Shanahan Decl. ¶12.) For those who are hard of hearing, being able to see the text a few words at a time will help them to understand the audio performance. (*Id.*) And for those who are learning English, the dual and deliberate focus on specific words will help their understanding. (Shanahan Decl. ¶¶ 11-12.)

*Third,* Audible Captions' dual audio-visual approach allows each learner to direct his own approach to the information. (Yudin Decl. ¶ 15.) For example, a student who is using Captions will have the opportunity to start-and-stop the audio, and to look up information in the same interface where the listening occurs. (*Id.* ¶ 14.) This flexibility may encourage a learner to engage with the material more because it preserves a student's autonomy while still providing important supports. (*Id.* ¶¶ 14-15.)

**6. <u>Audible Captions Will Not Affect Sales of Cross-Format Products</u>**

Audible sells cross-over products—Immersion Reading and Whispersync for Voice. Contrary to Plaintiffs' allegations (Compl. ¶¶ 24-27), Audible Captions will not affect sales of those products.

Audible launched Immersion Reading in 2012.  (Stern Decl. ¶ 24.)  It allows a reader who purchases both an audiobook and a Kindle e-book to sync the audiobook with a full e-book display (*id.*), and thus to listen to an audiobook while reading full pages of the associated e-book (with the e-book text highlighted to underscore what the reader is hearing).  (*Id.*)  The reader can view the full page of e-book text, complete with the page numbers, punctuation, and layout that replicate a paper book.  (*Id.*)  Immersion Reading also allows a reader to jump ahead or back to different pages in the text, as if she were holding a book, and the accompanying audiobook will jump back and forth to match the selected text.  (*Id.*)

Audible Captions will not replace Immersion Reading for several reasons.  *First*, as noted above, *see supra* pp. 7-9, Audible Captions is an audio-first experience that lacks the core features that allow a listener to *read* along with her audiobook, including all of the book-like elements offered in an e-book.  *Second*, Immersion Reading, unlike Audible Captions, is not available for the entire Audible catalog and is technically difficult to implement and, thus, not widely available.  (Stern Decl. ¶ 27.)  Only 35% of titles in the Audible catalog are available through Immersion Reading, but approximately 78% of titles could be available for Audible Captions at the current 94% accuracy threshold.  (Stern Decl. ¶ 19.)  *Third*, even for a title where Immersion Reading *is* available, it is not a popular option for Audible customers.  (*Id.* ¶ 25.)  In 2019, just 2.5% of Audible customers used Immersion Reading two or more times, down from 2.9% of customers in 2018, and 3.3% of customers in 2017.  (*Id.*)  These statistics reflect that (i) the vast majority of Audible listeners do not read along with their audiobook, even when it is an available option; and (ii) Immersion Reading usage continues to decline over time.  (*Id.*)

Similarly, Audible Captions will not replace Whispersync for Voice ("WfV").  WfV is a feature that allows an Audible listener who has purchased both a Kindle e-book and the Audible

audiobook to keep her place when switching between listening to the book and reading it on her e-reading device by tracking a reader's progress through both media. (Stern Decl. ¶ 26.) WfV allows an Audible customer to access the book in either format, but not at the same time. (*Id*.) Moreover, because Audible Captions does not provide listeners with a stand-alone e-book, an Audible subscriber looking for a full reading experience in addition to the audiobook—*e.g.*, the ability to read the e-book in bed at night, then listen to the audiobook on the subway in the morning—cannot replicate that experience with Audible Captions. (*Id.*)

Audible hopes that Audible Captions will help listeners engage with audiobooks; what Audible Captions will assuredly not do, as Plaintiffs feverishly declare, is "undermine the entire book industry the moment it becomes available." (Pl. Br. at 20.)

### 7. **Audible Has Licenses and Is Paying for Plaintiffs' Products**

To facilitate distribution of audiobooks, Audible has licensing agreements with each Plaintiff. (Compl. ¶¶ 23, 29, 39; Weber Decl. ¶¶ 6, 9; Yaged Decl. ¶ 6; Restivo-Alessi Decl. ¶¶ 6, 23; Stambaugh Decl. ¶¶ 15-16; Benton Decl. ¶¶ 6, 12; Mahoney Decl. ¶¶ 8, 12; Pietsch Decl. ¶ 7; Anderson Decl. ¶ 3.) These licenses authorize Audible to use Plaintiffs' copyrighted content (which in some instances includes audiobooks and in other instances the right to produce audiobooks). (Anderson Decl. ¶ 5.) In exchange, Audible makes royalty payments to Plaintiffs for the audiobooks. (*Id.*)

### **ARGUMENT**

## I. **THE RELEVANT LEGAL STANDARDS**

### A. **Standard for Preliminary Injunction**

A "preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990). A

district court may enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The Second Circuit has directed that a district court must undertake a four-step inquiry in determining whether to grant a plaintiff's motion for a preliminary injunction in a copyright case. *See Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010).

*First*, plaintiff must establish that it has a "likelihood of success on the merits" or there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s" favor.  *Id.* at 79-80 ("Courts should be particularly cognizant of the difficulty of predicting the merits of a copyright claim at a preliminary injunction hearing." *Id.* at 80.)  *Second*, a plaintiff must demonstrate that it is likely to suffer irreparable injury in the absence of an injunction.  *Id.*  "The court must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm." *Id.* at 80 (internal quotation omitted).  *Third*, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction "only if the balance of hardships tips in the plaintiff's favor."  *Id.*  *Fourth*, "the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction."  *Id.* (internal quotation omitted).

These factors weigh heavily against issuing a preliminary injunction here.

**B.  <u>Standard for a Motion to Dismiss</u>**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "When the well-pleaded facts 'do not permit the court to infer more than the mere possibility of misconduct,' the court must grant a motion to dismiss."  *Yamashita v. Scholastic, Inc.*, —F.3d—,

12

2019 WL 4047513, at *4 (2d Cir. Aug. 28, 2019) (citing *Iqbal*, 556 U.S. at 679).  The plaintiff's

obligation to "provide the grounds of his entitlement to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal citations omitted).

Plaintiffs' allegations fail as a matter of law and this case should be dismissed.

## II.   THE PARTIES' LICENSING AGREEMENTS BAR THE INFRINGEMENT CLAIMS

Plaintiffs have come to this Court with the wrong claim.  Each Plaintiff granted Audible a

license to its copyrighted works, and yet now alleges that Audible Captions infringes those

licensed works.  But the law is clear: by agreeing to those licenses, Plaintiffs waived their right

to sue for copyright infringement as a result of licensed conduct.  Thus, this Court need not reach

the copyright issues presented here.  If Plaintiffs object to Audible Captions, they must do so as

contract counterparties claiming breach, or carry their burden to prove some relevant limitation

to the scope of the licenses they granted.

Plaintiffs fail to do so.  They assert only copyright claims, but fail to plead a single fact

that, under Second Circuit precedent, would allow such claims.  As a result, there is no

likelihood that Plaintiffs will succeed on the merits of their copyright claims.  Accordingly, this

Court should both deny the preliminary injunction and grant Audible's motion to dismiss.

### A.   As Copyright Licensors, Plaintiffs Cannot Sue for Infringement for Licensed Conduct

"A copyright owner who grants a nonexclusive license to use his copyrighted material

waives his right to sue the licensee for copyright infringement."  *Graham v. James*, 144 F.3d

229, 236 (2d Cir. 1998); *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir.

1991) ("an exclusive licensee of any of the rights comprised in the copyright, though it is capable

of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it".)

Case after case confirms this doctrine, including a ruling the Second Circuit issued just weeks ago at the urging of a Plaintiff in this case.  *See, e.g.*, *Yamashita*, 2019 WL 4047513, at \*5 (affirming dismissal of copyright infringement claims against licensed defendant); *Muench Photo., Inc. v. McGraw-Hill Glob. Educ. Holdings, LLC*, 367 F. Supp. 3d 82, 88 (S.D.N.Y. 2019) (granting summary judgment dismissing copyright claims); *Sohm v. Scholastic Inc.*, 2018 WL 1605214, at \*14 (S.D.N.Y. Mar. 29, 2018) (same because "all claims for infringement…sound in contract rather than copyright"); *Nadav v. Beardwood & Co. LLC*, No. 17-CV-6465 (S.D.N.Y. Jan. 19, 2018) (Dkt. No. 24) (granting motion to dismiss copyright claim against licensee); *Reis, Inc. v. Spring11 LLC*, 2016 WL 5390896, at \*\*7-8 (S.D.N.Y. Sept. 26, 2016) (same); *Mech. Plastics Corp. v. W.W. Grainger, Inc.,* 2013 WL 12333770, at \*6 (S.D.N.Y. Oct. 3, 2013) (same); *Jasper v. Sony Music Entm't, Inc.*, 378 F. Supp. 2d 334, 339 (S.D.N.Y. 2005) ("It is a hallmark principle of copyright law that licensors may not sue their licensees for copyright infringement.")

In their rush to assert copyright claims, Plaintiffs allege that "Audible did not seek a license" for Audible Captions (Compl. ¶ 3), and otherwise barely acknowledge each of their audio and/or text license agreements (*id.* ¶¶ 23, 29, 39; Weber Decl. ¶¶ 6, 9; Yaged Decl. ¶ 6; Restivo-Alessi Decl. ¶¶ 6, 23; Stambaugh Decl. ¶¶ 15-16; Benton Decl. ¶¶ 6, 12; Mahoney Decl. ¶¶ 8, 12; Pietsch Decl. ¶ 7), or that certain of Plaintiffs' cease-and-desist letters assert that Audible has violated the terms of sale in the applicable contracts.  (Anderson Decl. ¶ 11.)  But this fundamental fact is inescapable: Audible is a licensed, paying user of the audiobooks from

and for which it created Audible Captions (*id.* ¶¶ 3, 5; Stern Decl. ¶ 9), and if Plaintiffs have a claim to make, those license contracts must provide the remedy (if any).

### B.   Plaintiffs Failed To Plead Any Exception to Their Waiver

There are exceptions to the rule barring Plaintiffs' claims: a licensor may sue its licensee for copyright infringement if the licensee's conduct either (a) exceeds the scope of the license or (b) violates a condition precedent (in contrast with a covenant) of the license.  *See Sohm*, 2018 WL 1605214, at *12; *Graham,* 144 F.3d at 236-37.  But just as Plaintiffs did not acknowledge the contracts, neither did they plead a single fact to justify applying these exceptions.

#### 1.   Plaintiffs fail to allege that Captions exceeds the scope of the licenses

Where a license agreement is conceded (Compl. ¶¶ 29, 37; *e.g.*, Weber Decl. ¶¶ 6, 9) and the scope of the license would be at issue, the copyright owner has the burden to plead and prove that defendant's use of a work was not authorized by the contract.  *Yamashita*, 2019 WL 4047513, at **5-6 (affirming dismissal where, absent allegations of the "applicable limitations" in the licenses, court cannot "understand how Scholastic is alleged to have exceeded those licenses"); *Graham*, 144 F.3d at 236 (same).  Where the plaintiff "failed to identify *any* specific license limitations as having been breached for any specific [work]," the copyright claims must be dismissed.  *Yamashita*, 2019 WL 4047513, at *5 (emphasis in original).

Here, Plaintiffs neither sued for breach of contract nor pled that Audible exceeded the "particular terms" of their licenses.  *Id.* at *5.  This warrants dismissal.  Plaintiffs have quite literally made no showing that the scope of their license agreements does not encompass a feature such as Audible Captions.  The Complaint only generically asserts that Audible "is a distributor of Publishers' audiobooks and no more has the right to create and offer [Captions] than a physical book store selling physical books would have the right to make and sell eBooks."

(Compl. ¶ 23.)  This vague and conclusory claim—which is also wrong as a matter of copyright law, *see infra* Part III—does not "plausibly allege that the defendant exceeded particular terms of the license."  *Yamashita*, 2019 WL 4047513, at *5.

Plaintiffs fail to plead the specific facts needed to identify the scope violation required for a viable copyright claim.  Accordingly, they quite literally fail to state a claim, and this case should be dismissed.  Whether or not Audible Captions violates contractual promises made in the license agreements is a contract dispute, and *only* a contract dispute.

### 2.   **Plaintiffs fail to plead a breach of a condition precedent in the licenses**

As to the second exception, contract terms are presumed to be covenants, not conditions. *See Graham*, 144 F.3d. at 237; *see also PaySys Int'l, Inc. v. Atos Se, Worldline SA*, 226 F. Supp. 3d 206, 226 (S.D.N.Y. 2016) (New York law "presum[es] that terms of a contract are covenants rather than conditions").  If a licensee violates a contract *covenant*, there is still a valid license and the licensor "will have a cause of action for breach of contract, not copyright infringement." *Graham*, 144 F.3d at 236.  But if a licensee violates a *condition* to the license, he has acted "without authority from the licensor" and the licensor may claim infringement.  *Id.* at 237.

A contract term is a condition (rather than a covenant, as the law presumes) only if the language is "unmistakable."  *Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 305 (2d Cir. 2016).  "Conditions precedent are not readily assumed. While specific, talismanic words are not required, the law nevertheless demands that conditions precedent be 'expressed in unmistakable language.'"  *Id.* at 305 (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 691 (1995)); *cf. U.S. Naval Inst.*, 936 F.2d at 695 (requirement that book be published "not sooner than October 1985" not condition precedent).

These doctrines are familiar to Plaintiffs because at least one recently and repeatedly relied on them.  *See Yamashita*, 2019 WL 4047513; *Sohm*, 2018 WL 1605214.  In a recent brief to the Second Circuit, Scholastic argued:

> As a preliminary matter, not all breaches of a license agreement amount to copyright infringement.  As the District Court correctly observed, only a breach of a condition – as distinguished from a covenant – will "constitute infringement of copyright."  JA488 (quoting *BroadVision*, 2010 WL 5158129, at *3); *see also Graham*, 144 F.3d at 237.  "Generally speaking, New York respects a presumption that terms of a contract are covenants rather than conditions." *Id*.; *Warth v. Greif*, 121 A.D. 434 (2d Dep't 1907) ("The law favors covenants rather than conditions precedent."), *aff'd*, 193 N.Y. 661, 87 N.E. 1129 (1908).

*See* Reisbaum Decl. ¶ 2, Ex. A.

Just so here.  Plaintiffs fail to plead or prove breach of a condition precedent to the license agreements.  The Complaint does not attach the agreements and does not identify *any* language of condition in any of them, much less any "unmistakable" language of condition precedent, such as "unless and until."  *See Oppenheimer*, 86 N.Y.2d at 691.

*       *       *

Because Plaintiffs' licensing agreements preclude their copyright claims, Plaintiffs cannot show a likelihood of success on the merits and fail to plead viable copyright infringement claims.  To the extent Plaintiffs have any claim at all, it would sound only in contract.  But Plaintiffs neither pled breach of contract nor allege any facts showing that such (non-pled) claims could warrant a preliminary injunction.[5]  The Court should deny the motion for a preliminary injunction and grant Audible's motion to dismiss.

---

[5] Plaintiffs could seek to replace their copyright infringement claims with breach of contract claims, though (a) it is unlikely there would be federal subject matter jurisdiction over such a suit, and (b) such claims would not warrant a preliminary injunction.  In any event, Audible reserves the right to oppose any actual or proposed revised pleading on all grounds.

### III.   <u>AUDIBLE CAPTIONS IS A FAIR USE</u>

Even if Plaintiffs could assert copyright claims, the Audible Captions feature is squarely protected by the fair use doctrine. "The monopoly privileges that Congress may authorize" in the Copyright Act "are neither unlimited nor primarily designed to provide a special private benefit." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). "Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Id.* at 431-32. "Courts thus developed the doctrine, eventually named fair use, which permits unauthorized copying in some circumstances, so as to further 'copyright's very purpose, "[t]o promote the Progress of Science and useful Arts."'" *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015) ("*Google Books*") (Leval, J.) (quoting *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8)).

To determine whether a given use is "fair," courts begin by looking at four statutory factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Campbell*, 510 U.S. at 577 (citing 17 U.S.C. § 107). These factors are not "treated in isolation," however. *Id.* at 578. "Each factor . . . stands as part of a multifaceted assessment of the crucial question: how to define the boundary limit of the original author's exclusive rights in order to best serve the overall objectives of the copyright law to expand public learning while protecting the incentives of authors to create for the public good." *Google Books*, 804 F.3d at 213; *see*

*Sony*, 464 U.S. at 448 (noting that factors "enable a Court to apply an equitable rule of reason analysis to particular claims of infringement" (internal quotation marks omitted)).

Audible Captions is a quintessential fair use.  After listeners purchase an audiobook—and Plaintiffs and their clients are compensated—Audible Captions can help listeners understand it by looking up unfamiliar words, accessing reference materials, or simply verifying and focusing on what they are hearing.  This will facilitate access for listeners who have difficulty engaging with audiobooks (or literature in general), either because of cognitive challenges, hearing impairments, or—as Audible learned from research and its work with Newark students—simply because an audiobook with captions meets them where they are.  Audible Captions does not, however, provide an e-book or text-reading experience: it does nothing more, and nothing less, than use widely available technology (speech-to-text transcription) to give audiobook listeners a tool to get at the meaning of a work.  In short, Audible Captions "expand[s] public learning while protecting the incentives of authors to create for the public good," *Google Books*, 804 F.3d at 213, and the statutory factors—individually and together—strongly favor a finding of fair use.[6]

## A.  <u>The Purpose and Character of Audible Captions Is To Expand The Utility of Audiobooks</u>

The first statutory factor is "the purpose and character of the use."  17 U.S.C. § 107(1).  "The Supreme Court has observed that this factor favors secondary uses that are transformative," such as those that "criticize, comment on, provide information about, or provide new uses for the copyrighted work," *id.*, as well as those that "'expand[] its utility."  *Capitol Records, LLC v.*

---

[6] Plaintiffs allege that Audible Captions infringes on their Section 106 rights in several ways. (Pl. Br. at 12-13.)  Those rights, however, are subject to the fair use provisions of Section 107, *see* 17 U.S.C. § 107 ("Notwithstanding the provisions of section[] 106 . . ."), which provides an affirmative defense to infringement claims, *see, e.g.*, *Google Books*, 804 F.3d at 213.

*ReDigi Inc.*, 910 F.3d 649, 660-61 (2d Cir. 2018) (Leval, J.) (quoting *Google Books* and collecting "[e]xamples of such utility-expanding transformative fair uses").

A use "'can be transformative in function or purpose without altering or actually adding to the original work.'"  *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg LP*, 756 F.3d 73, 84 (2d Cir. 2014) (quoting *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009)) (holding that publication of copyrighted audio of company's earnings call was fair use).  Thus, courts in this Circuit and elsewhere have held that "creation of complete digital copies of copyrighted works [can be] transformative fair uses when the copies 'served a different function from the original.'" *Google Books*, 804 F.3d at 217 (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (finding fair use where Google scanned books to create public text-searchable database)); *see, e.g.*, *iParadigms*, 562 F.3d at 639-40 (same where defendant copied works into plagiarism-detection database); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (same where defendant displayed "thumbnails" of protected images and links to originals); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (same).  The archetypal example is *Sony*, in which the Supreme Court held that it was a fair use for television viewers to record shows—in their entirety, unaltered—on their VCRs for later viewing.  464 U.S. 417 (1984).  As the Second Circuit recently noted, "[i]n *Sony*, the apparent reasoning was that a secondary use may be a fair use if it utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder because the improved delivery was to one entitled to receive the content." *Capitol Records*, 910 F.3d at 661 (internal citation and quotation marks omitted).

The "purpose and character" of Audible Captions is unequivocally "transformative" by these standards. Audible Captions can and will be used exclusively by customers who have obtained the rights to the audiobook versions of the works at issue: they will have either paid for them or, for students in the Audible for Schools program, Audible will have paid on their behalf. (Anderson Decl.¶ 6; Stern Decl. ¶ 8.)  After a customer has purchased an audiobook, the listener can generate Audible Captions for that work.  (Stern Decl. ¶¶ 9, 15.)  If she does, then, using off-the-shelf voice-recognition technology, Audible Captions will enhance the listening experience by briefly displaying a few words at a time immediately after a listener hears them (similar to closed captioning), which will allow listeners to (a) click on a word and look up its definition or translate it into another language; (b) access reference materials pertaining to that word; or simply (c) confirm that she heard the word correctly.  (*Id*. ¶¶ 10, 18.)

Plaintiffs allege that this process is tantamount to "display[ing] an entire version of the text of a book," implying that Audible Captions is a "stand-in for" a companion e-book.  (Pl. Br. at 2, 7; *id.* at 1 (arguing that Audible Captions provides "two for the price of one").  This is false: the snippets of ephemeral text provided by Audible Captions do not add up to an e-book in either "purpose" or "character."  Unlike a separately purchased book, e-book, Immersion Reading text, or WfV, a listener using Audible Captions cannot turn (real or virtual) pages, skip around in text, scan ahead, or access any text other than the few words she just heard, and the snippets of text disappear within seconds if the listener does not click a word or pause the audio.  *See supra* pp. 7-8.  In other words, the user cannot *read* a work via Audible Captions in any meaningful sense. (Stern Decl. ¶¶ 21, 22.)  Audible Captions does something more limited, though still important: improve a *listener's* ability to understand the work she has purchased.  (*Id.* ¶ 9.)

Viewed accurately, then, Audible Captions falls squarely into two overlapping categories of uses favored under the first fair use factor.

*First*, Audible Captions is a "utility-expanding" use that "deliver[s] the content in more convenient and usable form," *Capitol Records*, 910 F.3d at 661, a "pointer directing a user to a source of information," *Perfect 10*, 508 F.3d at 1165, a means of "mak[ing] available significant information about" what the listener is hearing, *Google Books*, 804 F.3d at 217, a "tool" that "improves access" to the original work, not a replacement for its "aesthetic purpose," *Kelly*, 336 F.3d at 818. Audible Captions "serves a different function from the original" book. *Google Books*, 804 F.3d at 217. "Authors [do not] write with the purpose of enabling text searches of their books," *HathiTrust*, 755 F.3d at 97, nor do they write for the purpose of improving the experience of audiobook listeners. Yet that is Audible Caption's utility-enhancing purpose—not to "replicat[e] protected expression in a manner that provides a meaningful substitute for the original," *Google Books*, 804 F.3d at 220.[7]

---

[7] While the use of the term "transform" in the context of both derivative works and the first fair use factor can cause confusion, *see Google Books*, 804 F.3d at 215-16 & n.18 (describing this problem); *Castle Rock Entm't , Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 143 (2d Cir. 1998) (same), Captions is a fair use and not, as Plaintiffs claim, a derivative work (Pl. Br. at 12; Compl. ¶¶ 48, 56). Listeners have the right to listen to the audiobook version of a particular work, and Audible Captions is inextricably part of the experience of *that version* of the work; it is not an independent "meaningful experience of the expressive content of the book," *Google Books*, 804 F.3d at 227, or "a new way to exploit the creative virtues of the original work," *Blanch v. Koons,* 467 F.3d 244, 252 (2d Cir. 2006), like a movie adaptation, or a play, or the audiobook itself. To the extent Plaintiffs argue that, analogizing to e-books, any digitized form of text is inherently a derivative work (Pl. Br. at 12-13), *Google Books* expressly rejected that theory, *see* 804 F.3d at 226 (holding that "Google's converting [plaintiffs'] books into a digitized form" did not yield a derivative work). Likewise, having licensed (and been compensated for) the audiobook, "[n]othing in the statutory definition of a derivative work, or of the logic that underlies it, suggests that the author of an original work enjoys an exclusive derivative right to" bar or permit a function such as Audible Captions to aid in the authorized listening process. *Id.*

*Second*, Audible Captions provides this tool *only* to those who have already "acquired an entitlement to receive the content" and have compensated Plaintiffs accordingly.  *Capitol Records*, 910 F.3d at 661 (discussing *Sony*).  The challenged secondary uses were deemed "fair" in *Google Books*, *HathiTrust*, *iParadigms*, *Perfect 10*, and *Kelly*, even though they benefited members of the public who had no prior, rightful relationship to the underlying protected expression.  By contrast, *every* Audible Captions user will be listening to an audiobook for which Plaintiffs and their clients have been paid; all Audible Captions does is help that listener do precisely what she has already purchased the right to do, namely, listen to the author's creative work.  In this critical sense, Audible Captions not only "expands [the] utility" of audiobooks and gives them a more "usable form," but also does so "without unreasonably encroaching on the commercial entitlements of the rights holder."  *Capitol Records*, 910 F.3d at 660-61.[8]

Finally, Plaintiffs either fail to see, or ignore, Audible Captions' profound potential benefits for listeners of all ages and styles.  For instance, Audible Captions may break through troubling and persistent barriers to access that are reflected in declining reading rates.  By meeting people where they are—on their phones—Audible Captions may meaningfully connect currently disconnected people to content.  (Yudin Decl. ¶ 15; Shanahan Decl. ¶ 13.)  Further, Audible Captions will support the listener, her classmates, and her teacher by encouraging autonomy, self-direction, and differentiated learning.  (Yudin Decl. ¶ 14.)  Finally, Audible Captions provides particular benefits to people with reading challenges, who are hard of hearing, or are learning English.  (Shanahan Decl. ¶ 12.)  Thus, Audible Captions will "serve the overall

---

[8] Plaintiffs cite this same passage of *Capitol Records* for the proposition that "it is not transformative to distribute content without commentary or criticism" (Pl. Br. at 13 n.6), but omit reference to the very next sentence, which reaffirms that there are indeed other forms of transformative use, including "deliver[ing] the content in more convenient and usable form to one who has acquired an entitlement to receive the content."  *Capitol Records*, 910 F.3d at 661.

objectives of the copyright law to expand public learning," *Google Books*, 804 F.3d at 213, which further supports a finding that the "purpose and character" of Audible Captions is a "fair one." *Id.*; *cf. Sony*, 464 U.S. at 455 n.40 ("[m]aking a copy of a copyrighted work for the convenience of a blind person" is fair use); *HathiTrust*, 755 F.3d at 101 (copying to "provide[] print-disabled patrons with versions of all of the works contained in [Google Books'] digital archive in formats accessible to them" is fair use).[9]

Viewed together, these facts demonstrate that Audible Captions' "purpose and character" is to make fair use of Plaintiffs' works.

### i. The "commercial" nature of Audible or Audible Captions does not change the result under the first factor

The fact that Audible will not only provide Audible Captions-enabled audiobooks for free to students, but also make the Audible Captions feature available to customers who are *paying* for access to Plaintiffs' audiobooks, does not alter the analysis.

*First*, secondary uses "are generally conducted for profit," and thus courts do not "give much weight to the fact that the secondary use was for commercial gain." *Castle Rock*, 150 F.3d at 142. Indeed, "nearly all of the illustrative uses listed in the preamble paragraph of § 107 . . .

---

[9] Plaintiffs assert "it is not a fair use to distribute text to assist users in understanding the audio that they are hearing." (Pl. Br. at 13 n.6.) Plaintiffs' generalize this supposed rule from cases arising in a single, specific context: karaoke. (*Id.*) This reductive reasoning runs afoul of the Supreme Court's fair use guidance: "The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577. Plaintiffs' analogy does not withstand scrutiny: the analysis presented herein regarding the purpose, character, and reasons for substantiality of the use, or the sales impact of Audible Captions would not apply to the use of song lyrics for karaoke. Plaintiffs' attempt to characterize karaoke as "assist[ing] users in understanding the audio" is absurd on its face—and, indeed, the fair use arguments in the karaoke context failed for similar reasons, *see Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 582 (6th Cir. 2007) (rejecting as "wholly meritless" argument that "karaoke packages are used for 'teaching'"); *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) (same).

are generally conducted for profit." *Campbell*, 510 U.S. at 584 (internal quotation marks omitted). Thus, a secondary use can be "fair" even if it generates a direct commercial benefit for the defendant. *See, e.g.*, *Swatch*, 756 F.3d 73 at 83 (finding fair use where defendant was "commercial enterprise" and copyrighted material was made available through "subscription service available to paying users"); *Blanch*, 467 F.3d at 253 (artwork that sold for $2 million was protected fair use); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006) (book that was "commercial venture" and reproduced copyrighted photographs was fair use).

*Second*, Audible Captions' legitimate transformative purpose minimizes, if not eliminates, the significance of the commercial nature of the use. *See, e.g.*, *Google Books*, 804 F.3d at 219 (noting that Second Circuit has "repeatedly rejected the contention that commercial motivation" trumps transformative use); *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013) ("Although there is no question that [the secondary works] are commercial, we do not place much significance on that fact due to the transformative nature of the work.")

*Third*, "'[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.'" *Bill Graham Archives*, 448 F.3d at 612 (quoting *Harper & Row Pubs, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985)). The issue in this case—again, unlike so many others—is not whether users can be given otherwise unauthorized access to protected expression without payment. Here, the user or Audible will have "pa[id] the customary price" for the right to experience the audiobook and, despite Plaintiffs' allegations, are not receiving "two for the price of one" (Pl. Br. at 1) because Audible Captions is not an "e-book" for which authors would typically receive separate remuneration, *see supra* 7-11.

25

Given the transformative purpose of Audible Captions, the significant public benefit that the tool offers, and the payments Audible and its users will have already made to Plaintiffs, this consideration does not weigh strongly—if at all—against a finding a fair use.

### B.  The "Nature of The Work" Factor Is of "Limited Usefulness"

The "nature of the work," the second fair use factor, 17 U.S.C. § 107(2), "has rarely played a significant role in the determination of a fair use dispute." *Google Books*, 804 F.3d at 220.  This factor addresses two considerations:  whether the original works are creative in nature, and whether they were previously unpublished.  *See Blanch*, 467 F.3d at 256 (citing 2 Howard B. Abrams, *The Law of Copyright*, § 15:52 (2006)).  The scope of fair use permitted with respect to creative works is narrower than that afforded factual works; likewise, the scope permitted with respect to unpublished works is narrower than that afforded previously published works.  *See id.*

Here, the Works at issue are, by definition, previously published—and, in fact, licensed to Audible, *see supra* p. 11—and are a mix of fictional and non-fictional works.  (*See* Compl. ¶ 36.)  In truth, neither of these facts should "influence[]" this Court "one way or the other." *Google Books*, 804 F.3d at 220.  To the extent the second factor is relevant here, it is because it "necessarily combines with the 'purpose and character' of the secondary work," which, as discussed above and below, "transformatively provides valuable information about the original, rather than replicating protected expression in a manner that provides a meaningful substitute for the original."  *Id.*; *see Campbell*, 510 U.S. at 586 (even though original work was creative, second factor "is not much help in this case"); *HathiTrust*, 755 F.3d at 98 ("nature of the work" factor is of "limited usefulness" where work is "being used for a transformative purpose").

In short, in this case—as in most others—the fair use analysis "hinges on the other three factors."  *HathiTrust*, 755 F.3d at 98.

C.      **Audible Captions Does Not Use More of the Copyrighted Material Than Is Reasonably Necessary to Its Fair-Use Purposes**

The third statutory factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).  "[T]here are no absolute rules as to how much of a copyrighted work may be copied and still considered a fair use."  *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986).  Indeed, "[c]omplete unchanged copying has repeatedly been found justified as fair use when the copying was reasonably appropriate to achieve the copier's transformative purpose and was done in such a manner that it did not offer a competing substitute for the original."  *Google Books*, 804 F.3d at 221.

Audible Captions' purpose—enhancing the listener's understanding—requires the display of each of the words in the audiobook, but Audible takes pains to do so "in such a manner that it d[oes] not offer a competing substitute for the original" underlying book, *Google Books*, 804 F.3d at 221.  By (a) doling out the text transcribed from the audiobook in small portions, (b) in a transient manner, (c) without providing a coherent text to refer back to or flip through, or scan, and (d) encrypting and protecting the underlying files, Audible gives listeners just enough information for just enough time "to decide whether to pursue more information about" the text, *Kelly,* 336 F.3d at 821, but does not provide a replacement e-book, *see supra* pp. 7-11.[10]

Moreover, while Google's fair use hinged, in part, on its efforts to prevent "revelations" of text and limit "the amount and substantiality of what is . . . made accessible to [the] public," *see Google Books,* 804 F.3d at 222 (emphasis omitted), there is no similar justification for

---

[10] While Plaintiffs complain about Audible Captions' 6% error rate (Pl. Br. at 9), fair use exists even when the technology of the secondary use is imperfect.  *See iParadigms*, 562 F.3d at 640-41 ("The question of whether a use is transformative does not rise or fall on whether the use perfectly achieves its intended purpose").

27

requiring Audible to hide from listeners some percentage of the words spoken in the audiobook, given that they have paid Plaintiffs for a license to receive precisely that information.  *See Capitol Records*, 910 F.3d at 660-61; *cf. Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 449 (2014) ("an entity that transmits a performance to individuals in their capacities as owners or possessors [of the underlying works] does not perform to 'the public'" under 17 U.S.C. § 101).

Because the amount of a work used to generate Captions is "reasonable in relation to the purpose of the copying," this factor favors a finding of fair use.  *Campbell*, 510 U.S. at 586.

### D.   Audible Captions Does Not Replace E-Books or Immersive Reading Products

The fourth statutory factor examines "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  As in the *Google Books* cases, where the publisher-plaintiffs warned that Google would "decimate existing and developing markets for literary works," Brief for Appellants, *Authors Guild, Inc. v. HathiTrust*, 775 F.3d 87 (2d Cir. 2014), No. 12-4547, 2013 WL 3771981, at *3, Plaintiffs now declare that Audible Captions will "undermine the entire book industry the moment it becomes available" (Pl. Br. at 20).  The Second Circuit rejected this rhetoric, and this Court should do the same.

Audible Captions does not "usurp[] the market of the original work," *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004).  In analyzing this factor, a court "is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *HathiTrust*, 755 F.3d at 99 (holding that these are "only market harms that count").  For this reason, "Factor Four is necessarily intertwined with Factor One; the more the objective of secondary use differs from that of the original, the less likely it will supplant the commercial market for the original." *Capitol Records*, 910 F.3d at 662; *see also Bill Graham Archives*, 448 F.3d at 615 (noting that "copyright holder cannot prevent others from entering fair use markets").

28

Here, Plaintiffs argue that Audible Captions will "directly compete with them in the market for the text of their Works as well as cross-format services." (Pl. Br. at 16.) This argument defies logic for the same reasons discussed above. Audible Captions is not a book, nor does it provide a replacement for a book or e-book. *See supra* pp. 7-8. Thus, there is no reason to conclude that the availability of an audiobook with Audible Captions will dissuade a customer from purchasing "the text of [Plaintiffs'] works." (*Id.*) Indeed, with or without Captions, an audiobook listener has, by definition, already purchased an audiobook title and is unlikely to purchase an additional copy of that title in any other form. (Stern Decl. ¶ 25.) Further, Audible Captions does not provide the full e-book reading experience that is integral to "cross format" products like Immersion Reading or WfV. *See supra* pp. 9-11. Thus, while Plaintiffs assert that Audible Captions is a "no-cost, functional substitute for the reading experience of Immersion Reading" (Pl. Br. at 17), that is simply false.

For much the same reason, Plaintiffs' speculation that Audible Captions will result in the loss of "unquantifiable revenues" (Pl. Br. at 18) has no foundation. *See generally Sony*, 464 U.S. at 453-54 (finding that copyright owners' "prediction that live television or movie audiences will decrease" as a result of VCR time-shifting was merely "speculative"); *Perfect 10*, 508 F.3d at 1168 (rejecting market harm alleged at preliminary injunction stage as "hypothetical"). Courts have rejected the circular logic that, because the challenged use is not being paid for, plaintiffs have *ipso facto* lost out on potential revenue. *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 n.17 (2d Cir. 1994). Instead, "[o]nly an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's effect upon the potential market for or value of the copyrighted work." *Id.* at 930 (internal quotation marks omitted). But there are no "potential licensing

revenues" for speech-to-text generated audiobook captions, and Plaintiffs do not even attempt to argue otherwise.  Nor could they: the supposedly "convoluted" speech-to-text technology that generates Audible Captions (Pl. Br. at 1) is, in fact, a free, publicly available tool that will allow anyone to "see instant captions anywhere."[11]  Thus, the addition of Audible Captions to duly licensed audiobooks does not alter Plaintiffs' economic circumstances.

Finally, even assuming some economic impact, "the possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute;" rather, "[t]here must be a *meaningful or significant* effect 'upon the potential market for or value of the copyrighted work.'"  *Google Books*, 804 F.3d at 224 (emphasis added).  For the reasons outlined above, an impact of that magnitude is quite unlikely and, as noted below, easily quantifiable and no basis for injunctive relief, *see infra* Part V.  Likewise, "this factor requires a balancing of the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied," *Bill Graham Archives*, 448 F.3d at 613 (internal quotation marks omitted); *see also Campbell*, 510 U.S. at 591 n.21 ("Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors.")  The significant benefits Audible Captions provides to audiobook listeners—including students, the hearing impaired, people with learning differences, but ultimately all listeners—outweigh the speculative impact on sales.

---

[11] *See* Bogdan Petrovan, Android Authority (May 7, 2019), *Google's Impressive Live Caption Will Add Subtitles to Any Audio on Your Phone*, https://www.androidauthority.com/google-live-caption-983562/; Android, *Introducing Live Transcribe*, https://www.android.com/accessibility/live-transcribe/ (last visited Sept. 10, 2019); Otter, *Generate Notes*, https://otter.ai/starter-guide?article=generateNotes (last visited Sept. 10, 2019).

In sum, Audible Captions will have "no demonstrable effect upon the potential market for, or the value of, the copyrighted work" at issue, and, thus, it "need not be prohibited in order to protect the author's incentive to create." *Sony*, 464 U.S. at 450. Doing so "would merely inhibit access to ideas without any countervailing benefit." *Id*. at 450-51. The fourth factor also favors fair use.

*     *     *

"The final step" in any fair use analysis "is to weigh the four statutory factors together" in "'light of the purposes of copyright.'" *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018) (quoting *Campbell*, 510 U.S. at 577-78). Here, those purposes would be served by allowing Audible to make Audible Captions available to listeners. "The sole interest of the United States and the primary object in conferring the [copyright] monopoly . . . lie in the general benefits derived by the public from the labors of authors." *Sony*, 464 U.S. at 432 (internal quotation marks omitted). "When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose." *Id.* The benefits provided by Audible Captions to millions of audiobook listeners are simply not outweighed by any countervailing threat to the "ultimate aim" of copyright law, namely, "to stimulate creativity for the general public good," *Swatch*, 756 F.3d at 91 (internal quotation marks omitted). In fact, to the extent Audible Captions helps listeners access and understand the very works at issue in this case, it will do just that. For this reason, Audible is likely to prevail against Plaintiffs' infringement claim on fair use grounds and their requested injunction should be denied.

## IV. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON ANY THEORY OF SECONDARY LIABILITY

Casting a wide net, Plaintiffs also argue that Audible should be liable under three theories of secondary liability (contributory, inducement, vicarious). But Plaintiffs put the cart before the

horse.  Even assuming that Plaintiffs pled an exception to their license agreements—which they

have not—and thus have standing to assert a copyright claim, Audible cannot be secondarily

liable unless there has been direct infringement of Plaintiffs' rights.  *See Faulkner v. Nat'l*

*Geographic Enters., Inc*., 409 F.3d 26, 40 (2d Cir. 2005) ("no contributory infringement absent

actual infringement"); *Wolk v. Kodak Imaging Network, Inc*., 840 F. Supp. 2d 724, 750

(S.D.N.Y. 2012) ("to hold a defendant secondarily liable someone else must have directly

infringed on the copyright holder's rights").  In other words, Plaintiffs would have to show that

Audible's customers infringed Plaintiffs' copyrights, and that Audible should be held responsible

for that infringement.  *See Sony*, 464 U.S. at 498 (home video taping was capable of non-

infringing uses, thus manufacturers not secondarily liable for the sale of such equipment).

     Plaintiffs cannot do so.  As detailed above, Audible Captions is a fair use of Plaintiffs'

audiobooks, whether viewed from the perspective of Audible or its customer, and thus there is no

"infringement" to which Audible's conduct could conceivably contribute.  *See supra* Part III; *cf.*,

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005) (secondary

infringement may be found where the defendant's actions are "designed to stimulate others to

commit violations.")  Plaintiffs do not even attempt to claim that an individual customer would

not be permitted to write down, type, or use a freely available tool like Google Live Caption,

Google Live Transcribe, or Otter to create an Audible Captions-equivalent for her personal use,

nor could they.  *See Sony*, 464 U.S. at 456; *see also Am. Geophysical Union*, 60 F.3d at 916

("We do not deal with the question of copying by an individual, for personal use in research or

otherwise (not for resale), recognizing that under the fair use doctrine or the *de minimis* doctrine,

such a practice by an individual might well not constitute an infringement.")  Thus, because

Plaintiffs are unlikely to succeed on their claim that any copyright infringement occurs as a result

of Audible Captions, their motion for a preliminary injunction on secondary liability grounds

also should be denied.[12]

## V.   PLAINTIFFS FAIL TO SHOW THEY WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION

Plaintiffs cannot show they will be harmed by Audible Captions, much less irreparably

so.  Plaintiffs paint Captions as an "extreme departure" from the norm (Pl. Br. at 20), but the

Court should not fall sway to these scare tactics.

To secure a preliminary injunction, a plaintiff must demonstrate actual or threatened

irreparable harm, *Salinger*, 607 F.3d at 79-80, which "is perhaps the single most important

prerequisite for the issuance of a preliminary injunction," *Rex Med. L.P. v. Angiotech Pharms.

(US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Kamerling v. Massanari*, 295

F.3d 206, 214 (2d Cir. 2002)).  The harm must not be "remote or speculative but actual and

imminent."  *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 2016 WL 4742317, at *4

(S.D.N.Y. Sept. 12, 2016).  The court must pay "particular attention to whether the 'remedies

available at law, such as monetary damages, are inadequate to compensate for that injury;'" it

"must not simply presume irreparable harm" in copyright cases; and plaintiffs must show that, in

their case, a failure to issue an injunction would actually cause irreparable harm.  *Salinger*, 607

F.3d at 80-82.

Plaintiffs overlook that their claims are rooted in contract with quantifiable monetary

damages available as a remedy.  *See supra* Part II.  "[T]he classic remedy for breach of contract

is an action at law for damages.  If the injury complained of may be compensated by an award of

---

[12] If this case proceeds, Audible expressly reserves and does not waive the right to argue, on other grounds, that it is not secondarily liable on the basis of contributory infringement, inducement of copyright infringement, or vicarious liability.

monetary damages, then an adequate remedy at law exists and no irreparable harm may be found as a matter of law." *General Texting Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994).  Moreover, if Plaintiffs were entitled to damages, they could be easily calculated using their license contract royalty rates.  (Anderson Decl. ¶ 5.) "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Con. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir. 2005).

To the extent that Plaintiffs can assert copyright claims, they still have failed to meet the high threshold necessary to establish irreparable harm.

*First*, Plaintiffs have failed to show, beyond speculation and conjecture, that Audible Captions will irreparably harm sales of their products in the first instance.  *See supra* pp.9-11; *Gym Door Repairs*, 2016 WL 4742317, at *4 (denying preliminary injunction where plaintiffs "cannot plausibly claim that they will be harmed by a loss of business that they would not recover even if the Court grants the injunction").

*Second*, Plaintiffs' claim that Audible Captions undermines their control over their products and may harm their reputations is speculative at best.  Each Audible Captions listener receives actual notice that transcription errors may appear in Audible Captions due to the automated transcription technology.  (Stern Decl. ¶ 20.)  Audible listeners are, therefore, unlikely to attribute these errors to the publisher or author.  Plaintiffs' speculative arguments do not support a preliminary injunction.  *See Blassingame v. Yale Univ.*, 2004 WL 1534196, at *2 (D. Conn. July 6, 2004) (denying preliminary injunction in copyright infringement case where damages were speculative); *Fox Ins. Co. v. Envision Pharm. Holdings, Inc.,* 2009 WL 790312, at

34

*7 (E.D.N.Y. Mar. 23, 2009) ("There is no irreparable harm where the loss of goodwill is

doubtful and the loss of a profitable line of business is compensable by monetary damages.")

   *Third*, Plaintiffs have not established that damages in this case are impossible to measure.

Even in copyright cases, a court may be able to "award meaningful monetary relief" out of either

actual damages, the infringer's profits, or statutory damages.  *See TD Bank N.A. v. Hill*, 928 F.3d

259, 282 (3d Cir. 2019) (reversing grant of preliminary injunction in copyright case).  Should the

Court ultimately find that Audible Captions somehow damaged Plaintiffs, the Court could award

damages keyed to a non-speculative demonstration by Plaintiffs of the royalties they would be

owed under their relevant e-book royalty contracts.

   *Fourth*, if Plaintiffs were to succeed here, Audible Captions can be disabled (such that it

will no longer function on any user devices) and the status quo will be resumed.  Thus, it is

entirely possible to "unring the bell" once the feature is released.  (Pl. Br. at 20; Stern Decl. Ex.

A.)

## VI.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST
##        BOTH FAVOR AUDIBLE

   "A court must consider the balance of hardships between the plaintiff and defendant and

issue the injunction only if the balance of hardships tips in the plaintiff's favor."  *Salinger*, 607

F.3d at 80; *Gym Door Repairs*, 2016 WL 4742317, at **4-5.  Equally, "the court must ensure

that the 'public interest would not be disserved' by the issuance of a preliminary injunction."

*Salinger*, 607 F.3d at 80 (internal citation omitted).  In copyright disputes, each party is

protecting a property interest in its products *and* its "core First Amendment interest" in freedom

of expression, and the court must seek to "keep pace with innovation."  *Id*. at 81-82.  The public

interest is always at issue in copyright cases because "[t]he object of copyright law is to promote

the store of knowledge available to the public," and the public has its own interest in free expression. *Id.* at 82.

Here, consideration of the balance of hardships and the public interest both favor Audible. Again, Plaintiffs could easily be made whole by monetary damages, which tips the balance of hardships away from Plaintiffs. *See Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 492 (2d Cir. 2002) (affirming denial of preliminary injunction where potential remedy of money damages for lost sales diminishes claim of hardship). Plaintiffs' theory that, if Audible Captions is deemed infringing, the theoretical cross-over customer who once bought e-books but ceased doing so "might not return to buying" (Pl. Br. at 22) is purely speculative and cannot support an injunction. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995) (affirming denial of preliminary injunction where plaintiff's alleged hardship speculative); *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 587 (S.D.N.Y. 2009) (denying preliminary injunction where plaintiff's alleged hardship speculative); *Waddington N. Am. Bus. Tr. v. EMI Plastics, Inc.*, 2002 WL 2031372, at *10 (E.D.N.Y. Sept. 5, 2002) (same).

By contrast, issuing an injunction would harm Audible and its customers, and would be contrary to the public interest. The purpose of Audible Captions is to foster learning by enabling paying license holders to engage more meaningfully with the audio content they have purchased. (Stern Decl. ¶ 9.) Audible Captions will also support learners with disabilities, who are hard of hearing, for whom English is not their first language, and who are disinclined to read. (Yudin Decl. ¶ 15; Shanahan Decl. ¶ 12.) Enjoining Audible Captions would frustrate Audible's goal of making content more accessible to students and the general population, and instead force listeners seeking this functionality to use other, generally available technologies that achieve a

similar (though lesser) result without any corresponding benefits to Plaintiffs.  (Reisbaum Decl. Exs. B-D.)

Plaintiffs claim that they are the ones who "promote literacy, defend freedom of speech, advance scientific progress, stimulate the intellectual and cultural discourse that is central to a healthy democratic society, and foster the joy of storytelling."  (Compl. ¶ 17.)  Yet, in response to Audible's efforts to support those same ideals, Plaintiffs show only sneering contempt.  (*Id.* ¶ 41; Pl. Br. at 24-25 (referring to the "ramshackle argument" that Audible Captions "is important to education" as an "educational pretext").)  If Plaintiffs truly wanted to "foster the joy of storytelling," they would embrace Audible's efforts to use technology to spread that joy to those who have the most difficulty experiencing it.  Audible respectfully submits that this Court would undermine, rather than serve, the public interest by preventing Audible from making Audible Captions available to both its customers and to the students it has chosen to serve.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction and grant Audible's motion to dismiss.

Dated: September 12, 2019
      New York, New York

CLARICK GUERON REISBAUM LLP

By: _____
      Emily Reisbaum
      Nicole Gueron
      Aaron H. Crowell
      Emily A. Weissler
      Ashleigh Hunt
      220 Fifth Avenue, 14th Floor
      New York, NY  10001
      Phone:  (212) 633-4310
      Fax:  (646) 478-9484

      *Attorneys for Defendant Audible, Inc.*

37