Dale M. Cendali
Joshua L. Simmons
Jordan M. Romanoff
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
jordan.romanoff@kirkland.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRONICLE BOOKS, LLC; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS LLC; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SCHOLASTIC INC.; AND SIMON & SCHUSTER, INC.<br><br>Plaintiffs,<br><br>- against -<br><br>AUDIBLE, INC.<br><br>Defendant. | Case No. 19-cv-7913 (VEC)<br><br>ECF Case |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 3

    I.      PUBLISHERS ARE LIKELY TO SUCCEED ON THE MERITS ...................... 3

         A.    Publishers' Copyright Claim Is Not Foreclosed by Audible's Unraised Defense ................................................................................ 3

         B.    Audible's Commercial, Substitutive Infringement Is Not Fair Use .......... 6

              1.    Factor One: The Distributed Text is Commercial and Not Transformative ............................................................................. 8

              2.    Factor Two: The Works are Fictional and Creative..................... 11

              3.    Factor Three: The Distributed Text is the Entirety of the Works ............................................................................................ 12

              4.    Factor Four: The Distributed Text Affects the Markets for and Value of the Works ............................................................... 13

         C.    Audible Cannot Avoid Secondary Liability Based on its Fair Use Claim ............................................................................................... 16

    II.     PUBLISHERS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION ................................................................................................ 17

    III.    THE BALANCE OF HARDSHIPS FAVORS PUBLISHERS ............................ 19

    IV.    THE PUBLIC INTEREST SUPPORTS INJUNCTIVE RELIEF ........................ 20

CONCLUSION ...................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Stellar Records, Inc.*,
   96 F.3d 60 (2d Cir. 1996) ............................................................................................5

*Am. Airlines, Inc. v. Imhof*,
   620 F. Supp. 2d 574 (S.D.N.Y. 2009).......................................................................19

*Am. Broad. Cos. v. Aereo, Inc.*,
   573 U.S. 431 (2014)...................................................................................................13

*Am. Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994)................................................................................. *passim*

*Assoc. Press v. Meltwater US Holdings, Inc.*,
   931 F. Supp. 2d 537 (S.D.N.Y. 2013) ...................................................................9, 14

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014).............................................................................7, 10, 11

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015)....................................................................................6, 11

*Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*,
   No. 14 Civ. 9687, 2016 WL 4916969 (S.D.N.Y. Feb. 11, 2016) ..............................5

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006).......................................................................................8

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006).......................................................................................8

*Blassingame v. Yale Univ.*,
   No. 3:02 Civ. 2009, 2004 WL 1534196 (D. Conn. July 6, 2004).............................18

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1993).......................................................................................8, 13, 16

*Capitol Records, LLC v. ReDigi Inc.*,
   910 F.3d 649 (2d Cir. 2018).............................................................................7, 9, 13

*Castle Rock Entm't v. Carol Publ'g Grp.*,
   150 F.3d 132 (2d Cir. 1998)..................................................................................11, 14

*Cohen v. United States*,
98 Fed. Cl. 156 (Fed. Cl. 2011) ................................................................5

*Davis v. Gap, Inc.*,
246 F.3d 152 (2d Cir. 2001) .......................................................... *passim*

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ...................................................................9

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) ...............................................................................15

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) .................................................................................3

*Fox Ins. Co. v. Envision Pharm. Holdings, Inc.*,
No. 09 Civ. 0237, 2009 WL 790312 (E.D.N.Y. Mar. 23, 2009) .............18

*Fox News Network, LLC v. TVEyes*,
883 F.3d 169 (2d Cir. 2018) .................................................6, 12, 14, 15

*Gilliam v. Am. Broad. Cos.*,
538 F.2d 14 (2d Cir. 1976) .......................................................................5

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
No. 15 Civ. 4244, 2016 WL 4742317 (S.D.N.Y. Sept. 12, 2016) ...........17

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1984) ..........................................................8, 12, 13, 16

*HarperCollins Publishers, LLC v. Gawker Media LLC*,
721 F. Supp. 2d 303 (S.D.N.Y. 2010) ....................................................18

*Infinity Broad. Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998) ........................................................ *passim*

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
58 F.3d 27 (2d Cir. 1995) .......................................................................19

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ...............................................................7, 9

*L.A. News Serv. v. Reuters Television Int'l*,
149 F.3d 987 (9th Cir. 1998) ..................................................................10

*L.A. News Serv. v. Tullo*,
973 F.2d 791 (9th Cir. 1992) ..................................................................10

*Leadsinger, Inc. v. BMG Music Pub.*,
    512 F.3d 522 (9th Cir. 2008) ........................................................................10

*Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*,
    23 F. Supp. 3d 344 (S.D.N.Y. 2014)...............................................................5

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
    312 F.3d 94 (2d Cir. 2002)............................................................................10

*Monge v. Maya Magazines, Inc.*,
    688 F.3d 1164 (9th Cir. 2012) .......................................................................8

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999).........................................................................7, 9

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .......................................................................7

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
    99 F.3d 1381 (6th Cir. 1996) .......................................................................11

*Random House, Inc. v. Rosetta Books LLC*,
    83 F.3d 490 (2d Cir. 2002)...........................................................................19

*Ringgold v. Black Entm't Television, Inc.*,
    126 F.3d 70 (2d Cir. 1997)......................................................................14, 15

*Sohm v. Scholastic Inc.*,
    No. 17 Civ. 6098, 2018 WL 1605214 (S.D.N.Y., 2018) .................................4

*Sony Corp. of Am. v. Universal City Studios*,
    464 U.S. 417 (1983)................................................................................11, 16

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2d Cir. 2018)...........................................................................4

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg*,
    756 F.3d 73 (2d Cir. 2014).............................................................................8

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019).........................................................................18

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) .............................................................................18

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993).....................................................................9, 12

*United States v. ASCAP*,
   599 F. Supp. 2d 415 (S.D.N.Y. 2009)...........................................................................8, 12, 15

*A.V. ex. rel. Vanderhye v. iParadigms, LLC*,
   562 F.3d 630 (4th Cir. 2009) ................................................................................................7

*VHT, Inc. v. Zillow Grp., Inc.*,
   918 F.3d 723 (9th Cir. 2019) ...............................................................................................7

*Video Pipeline v. Buena Vista Home Entm't, Inc.*,
   342 F.3d 191 (3d Cir. 2003)..................................................................................................7

*Video-Cinema Films, Inc. v. Lloyd E. Rigler-Lawrence E. Deutsch Found.*,
   No. 04 Civ. 5332, 2005 WL 2875327 (S.D.N.Y. Nov. 2, 2005) ..........................................15

*Waddington N. Am. Bus. Trust v. EMI Plastics, Inc.*,
   No. 02 Civ. 3781, 2002 WL 2031372 (E.D.N.Y. Sept. 5, 2002)...........................................19

*Wainwright Sec., Inc. v. Wall St. Transcript Corp.*,
   558 F.2d 91 (2d Cir. 1977)..................................................................................................13

*Warner Bros. Enm't Inc. v. RDR Books*,
   575 F. Supp. 2d 513 (S.D.N.Y. 2008)...................................................................................11

*Weissman v. Freeman*,
   868 F.2d 1313 (2d Cir. 1989)..............................................................................................12

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) .............................................................................................14

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012)...............................................................................16, 17, 18, 19

*Yamashita v. Scholastic, Inc.*,
   — F.3d —, 2019 WL 4047513 (2d Cir. Aug. 28, 2019) .......................................................4, 5

*Young-Wolff v. McGraw-Hill School Educ. Holdings, LLC*,
   No. 13 Civ. 4372, 2015 WL 1399702 (S.D.N.Y. Mar. 27, 2015) ...........................................5

*Zomba Enters., Inc. v. Panorama Records, Inc.*,
   491 F.3d 574 (6th Cir. 2007) ..............................................................................................11

**Rules**

Fed. R. Civ. P. 8.................................................................................................................3, 4, 5

**Other Authorities**

U.S. Copyright Office, *Report on Orphan Works and Mass Digitization* (2015) ..........................7

# PRELIMINARY STATEMENT[1]

Audible's brief is remarkable for what it admits and fails to rebut, as well as its many misstatements of copyright law.  Audible fails to address, or respond with evidence to refute, that: (1) Publishers and their authors hold valid copyrights, *id*. at 11; (2) the right to resell audiobooks is distinct from the right to reproduce and distribute text, *id*. at 2; (3) the revenues from each distribution method—*e.g.*, print, eBook, and digital audiobook—benefit the public by incentivizing authors to write and publishers to publish and promote works, *id*. at 5; (4) absent a successful affirmative defense, the Distributed Text violates Publishers' copyrights, *id*. at 12–16; (5) the Distributed Text's error rate may be as high as 6% and lacks paragraphing and correct punctuation, *id*. at 9; Stern Decl. (Dkt. No. 38) ¶ 19; (6) Audible reproduces and distributes the *entirety* of Publishers' Works as Distributed Text, *id*. at 8; Stern. Decl. ¶ 16; (7) Immersion Reading and Distributed Text provide consumers with a combined audio and text experience, *id*. at 17; (8) Distributed Text would irreparably harm Publishers and authors by eliminating their ability to determine how their works are disseminated, *id*. at 16–17; and (9) Audible would not face economic hardship if enjoined, *id*. at Br. 22–23.

Rather than marshalling evidence to dispute the foregoing, Audible raises collateral attacks that are inconsistent with established law and do not support denial of Publishers' motion.  **First**, Publishers have alleged the elements of copyright infringement articulated by the Supreme Court.  It is Audible's burden to prove the affirmative defense of license, which, given that audiobooks and text are distinct, it tellingly has not asserted.  Audible's attempt to shift its

---

[1]    Capitalized terms were defined in Publishers' opening brief (Dkt. No. 11) ("Pls.' Br.").  Audible filed one brief opposing a preliminary injunction and moving to dismiss.  ("Def.'s Br.")  Publishers respond separately to each as Audible's approach confuses the issues and muddles what evidence may be considered in deciding each motion.  For the Court's convenience, Publishers submit their opposition concurrently though it was not due until September 26, 2019.

burden to Publishers is inconsistent with Second Circuit law, the Federal Rules, and the liberal pleading standard.

**Second**, Audible's fair use argument is meritless as it plucks phrases out of court decisions but ignores that distributing the *entire* text of a book for consumers to read does not constitute fair use.  This Circuit is clear: although it may be permissible to provide content to assist in finding or commenting on authorized copies of a work, the distribution of an entire unauthorized copy, even in short segments, is not a fair use.  Such naked distribution is classic infringement.

**Third**, Publishers extensively documented how they will be harmed in numerous, specific ways that courts have found constitute irreparable injury.  Audible cannot avoid this by merely and wrongly proclaiming that Publishers are "speculating"; it must present evidence that the harm is not irreparable.  It has failed to do so.

**Fourth**, the balance of hardships does not favor Audible.  Audible does not even attempt to argue that it would suffer economic hardship if unable to release Distributed Text for Publishers' Works during this suit.  Rather, it conflates this analysis with the public interest analysis, but has not identified a harm to it if the *status quo* is maintained.

**Finally**, the public interest in protecting Publishers' copyrights outweighs Audible's unsupported claims that Distributed Text aids literacy.  Leaving aside that Audible Captions is not limited to the educational market (a critical market for Publishers), Audible has not provided any research supporting its allegations.  In contrast to the conclusory declaration of Timothy Shanahan, a member of an Audible advisory council, Scholastic's lead educator, Dr. Lois Bridges, uses actual literacy research to show that Distributed Text would only not be unhelpful, but may even be actively *harmful* to readers as it is "inconsiderate text" ("Bridges Decl.").

# ARGUMENT

## I.  PUBLISHERS ARE LIKELY TO SUCCEED ON THE MERITS

Publishers' opening brief showed that Audible was directly or, alternatively, secondarily liable for copyright infringement.  Audible does not dispute that Publishers have established both elements of their claim (*i.e.*, ownership of valid works and copying of original elements of the works) under *Feist*.  Pls.' Br. 11–13.  Nor does Audible dispute that Publishers have established secondary liability.  *Id.* at 13–16.  Instead, it raises a misguided pleading argument and asserts fair use on the merits—both arguments are unavailing.

### A.  Publishers' Copyright Claim Is Not Foreclosed by Audible's Unraised Defense

Audible's claim that Publishers filed a deficient pleading is wrong legally and factually.  As a threshold matter, instead of asserting a substantive defense that it is licensed to reproduce and provide Distributed Text, Audible merely asserts insufficient pleading.  In other words, Audible *does not claim* that the resale agreements authorize Distributed Text.  Rather, it argues only that Publishers should have pleaded Audible exceeds the scope or violates the conditions of the audiobook resale agreements.  This is a procedural issue, not a substantive license defense.[2]

Regardless, Audible's pleading argument fails.  ***First***, Publishers' claims were properly pleaded.  The Supreme Court has held that there are only two elements of a copyright claim— "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Audible does not dispute that Publishers have properly alleged both.  Under Federal Rule of Civil Procedure 8(c)(1), license is an affirmative defense, as the Second Circuit repeatedly has recognized

---

[2]   Audible could have put the agreements before the Court if it wanted to assert a license defense.  Its counsel even told Publishers' counsel: "We will be submitting as exhibits each of the Plaintiffs' licensing agreements with Audible."  *See* Reply Decl. of Dale Cendali ("Cendali 2d Decl.") Ex. 1.  Audible evidently reconsidered.

(including in Audible's cited cases). *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018) ("The existence of a license is an affirmative defense, placing upon the party claiming a license 'the burden of coming forward with evidence' of one."); *see also Yamashita v. Scholastic, Inc.*, — F.3d —, 2019 WL 4047513, at *5 (2d Cir. Aug. 28, 2019) ("[P]ossession of an applicable license . . . is a defense that the alleged infringer must plead and prove."); *Sohm v. Scholastic Inc.*, No. 17 Civ. 6098, 2018 WL 1605214, at *2 (S.D.N.Y., 2018) (same). Alleging a lack of license is thus not a required element of Publishers' copyright claims.

***Second***, Audible's entire argument rests on a flawed reading of the Second Circuit's recent decision in *Yamashita* and how it relates to the notice requirements under Rule 8. *Yamashita* only applies in the unusual circumstance where the plaintiff (a) identifies a license in the complaint that covers the conduct at issue and then (b) fails to identify *how* the defendant exceeded the scope of that license. In *Yamashita*, the plaintiff's complaint "acknowledged" that the defendant "procured licenses to copy the Photographs." 2019 WL 4047513, at *5. In other words, the plaintiff admitted that the works (the photographs) and the alleged infringement (the reproduction) were covered by an existing license, such that the motion turned on whether the complaint sufficiently alleged how the defendant exceeded the scope of that license. *Id.* Plaintiff speculated that a host of license limitations "might" have been violated without specifying how. *Id.* On those narrow facts, the Second Circuit affirmed the dismissal of the complaint, finding the defendant lacked adequate notice of how it allegedly exceeded the license.

Publishers' Complaint, unlike in *Yamashita*, alleges that the agreements <u>do not</u> encompass Audible's challenged conduct nor do they use those agreements to "set[] the terms that provide the foundation for [the] Complaint." 2019 WL 4047513, at *5. Publishers are not asserting that Audible can engage in the challenged conduct at all, as the plaintiff did in

*Yamashita*, because whereas in *Yamashita* the infringement was a matter of degree (how many copies were made); here, it is a matter of kind (audio v. Distributed Text). *Yamashita's* narrow holding does not apply and the Complaint is well-pleaded.

Even if this Court were to find that Publishers' Complaint concedes the existence of an agreement that authorizes Audible's infringing conduct, the Complaint still satisfies *Yamashita* as it meets the Rule 8 pleading requirements by stating which of Audible's actions were not permitted.[3]  *See, e.g.*, Compl. ¶¶ 23 ("Audible is a distributor of Publishers' audiobooks and no more has the right to create and offer Distributed Text than a physical book store selling physical books would have the right to make and sell eBooks"), 38 ("Audible's admitted goal is to give users a *reading* experience, despite Audible only having the right to distribute *audio*books"), 39 (Audible is "unilaterally offering the unauthorized Distributed Text").[4]  It is simply unnecessary for Publishers to plead more.  *See Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 353–54 (S.D.N.Y. 2014) (Plaintiff need not meet "a heightened pleading requirement" when alleging how defendant exceeded an identified license); *Young-Wolff v. McGraw-Hill School Educ. Holdings, LLC*, No. 13 Civ. 4372, 2015 WL 1399702, at *3 (S.D.N.Y. Mar. 27, 2015) (complaint need not plead specific "license terms" to state a plausible claim for relief).  Thus, *Yamashita* is not controlling.  If Audible wishes to raise a license defense, it is required to do so in its answer.  Publishers are not required to take the unusual step of disproving Audible's unstated affirmative defense in their Complaint.

---

[3]   *See Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14 Civ. 9687, 2016 WL 4916969, at *5 (S.D.N.Y. Feb. 11, 2016) (Caproni, J.) (Rule 8 dismissal is for cases where "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised").

[4]   Audible's ability to resell audiobooks does not, without separate authorization, give it the right to provide Distributed Text; the right to sell a derivative work does not include the right to adapt the underlying work.  *See Gilliam v. Am. Broad. Cos.*, 538 F.2d 14, 19–21 (2d Cir. 1976) (license to derivative work does not permit use of underlying work in other derivative works); *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 64 (2d Cir. 1996) (same).  Similarly, rights are divisible and "rights not expressly . . . granted are reserved." *See Cohen v. United States*, 98 Fed. Cl. 156, 164 (Fed. Cl. 2011) (rights to one medium do not extend to all mediums).

### B.  Audible's Commercial, Substitutive Infringement Is Not Fair Use

Audible argues that duplicating and distributing the *entire* text of the Works is fair use, Def.'s Br. 18, relying on *Authors Guild v. Google, Inc.  Id*. at 18–30 (citing 804 F.3d 202 (2d Cir. 2015) ("*Google Books*")).  Yet, *Google Books* and those cases that follow it are key precedents showing why Distributed Text is *not* fair use.  The Second Circuit found that *Google Books* "tested the boundaries of fair use."  804 F.3d at 206.  Distributed Text far exceeds it.

The Second Circuit held that Google Books was fair use only because it found that it did not distribute the entirety of the books.  Rather, it allowed users to *find* authorized copies in a carefully controlled environment where the entire book was systematically withheld from distribution.  Google showed only "enough context surrounding the searched term to help" evaluate whether the book was responsive to a search.  804 F.3d at 218.  It provided three "snippets" of books in response to all similar queries (*i.e.*, additional snippets were not revealed even if someone used repeated searches or different computers).  *Id.* at 209–10, 218, 222, 230. Importantly, the word "snippet" was not used lightly: it specifically meant a small amount of text that was no more than one-eighth of a page, and Google Books "blacklist[ed]" (*i.e.*, made permanently unavailable) (a) 10% of each book, (b) "one snippet on each page," and (c) all snippets for "books . . . for which viewing a small segment is likely to satisfy the searcher's need."  *Id.*  And Google completely excluded books at rights holders' request.  *Id.*  In short, Google Books was transformative because it served a new and different purpose while making it impossible to read a whole book.

The "boundaries" of fair use were further tested in *Fox News Network, LLC v. TVEyes, Inc.*, where the Second Circuit found that a service that offered "the entirety of the Fox programming" was not fair use as it was "radically dissimilar to the service at issue in *Google Books*," despite TVEyes' claimed limitations on accessing content.  883 F.3d 169, 179 (2d Cir.

2018).  Similarly, in *Capitol Records, LLC v. ReDigi Inc.*, the Second Circuit held that it was not

fair use to have a "system [that] makes identical copies of the whole of Plaintiffs' copyrighted

sound recordings."  910 F.3d 649, 662 (2d Cir. 2018).  *Accord Authors Guild, Inc. v. HathiTrust*,

755 F.3d 87, 97 (2d Cir. 2014) (fair use to indicate location of keywords without revealing

copyrighted content); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 69,

72 (2d Cir. 1999) (not fair use to distribute "abstracts" or "rough translations" of news articles to

customers); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998) (service not fair

use where purpose was "retransmission" of broadcast).[5]  Likewise, the U.S. Copyright Office has

concluded that "there is broad agreement that no colorable fair use claim exists [for] providing

digital access to copyrighted works in their entirety."  *Report on Orphan Works and Mass

Digitization* (2015), at 101, https://www.copyright.gov/orphan/reports/orphan-works2015.pdf.

These cases reflect the clear distinction in Second Circuit case law between services that *find*

content (which might be fair use) and those that *deliver* content (which are not).

By distributing the entirety of the Works wholesale, Audible blows far past the

"boundaries" set in *Google Books* and other cases.  Confusingly, Audible relies on many of these

cases, but does not demonstrate how the holdings provide a defense to distributing the entirety of

Publishers' Works.[6]  The Distributed Text is the *entire* text of Publishers' Works—that's the

point.  It does not have protections to ensure that consumers cannot read the entire book, it does

not eliminate categories of books for which snippets likely satisfy the demand, and authors

---

[5]    *See also Video Pipeline v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 199 (3d Cir. 2003) (a service that does
not help find authorized works may not "display[] unauthorized copies of the copyrighted works").

[6]    Audible's out-of-Circuit cases favor Publishers.  *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817 (9th Cir.
2003) (image search engine that provided only thumbnail images of photographs to assist users in finding
authorized, full size versions fair use); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir.
2007) (same); *A.V. ex. rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 641 (4th Cir. 2009) (fair use where
service only identified plagiarism and did not provide text to consumers); *see also VHT, Inc. v. Zillow Grp.,
Inc.*, 918 F.3d 723, 744 (9th Cir. 2019) (subsequent Ninth Circuit case: service not fair use that delivered
unauthorized, full size images, instead of using thumbnails to direct users to the originals).

cannot opt out.  These facts prevent a finding of fair use as do each of the four fair use factors.

  1.  Factor One: The Distributed Text is Commercial and Not Transformative

As to the first factor ("the purpose and character of the use, including whether such use is

of a commercial nature or is for nonprofit educational purposes"), Audible admits its use is

commercial: it will make Distributed Text "available to customers who are *paying* for access,"

Def.'s Br. 24, promoting and increasing subscription revenue for Audible.  Hachette Decl. ¶ 25;

S&S Decl. ¶ 35.  Although Audible attempts to minimize this subfactor,[7] it nevertheless

"weigh[s] against a finding of fair use."  See *Harper & Row Publishers, Inc. v. Nation Enters.*,

471 U.S. 539, 562 (1984); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 921-22 (2d Cir.

1994); *ASCAP*, 599 F. Supp. 2d at 425–26.[8]

Audible's attempt to argue that Distributed Text is transformative by offering a "utility

expanding use" falls flat, as "[t]he central purpose of this investigation is to see . . . whether the

new work merely supersedes the objects of the original creation, or instead adds something new,

with a further purpose or different character, altering the first with new expression, meaning, or

message."  *Campbell*, 510 U.S. at 579 (citations, alterations, and internal quotation marks

omitted).  The Distributed Text does not meet this test as it serves *the same purposes* as the

underlying books—reading.  Harper Collins Decl. ¶ 15; Macmillan Decl. ¶ 19; PRH Decl. ¶ 39;

---

[7]   Audible argues that even uses that "generate[] a direct commercial benefit for the defendant" can be fair use, but its cited cases involved commentary, not wholesale distribution.  *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg*, 756 F.3d 73,82 (2d Cir. 2014) (news reporting); *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006) (commentary); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006) (using thumbnails in biography for historical reference).  Similarly, although Audible argues that its "transformative purpose minimizes" this subfactor, Def.'s Br. 25, its commercial, non-transformative exploitation of Publishers' Works actually "takes on a heightened importance."  *United States v. ASCAP*, 599 F. Supp. 2d 415, 428 (S.D.N.Y. 2009) (citing *Davis v. Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001)).  Finally, Audible suggests that because Publishers are paid for the audiobooks, the free distribution of the text is not commercial.  Def.'s Br. 25.  Audible, however, is using Distributed Text to drive commercial sales.  PRH Decl. ¶ 45.

[8]   To be clear, transformativeness is not a litmus test for the full fair use analysis.  *See, e.g., Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012) (commentary that was "at best minimally transformative," not fair use).  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1993) (factors are to be weighed together, no one factor is determinative).

Scholastic Decl. ¶ 13.  It does not shed any new light on the text of Publishers' Works, it does not comment on or criticize them, and it is not used to find an authorized version of them; it merely provides the Works' text in competition with authorized offerings.  It is thus substitutive of print books, eBooks, and cross-function products such as Immersion Reading. [9]

Such distribution is not transformative.  *First*, as the Second Circuit explained, it is not transformative to resell a work where the defendant "makes no change" to it; "provides neither criticism, commentary, nor information about it"; and does not "deliver the content in [a] more convenient and usable form to one who has acquired an entitlement to receive the content." *ReDigi*, 910 F.3d at 661.  In *Infinity*, it held that there was "no transformation" in a service that retransmitted radio leaving "the character of the original broadcasts unchanged."  150 F.3d at 108.  In *Texaco*, it held that copying to provide individuals "with his or her own personal copy of [a work] without . . . having to purchase" access to the work "merely supersedes the objects of the original."  60 F.3d at 919–20; *see also Nihon*, 166 F.3d at 69, 72 ("not in the least 'transformative'" to gather articles and distribute "abstracts" or "rough translations").[10]

*Second*, although Audible argues that Distributed Text is "utility-expanding," Def.'s Br. 22, the cases on which it relies involved services that helped find authorized copies of the works, *see supra* 6, and are thus inapposite.  Also, Audible cannot rely on Distributed Text offering additional features, such as dictionary definitions, as a justification for its copying.  The Second

---

[9]   Audible disputes that Distributed Text is substitutive because its customers cannot manipulate it in the same way as an eBook, Def.'s Br. 21, but this fails.  The infringing work need not be identical, merely an "adequate substitute."  *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993); *see also Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017) (films with scenes omitted still substitutive).

[10]   As Judge Cote has held, there "is nothing transformative about" a service that "use[s] its computer programs to automatically capture and republish designated segments of text . . . without adding any commentary or insight."  *Assoc. Press v. Meltwater US Holdings, Inc.*, 931 F. Supp. 2d 537, 552–56 (S.D.N.Y. 2013).  Even *Kelly*, on which Audible relies, noted that "reproducing news footage into a different format does not change the ultimate purpose of informing the public about current affairs."  336 F.3d at 819.

Circuit has rejected similar arguments. *See Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 98–99 (2d Cir. 2002) (not fair use to distribute entire text even though defendant's version "adds user-friendly instructions" and a "different layout").[11]   And Immersion Reading, which is authorized by Publishers, provides the same features. *See* Cendali 2d Decl. Ex. 2 (side-by-side video showing Immersion Reading's dictionary feature).

   ***Third***, Audible's reliance on supposed educational benefits to its customers of reading the text of Publishers' Works while listening to audiobooks, Def.'s Br. 21, 23, fails for three reasons.  As an initial matter, Dr. Bridges showed Audible's approach does not achieve its claimed goals. *See infra* 20; Pls.' Br. 25.  Next, in any case, "a use does not become transformative by making an 'invaluable contribution to the progress of science and cultivation of the arts.'" *HathiTrust*, 755 F.3d at 96.  And Audible cannot defend its distribution of the entire text of the Works based on a supposed pedagogical use by its users.  As the Second Circuit has made clear, a defendant's own actions must be transformative, "not the acts of his end-users." *Infinity*, 150 F.3d at 108.[12]   Courts have considered and rejected arguments by defendants who wanted to distribute the entire text of literary and musical works on the basis that users might put them to an educational or research purpose because the defendant's act—distributing the entire work—is not transformative, regardless of how the person receiving the copy may use it. *See Texaco*, 60 F.3d at 923 (not transformative to distribute entire articles for users' research); *see also Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) (not transformative to provide lyrics without authorization to help singers "understand the song

---

[11]   Moreover, Audible's linking to dictionary definitions and Wikipedia entries for Distributed Text does not support its transformative argument as it does not change the text.  If such an argument were viable, Audible could reproduce and distribute Publishers' Works in any format as long as its linked to the Internet.

[12]   *See also L.A. News Serv. v. Reuters Television Int'l*, 149 F.3d 987, 993–94 (9th Cir. 1998) (subscribers' purposes irrelevant); *L.A. News Serv. v. Tullo*, 973 F.2d 791, 797 (9th Cir. 1992) (same).

lyrics" from authorized karaoke tracks); *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 582 (6th Cir. 2007) (not transformative to provide karaoke lyrics for education purposes); *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1386 (6th Cir. 1996) (not fair use to provide students infringing coursepacks).  The purposes for which users might, hypothetically, put the undiluted distribution of content cannot justify fair use.

Finally, Audible's claimed justification for Distributed Text, based on *Sony* and *HathiTrust*, that it is fair use to make works available for the print disabled, Def.'s Br. 24, is fundamentally misplaced; both holdings are based on the legislative history that emphasized how making works available for the print-disabled should be fair use.  *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 430 n.12 (1983); *HathiTrust*, 755 F.3d at 102.  This does not help Audible.  **First**, this case does not implicate the print-disabled, and Distributed Text serves a mass market.  **Second**, the Second Circuit explicitly held that "providing expanded access to the print disabled is not 'transformative'" because, although it may "enable[] a larger audience to read those works . . . the underlying purpose . . . is the same as the author's original purpose."[13]

2.   Factor Two: The Works are Fictional and Creative

As to the second factor ("the nature of the copyrighted work"), it is "well settled that creative and fictional works are generally more deserving of protection than factual works." *Warner Bros. Enm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 549 (S.D.N.Y. 2008).  As the Works are creative and, in most cases, fictional, Pls.' Br. 3, 10, this factor militates against fair use.  *See Infinity*, 150 F.3d at 109; *see also Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d

---

[13]   Contrary to Audible's claim that *Google Books* "rejected [the] theory" that digitizing books creates a derivative work, Def.'s Br. 22 n.7, the court held the opposite.  804 F.3d at 226 ("converting . . . books into a digitized form and making that digitized version accessible to the public" would be "strong" claim); *HathiTrust*, 755 F.3d at 95 ("Paradigmatic examples of derivative works include . . . the recasting of a novel as an e-book or an audiobook."); Pls.' Br. 13.

132, 143–144 (2d Cir. 1998); *Twin Peaks Prods.*, 996 F.2d at 1376.  Audible's attempt to

minimize the importance of this factor, which clearly favors Publishers, by relying on its claimed

transformative purpose, Def.'s Br. 26, fails as its use is not transformative.  *See supra* 8.

      3.  <u>Factor Three: The Distributed Text is the Entirety of the Works</u>

      As to the third factor ("the amount and substantiality of the portion used in relation to the

copyrighted work as a whole"), Audible argues that it uses no more than necessary for its

purposes: that is, the entirety of the Works.  But the Second Circuit has held that when copying is

"wholesale," a defendant "cannot benefit from the third factor."  *Davis*, 246 F.3d at 175.

Moreover, it does not matter whether a work is divided up and distributed in segments.  Where a

service "makes available virtually the entirety" of the plaintiff's content, the third factor "clearly

favors" the plaintiff.  *TVEyes*, 883 F.3d at 179 (distribution of television broadcasts in up to 10-

minute segments was both "extensive" and "inclusive of all that is 'important' from the

copyrighted work").  As Audible is providing the entirety of the Works, Pls.' Br. 7, this factor

heavily weighs against fair use.  *Harper*, 471 U.S. at 565 (verbatim copying evidences

qualitative value of copied material); *Weissman v. Freeman*, 868 F.2d 1313, 1325 (2d Cir. 1989)

(copying of work word-for-word, even with "slight additions," weighed against a finding of fair

use); *ASCAP*, 599 F. Supp. 2d at 431 (substantial taking given verbatim copying).

      Audible again tries to justify its substantial copying and distribution of text by comparing

Distributed Text to Google Books' "snippets," Def.'s Br. 27.  But whereas the entire legal

foundation of *Google Books* was that Google's search function did not distribute the books,

*supra* 6, Audible distributes the entire text of Publishers' Works.  Pls.' Br. 7; *TVEyes*, 883 F.3d

at 179 (distinguishing *Google Books* based on defendant providing all of the plaintiff's content).

Audible also claims that it is permitted to provide the entire text because its customers "have

paid Plaintiffs for a license to receive precisely that information," Def.'s Br. 28, but it again

ignores the critical difference between rights to an audiobook and to its underlying text.  *See supra* 5 n.4.  Listeners have paid for the right to *listen*, not to *read*.[14]

4.   Factor Four: The Distributed Text Affects the Markets for and Value of the Works

As to the fourth factor ("the effect of the use upon the potential market for or value of the copyrighted work"), courts consider the effect on the market for not only the original work, but also the market for derivative works and whether unrestricted and widespread conduct like the defendant's would cause additional harm.  *Campbell*, 510 U.S. at 590; *Harper*, 571 U.S. at 568.[15]

Audible asserts that Distributed Text does not usurp the market of the Works and repeatedly dismisses Publisher's harm as "speculative."  As Publishers detailed in their opening brief through evidentiary submissions, however, the harms caused by Distributed Text will be legion.  ***First***, Distributed Text will directly compete with existing markets for the Works' text and for cross-format services, replacing Publishers as the providers of their own content.  Pls.' Br. 16–17, 20.  The harm from a defendant replacing the plaintiff "as the supplier of [its own content] to meet the demand of his customers" is "precisely the kind of harm the fourth factor aims to prevent."  *Infinity*, 150 F.3d at 111; *see Davis*, 246 F.3d at 175–76 ("market substitute" weighs strongly against a finding of fair use); *Wainwright Sec., Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 96 (2d Cir. 1977) (no fair use where plaintiff's reports "fulfill[ed] the demand for the original work").  Audible's suggestion that Distributed Text will not be a substitute, Def.'s Br. 29, is just wrong. As shown by the side-by-side video when Distributed Text is compared to

---

[14]   Audible's cases are inapposite and favor Publishers.  *See Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 449 (2014) (copyright infringement to transmit television broadcasts to subscribers even though subscribers were authorized to receive them directly); *ReDigi*, 910 F.3d at 662 (factor three weighed against fair use as the defendant's "system makes identical copies of the whole of Plaintiffs' copyrighted sound recordings").

[15]   Further, the Supreme Court has recognized an effective presumption of market harm in the "context of verbatim copying of the original in its entirety for commercial purposes." *Campbell*, 510 U.S. at 591 ("[W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects . . . of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." (internal quotation marks, citations and alterations omitted)).

Immersion Reading, the similarities are striking.  *See* Cendali 2d Decl.
Ex. 2.  The similarity is also shown by the side by side images at right.
*Id.*  Moreover, although Audible claims that "an audiobook listener . . . is
unlikely to purchase an additional copy of that title in any other form,"
Def.'s Br. 29, it admits that users purchase both audiobooks and Kindle eBooks for use with
Audible Immersion.  Def.'s Br. 10; Stern Decl. ¶ 25.[16]



**Second**, it is well established that market harm exists where the defendant "avoid[s]

paying 'the customary price'" for the work because it diminishes the opportunity to "license to

others who might regard [the work] as preempted by the [defendant's use]."  *Davis*, 246 F.3d at

176.  In other words, distributing a work without a license weighs against fair use as it "cheapens

the value of [the] work by competing with companies that do pay a licensing fee."  *Meltwater*,

931 F. Supp. 2d at 559, 561 ("Where there is a fully functioning market for the infringer's use of

the copyrighted material, it will be difficult for the infringing party to show that it made fair use

without paying a licensing fee.").  Audible is not paying Publishers to provide Distributed Text.

Pls.' Br. 22.  Although Audible attempts to limit the universe of lost sales to "speech-to-text

generated audiobook captions," and claims that there is no potential market for such use, Def.'s

Br. 30, this argument is illogical.  Text is text (*how* the text is made is irrelevant), and Publishers

have shown that cross-format products are an existing, significant business.[17]  Pls.' Br. 18.  Thus,

---

[16]   Audible attempts to downplay this harm by suggesting the existence of a quantitative harm threshold, Def.'s Br.
30, but it is well-established that this factor weighs against fair use even where a plaintiff cannot show "actual .
. . monetary loss," *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1119 (9th
Cir. 2000), or "a decline in the number of licensing requests."  *Ringgold v. Black Entm't Television, Inc.*, 126
F.3d 70, 81 (2d Cir. 1997); *see Castle Rock*, 150 F.3d at 136 (affirming finding of market harm even though
there was "no evidence that *The SAT*'s publication diminished *Seinfeld*'s profitability, and in fact *Seinfeld*'s
audience grew after *The SAT* was first published").  The question merely is whether Distributed Text will affect
Publishers' traditional, reasonable, or likely to be developed markets.  *Ringgold*, 126 F.3d at 81.  It clearly will.

[17]   In addition to the harm to actual markets, Distributed Text clearly harms potential markets to the extent they do
not overlap with the considerable use already made of Publishers' Works.  *See TVEyes*, 883 F.3d at 180.

this too weighs against fair use. *TVEyes*, 883 F.3d at 180 (fourth factor favored plaintiff where defendant was "depriving [plaintiff] of licensing revenues from [defendant] or from similar entities"); *ASCAP*, 599 F. Supp. 2d at 432 ("By using ASCAP music without compensating ASCAP, applicant avoids paying the 'customary price' ASCAP is entitled to charge for the use of its songs." (citing *Davis*, 246 F.3d at 176)).

**Third**, nowhere does Audible deny that Distributed Text will devalue the Works by providing it as a free add-on, undermining Publishers' pricing models and competing services. Pls.' Br. 17–18; *Video-Cinema Films, Inc. v. Lloyd E. Rigler-Lawrence E. Deutsch Found.*, No. 04 Civ. 5332, 2005 WL 2875327, at *8 (S.D.N.Y. Nov. 2, 2005) (erosion of commercial market for video clips of performances by providing those clips for free was sufficient to support finding of no fair use, despite educational and non-commercial purpose). This also shows harm.

As Audible's use of Publishers' Works—particularly if it became widespread[18]— threatens numerous original and derivative markets for the Works, and clearly devalues them by providing their text essentially for free, the fourth factor heavily weighs against fair use. *See Ringgold*, 126 F.3d at 81 (defendant's conduct in using plaintiff's work for its intended purpose without compensation, if widespread, would adversely impact the market for licensing plaintiff's work and, thus, weighed against fair use).

Finally, despite Audible's repetitious claim to provide a public benefit, Def.'s Br. 30, the promised benefits of Distributed Text are unsupportable. *See* Pls.' Br. 25; *infra* 20. Moreover, courts do not myopically focus on the alleged benefits provided by the defendant's use. Rather, the Supreme Court has made clear that "copyright itself [is intended] to be the engine of free expression," *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003), and "the public has a compelling

---

[18] Audible has not denied that if everyone were permitted to purchase audiobooks, recast them as text, and then distribute that text to the consuming public, the above noted harms would grow exponentially.

interest in protecting copyright owners' . . . rights to their work and the economic incentive to continue creating." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012). Thus, any fair use analysis must consider the policies, incentives, and purposes on which copyright law is based. *See Campbell*, 510 U.S. at 578; *Harper*, 471 U.S. at 545–46, 560 (admonishing courts that "gave insufficient deference to the scheme established by the Copyright Act for fostering the original works that provide the seed and substance of this harvest"). Those purposes include "motivat[ing] the creative activity of authors . . . by [providing] a special reward," *Sony*, 464 U.S. at 429, and ensuring that copyright owners receive "a fair return for their labors." *Harper & Row*, 471 U.S. at 546. As "[i]nadequate protections for copyright owners can threaten the very store of knowledge to be accessed," it is essential that this Court consider the public interest in enforcing Publishers' copyrights. *WPIX*, 691 F.3d at 287; Pls.' Br. 23–25.

As each of the factors militates against a finding of fair use, the balance tips heavily in favor of Publishers, and Audible will be unable to satisfy its burden. *Infinity*, 150 F.3d at 107.

### C.  Audible Cannot Avoid Secondary Liability Based on its Fair Use Claim

The Court need not reach secondary liability as Audible is directly liable. In any case, Audible concedes the elements of secondary liability for the purposes of this motion, instead merely arguing that its users engage in fair use. Def.'s Br. 31-32. Despite Audible's conclusory assertion that it would be fair use for its customers to create and disseminate Distributed Text for the same reasons as Audible, Def.'s Br. 32, Audible has not addressed why its customers' creation of an unauthorized derivative of Publishers' Works would be fair use under these circumstances. Fair use is Audible's burden to prove. It has not done so.[19]

---

[19]   Audible's reliance on other transcription-based tools, which have not even been litigated, misses the mark. As a legal matter, its supporting cases are inapposite. Unlike the users in *Sony* who received telecasts legitimately and merely saved them for later viewing, 464 U.S. at 447, Audible's customers are not otherwise entitled to receive the text of Publishers' Works from Audible. And *Texaco* did not decide the question of whether it was

## II.  PUBLISHERS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Publishers demonstrated in their opening brief that Distributed Text will harm them in four distinct ways.  Pls.' Br. 16–21.  ***First***, Publishers made clear that the text of their Works will be devalued when offered by Audible as a free add-on.  Pls.' Br. 17–18.  Audible does not address this form of harm, thereby tacitly conceding that Publishers will be harmed by such devaluation.  For this reason alone, a likelihood of irreparable harm has been established.

*Next*, Publishers detailed how Distributed Text directly competes with and thereby harms their offerings.  Pls.' Br. 16–17.  Audible's sole response was to state that Publishers are engaged in "speculation and conjecture."  Def.'s Br. 34.  On the contrary, Publishers produced detailed declarations from numerous publishing executives and other employees, each of whom explained the adverse consequences of Distributed Text.  This is precisely the type of evidence on which the Second Circuit in *WPIX* affirmed the district court's grant of an injunction.  691 F.3d 275, *aff'g*, 765 F.Supp.2d 594, 617 (S.D.N.Y. 2011).  If speculation is at issue, it can be found in Audible's briefing.  It has offered no declarations describing the effect that Distributed Text would have on Publishers' Works or the publishing industry.  If Audible does not offer Distributed Text, at least some consumers *will* purchase authorized print books or eBooks.  Audible's cited case, *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, No. 15 Civ. 4244, 2016 WL 4742317, *4 (S.D.N.Y. Sept. 12, 2016), is thus inapplicable.

***Then***, Publishers showed Distributed Text causes a loss of control over the means by which their Works are distributed to the public.  Pls.' Br. 18–19.  Audible's sole response to Publishers' concern was that the first time that a consumer activates Distributed Text she will see

---

fair use for the professor conducting research to make complete copies of the plaintiff's articles.  60 F.3d at 916. In any case, Audible's users are not conducting research; they are reading Publishers' Works.  Moreover, the transcription services Audible cites are not work-specific.  Reisbaum Decl. Exs. B–D.  By contrast, Audible selects the content that it will transcribe and markets a service that competes with the Works.

a message that states: "Captions are computer generated.  Tyyppos [sic] may happen."  Stern

Decl. ¶ 20; Def.'s Br. 34.  This only serves to highlight Publishers' loss of control as Audible has

unilaterally replaced them as the arbiter of quality or lack thereof.  Moreover, Audible provides

no support for the idea that consumers will remember this message, let unknown understand it to

mean that Publishers or their authors did not authorize Distributed Text.  Audible wholly ignores

the fact that loss of "control[]"over Publishers' "carefully orchestrated" plans for their

copyrighted works itself is irreparable harm.  *HarperCollins Publishers, LLC v. Gawker Media

LLC*, 721 F. Supp. 2d 303, 307 (S.D.N.Y. 2010); *see also WPIX*, 691 F.3d at 285 (same).[20]

   ***Finally***, Publishers explained why monetary damages are insufficient, citing numerous

cases holding that copyright infringement damages are particularly difficult to calculate.  Pls.'

Br. 19–21.  Audible responded by merely stating that "a court *may* be able to 'award meaningful

monetary relief.'"  Def.'s Br. 35 (emphasis added).  It, however, does not provide any evidence

as to why monetary relief is adequate in *this* case,[21] and the sole case on which it relies is an out-

of-Circuit decision where the "copyright holder present[ed] no evidence of actual harm."  *TD

Bank N.A. v. Hill*, 928 F.3d 259, 283 (3d Cir. 2019).  And even the Third Circuit confirmed that

not "all copyright infringement can be adequately remedied through damages" as the

"availability of some legal remedy does not mean such a remedy is adequate."  *Id.*

   Given the clear likelihood of irreparable harm presented by the undiluted distribution of

the text of Publishers' Works to consumers, Audible's final suggestion that its service could be

---

[20]   Audible's cited cases are distinguishable.  *Blassingame v. Yale Univ.*, No. 3:02 Civ. 2009, 2004 WL 1534196, at *2 (D. Conn. July 6, 2004) (unlike Publishers, plaintiff "did not indicate the nature of such [reputational] damage"); *Fox Ins. Co. v. Envision Pharm. Holdings, Inc.*, No. 09 Civ. 0237, 2009 WL 790312, at *7 (E.D.N.Y. Mar. 23, 2009) (plaintiff did not substantiate why defendant's actions caused reputational harm).

[21]   Audible also claims that monetary relief is adequate because it views Publishers' claim as one of contract, rather than copyright.  Def.'s Br. 33–34.  But as this is a copyright case, Audible's digression is inapposite.  *See supra* 3.  In any case, preliminary injunctions are awarded in breach of contract cases, too.  *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 29 (2d Cir. 1995); *Fox*, 2009 WL 790312, at *7.

disabled if Publishers were to succeed in this case, Def.'s Br. 35, rings hollow as Publishers would not be protected during the pendency of this litigation.  Audible has not refuted Publishers' irreparable harm evidence; an injunction is thus warranted to preserve the *status quo*.

### III. THE BALANCE OF HARDSHIPS FAVORS PUBLISHERS

As discussed above, Publishers face irreparable harm from Distributed Text.  *See supra* 17; Pls.' Br. 21–22.  By contrast, Audible has not asserted any form of economic injury or specific hardship that would suggest a preliminary injunction should not issue.  Nor could it— public reports indicate that Audible will be releasing a version of Distributed Text that includes only public domain text, Cendali 2d Decl. Ex. C, which is exactly what Publishers explained Audible could do to if it wanted to launch Audile Captions.  Pls.' Br. 22.  Moreover, Audible's own cases serve to highlight its inability to establish that the balance of hardships favor it, as an injunction in this case will not put Audible "out of business," *Random House, Inc. v. Rosetta Books LLC*, 83 F.3d 490 (2d Cir. 2002), shut down an entire product line, *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995); *Waddington N. Am. Bus. Trust v. EMI Plastics, Inc.*, No. 02 Civ. 3781, 2002 WL 2031372, at *10 (E.D.N.Y. Sept. 5, 2002), or cause an individual to lose his job.  *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 586 (S.D.N.Y. 2009).  Audible thus tries to shift the focus away from its own obvious lack of harm by repeating its arguments concerning Publishers' irreparable harm and the sufficiency of monetary damages.  Def.'s Br. 36.  As discussed above, however, Audible's arguments are meritless.  *See supra* 17.

Faced with no harm to itself, Audible conflates the balance of hardships with its claim that Distributed Text provides a public benefit, Def.'s Br. 36, but those inquiries are legally distinct.  *See* Pls.' Br. 11.  In any case, Audible fails to address Publishers' cases indicating that "a defendant 'cannot be legally harmed by the fact that it cannot continue' infringing a plaintiff's copyrighted works.'"  Pls.' Br. 23 (quoting *WPIX*, 691 F.3d at 287).  And Distributed Text, in

any case, will not provide these claimed public benefits.  *See infra* 20.

## IV. THE PUBLIC INTEREST SUPPORTS INJUNCTIVE RELIEF

Audible does not address the clear public interest in enforcing copyright law, which provides incentives to create new works, and protects authors and Publishers, Pls.' Br. 23–24, tacitly admitting that those concerns favor Publishers.  Instead, Audible merely restates how useful it believes Distributed Text will be, Def.'s Br. 36, but Publishers already explained that Distributed Text will not accomplish those goals.  Pls.' Br. 25.  Dr. Bridges details, moreover, that literacy professionals seek to provide "considerate" text (*i.e.*, text that is approachable, authentic, and well-designed), whereas "inconsiderate" text (*i.e.*, text that is disorganized, poorly structured, or hard to understand) is detrimental to readers.  *See generally* Bridges Decl.  Audible should not be permitted to sanctimoniously wrap itself in the cloak of education when it has not provided any scholarship supporting its claim that Distributed Text serves such a purpose.  At any rate, any claimed benefit could be provided by offering public domain classics well suited to classroom use.  Further, contrary to Audible's assertion that an injunction would "force listeners seeking this functionality to use other . . .  technologies . . . without any corresponding benefits to Plaintiffs," Def.'s Br. 36–37, Audible's customers could use Immersion Reading to accomplish each of Audible's goals, thereby helping students while compensating Publishers.  Pls.' Br. 6.

## CONCLUSION

Audible's cheeky request that Publishers "embrace" Distributed Text so that Audible can profit by spreading the joy of storytelling, Def.'s Br. 37, illustrates Audible's deeply flawed understanding of the incentives provided by copyright law, best practices in literacy and literature engagement, and the resulting harms faced by Publishers and authors.  For the foregoing reasons, Publishers respectfully request that this Court enter an order preliminarily enjoining Audible from providing Distributed Text to consumers.

Dated:  New York, New York
      September 20, 2019               */s/ Dale M. Cendali*
                                         Dale M. Cendali
                                         Joshua L. Simmons
                                         Jordan M. Romanoff
                                         KIRKLAND & ELLIS LLP
                                         601 Lexington Avenue
                                         New York, New York  10022
                                         Telephone: (212) 446-4800
                                         Facsimile: (212) 446-4900
                                         dale.cendali@kirkland.com
                                         joshua.simmons@kirkland.com
                                         jordan.romanoff@kirkland.com

                                         *Attorneys for Plaintiffs*